Sathya Gosselin (SBN 269171)
Swathi Bojedla (*pro hac vice* motion forthcoming)
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
sgosselin@hausfeld.com
sbojedla@hausfeld.com

*Counsel for Yelp Inc.*

*(additional counsel listed on signature page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **YELP INC.,**<br>350 Mission Street, 10th Floor<br>San Francisco, California 94105,<br><br>    Plaintiff,<br><br> v.<br><br>**GOOGLE LLC**,<br>1600 Amphitheatre Parkway<br>Mountain View, California 94043,<br><br>    Defendant. | Case No. 3:24-cv-6101<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION................................................................................................ 1

JURISDICTION AND VENUE.......................................................................... 5

INTRADISTRICT ASSIGNMENT.................................................................... 6

PARTIES ............................................................................................................. 6

FACTUAL ALLEGATIONS .............................................................................. 7

I.    Google's History and the Development of Internet Search ................................. 7

II.    Search Monetization and Architecture.................................................... 8

MARKET ALLEGATIONS ............................................................................ 15

I.    General Search Services ...................................................................... 15

A.    General Search Services in the United States Is a Relevant Antitrust Market ............ 15

B.    Google Has Monopoly Power in the General Search Services Market in the United States ............................................................................................ 18

II.    Local Search Services ........................................................................ 22

A.    Local Search Services in the United States Is a Relevant Antitrust Market. ............... 22

B.    Google Has Monopoly Power in the Local Search Services Market in the United States. ........................................................................................... 26

III.    Local Search Advertising.................................................................. 28

A.    Local Search Advertising in the United States Is a Relevant Product Market. ............ 28

B.    Google Has Market Power in the Local Search Advertising Market in the United States. ........................................................................................... 34

ANTICOMPETITIVE CONDUCT IN THE RELEVANT MARKETS ............................. 36

I.    Google's Anticompetitive Conduct in Local Search Services Market ............................. 36

II.    Google's Anticompetitive Conduct in Local Search Advertising ............................... 48

III.    Yelp Has Been Injured by Google's Anticompetitive Conduct................................... 49

IV.    Google's Anticompetitive Conduct Persists and Recurs Every Day ........................... 51

INTERSTATE COMMERCE AND TRADE ............................................................. 51

CLAIMS FOR RELIEF .................................................................................. 52

COMPLAINT

1

**PRAYER FOR RELIEF**........................................................................ 62

**JURY DEMAND**................................................................................ 63

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Yelp Inc. brings this action under Section 2 of the Sherman Act, 15 U.S.C. § 2, and California's Unfair Competition Law to safeguard competition, protect consumer choice, recover damages, and prevent Google LLC from engaging in various anticompetitive practices designed to monopolize the markets for local search services and local search advertising.

## INTRODUCTION

1.     Americans rely on internet search services for high-quality information about the world around them, responsive to their search queries. In key areas, however, Google—a multi-trillion-dollar company and confirmed monopolist—abuses its unlawfully maintained dominance in general internet search to steer users to its own inferior content to pad its massive revenues. As a result, consumers, businesses, and competition all suffer.

2.     This is a case about Google, the largest information gatekeeper in existence, abandoning its stated mission to deliver the best information available to its consumers and instead forcing its own low-quality local search content on them. Google's scheme prevents businesses from reaching customers without paying Google and starves competitors of the traffic and revenues that would allow them to achieve scale and pose a competitive constraint on Google's conduct.

3.     Yelp was founded in 2004 with a mission to connect consumers with great local businesses through local search. Through its websites and mobile applications, Yelp empowers consumers nationwide to share—and learn from—a wide variety of content, including detailed and passionate reviews about businesses in thousands of neighborhoods. In turn, local businesses providing exceptional service can establish and promote themselves on Yelp. To sustain its business, Yelp sells local search advertising, enabling businesses to advertise directly to potential customers seeking specific businesses and services within particular neighborhoods.

4.     Since the dawn of the world wide web, people have harnessed its information-sharing potential to learn more about, and share information about, local businesses, creating an opportunity for local search providers to aggregate this information to benefit consumers (and provide advertising opportunities). But Google, which was late to market in this respect, has never been able to develop a high-quality local search service to rival that of Yelp and other local

COMPLAINT

search platforms. Unwilling to invest or innovate to attract users in a competitive environment, Google has instead relied on a simple but effective strategy—it uses its monopoly power in general search to make sure that users never get to local search competitors in the first instance, diverting traffic away from those rivals and toward Google's own inferior local search product.

5.      Google's strategy is part of a deliberate plot to self-preference its own products in all aspects of search, no matter the attendant costs to consumers or market effects. It openly admits that its policy is to put its own products ahead of competitors, regardless of quality. In discussing an early search product that pioneered this approach, Marissa Meyer, Google's former Vice President of Search Products and User Experience, explained that "when we rolled out Google Finance[1] we did put the Google link first" ahead of the "top five finance sites in their order of popularity" and "that's actually been a policy then, because of Finance, we implemented in other places. So for Google Maps, again, it's the first link…and after that it's ranked usually by popularity."[2]

6.      It was not always this way. When Google's general search engine launched in 1998, it was lauded as an unbiased and impartial matchmaker sitting between consumers and all the web had to offer. Google's algorithm, also known as its "organic" search, elevated the best of the internet, incentivizing companies to put forth their finest products and services to be found by consumers. As Google's co-founder Larry Page put it in 2004: "We want to get you out of Google and to the right place as fast as possible." And Google has dominated the field. As United States District Judge Amit Mehta (D.D.C.) recently concluded, following a months-long bench trial, Google has acquired an 89.2% share of the general search market, and it is the first place that most users turn to when they have an inquiry, effectively serving as the "gateway" to the internet. Each day, roughly 9 billion searches are performed using Google's general search engine. Google has tremendous, singular influence over what people see online.

---

[1] A Google service that provides financial information, e.g. real-time market quotes, business news, and analytics.
[2] @ChrisPavlovski, X (June 13, 2024, 12:16 PM), https://x.com/chrispavlovski/status/1801287521755709772.

2

COMPLAINT

7.      Google exists in a search ecosystem with specialized vertical providers ("SVPs"), like Yelp, which are platforms that respond to user queries on a particular subject matter with proprietary, structured data that is not available elsewhere and made possible only through sustained investment. Just as Yelp provides a vertical search option for local businesses, so too does Expedia provide a vertical search option for travel, Glassdoor for jobs and employers, and Zillow for apartment rentals and real estate. Consumers can use Google as a general search gateway to find and access these vertical search platforms (and often do), or they can go directly to an SVP.

8.      SVPs typically generate revenue by offering the best narrow and deep subject-matter information possible, thereby enticing consumers to use their search platform, and then selling advertisements, subscriptions, or monetizing their specialized content in other ways. Advertising revenue is the lifeblood of many online businesses; it allows companies like Yelp to provide services and invest in continued innovation, content moderation, and user design. And local search—which enables consumers to search locales for relevant businesses, professionals, services, and activities and receive detailed information, including passionate and detailed consumer reviews and other content—accounts for roughly a third of all desktop search volume and over half of mobile search on Google. On a level playing field, SVPs like Yelp are a threat to Google, which sells advertising in conjunction with search queries, given their ability to siphon traffic (and thus revenue) away from it. As such, Google has sought to create and steadily expand its own foothold in the local search market so that it can sell more of its own advertising, as opposed to sending consumers to Yelp (or any other local search providers), however much Google's own organic algorithm suggests the match.

9.      For years, when Google was focused on organic search and creating the best possible general search engine, Yelp peacefully coexisted with Google, working together and licensing Yelp's user-generated content for Google's use. Google even sought to acquire Yelp, recognizing the quality and value of the local content available on Yelp. But when Yelp rebuffed Google, Google began a years-long mission to stymie Yelp's ability to reach consumers through Google's dominant general search platform, with the goal of keeping Yelp's would-be users on

3

Google platforms instead. Google has engaged in numerous anti-competitive practices, including stealing information from Yelp's website and passing it off as Google's own; preferencing Google's own local search results over Yelp's; implementing a "OneBox" feature to prioritize Google's own inferior local search services at the top of the search results page; and even going so far as to tweak its algorithm and steer customers away from Yelp. Google has undertaken these practices not to provide a better product to consumers or compete fairly, but instead to enhance its own bottom line and stifle competition. And consumers and competition have been harmed in myriad ways, forced to contend with an inferior product and obscured, objectively superior results (even by Google's own indicators).

10.    Antitrust authorities worldwide have scrutinized similar conduct by Google, resulting in numerous antitrust probes and billions of dollars in fines. From 2011-13, for example, the Federal Trade Commission investigated Google's appropriation of content from SVPs, and FTC staff concluded that Google's conduct violated Section 2 of the Sherman Act. As part of this inquiry, FTC staff authored a report finding Google self-preferenced its own inferior vertical search results over its competitors, depriving them of an equal opportunity to compete for customers. In 2017, the European Commission fined Google €2.42 billion for abusing its dominance as a search engine and favoring its own, ad-sponsored comparison-shopping service over organic search results for competing comparison-shopping sites. And earlier this month, in *United States v. Google*, a case brought by the Department of Justice and various state attorneys general, Judge Mehta found Google liable for violating the federal antitrust laws by unlawfully maintaining its monopoly in the markets for general search services and general search text ads through exclusive distribution agreements with purely anticompetitive effects.

11.    Google uses its dominant position in the market for general search services to give itself an advantage in various adjacent markets, including the markets for local search services and for local search advertising. This monopoly leveraging undermines competition in those markets by, e.g., preventing competing providers from achieving scale, reaching customers, and building content. When competitors cannot achieve scale, this softens the

4

COMPLAINT

competitive constraints on Google on both the consumer and advertiser side. On the consumer side, this means less need for Google to invest in quality (e.g., by improving curation of its online reviews) and greater incentives to show less relevant but nevertheless monetizable results. On the advertiser side, Google is able to extract higher fees from advertisers.

12.     Within the local search services market, Google's self-preferencing and gatekeeping has resulted in stagnant or diminished traffic to Yelp and other local search competitors despite objectively superior offerings, as confirmed by Google's own quality indicators. This undermining of competitive pressure allows Google to offer an inferior product to users without consequence. Google's conduct has injured Yelp through lower traffic, reduced advertising revenues, raising Yelp's own costs, and impaired network effects that come with fewer new and returning users.

13.     The same is true for the local search advertising market. When a customer seeks a local business online, such as a plumber or hairstylist, they typically turn to local search providers to find that business. Local and national businesses purchase local search advertising (delivered in response to particular local search queries) to help ensure that customers are steered toward them. Google, Yelp, and other local search providers compete fiercely for local search advertising dollars, but Google has leveraged its dominant position in general search to ensure that more local search advertisers purchase local search advertising from Google, as Google keeps users within its own inferior local search vertical and away from Yelp and other local competitors. In this way, Google also suppresses competition in the market for local search advertising.

14.     By this action, Yelp seeks injunctive relief, monetary damages, restitution, pre- and post-judgment interest, its attorney fees, costs, and expenses, and a declaratory judgment that Google's conduct violates the antitrust laws.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, and 1367, and the Clayton Act, 15 U.S.C. §§ 4, 15, and 26.

COMPLAINT

16. Venue is proper in this District under the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b). A substantial part of the events giving rise to the claims alleged herein occurred in the Northern District of California, Google conducts substantial business in the Northern District of California, and Google resides within the Northern District of California.

17. This Court also has personal jurisdiction over Google. Again, Google conducts substantial business in the Northern District of California, and Google resides within the Northern District of California.

## INTRADISTRICT ASSIGNMENT

18. Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a particular Division of this District and instead shall be assigned on a District-wide basis.

## PARTIES

19. Plaintiff Yelp Inc. is a corporation organized and existing under the laws of Delaware and headquartered in San Francisco, California. Yelp was founded in July 2004 by Jeremy Stoppelman, its current CEO, and his former colleague from PayPal, Russel Simmons, to provide a local search platform to connect consumers with great local businesses. Yelp's website, Yelp.com, went live in October 2004, providing a forum for people to share their word-of-mouth recommendations for local businesses more broadly, and for local businesses to reach customers who might not otherwise have heard of them.

20. Via its websites and mobile applications, Yelp provides a one-stop local platform for consumers to easily discover, connect, and transact with local businesses across a broad range of categories. Through Yelp, consumers can find home services, restaurants, health care professionals, and more, and they can consider trusted reviews of local businesses, and other contributions, from other users (and in turn contribute their own reviews, photos, videos, and other content).

21. Yelp was born out of a need for reliable, easy-to-find information about businesses in local communities.

22. By the end of 2023, over 7.1 million active claimed local businesses were listed on Yelp's platform, with over 287 million reviews. More than 77 million consumers use Yelp

6

COMPLAINT

every month to decide how and where to spend their money. Yelp also helps small businesses reach new customers by amplifying their positive word-of-mouth. Yelp serves as a vital resource for consumers, local businesses, and advertisers nationwide.

23.     Google LLC is a limited liability company organized and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally. Google operates a general, "horizontal" search engine, as well as numerous integrated vertical search options that focus on specific content areas, such as local, product or shopping comparison, and travel. Google engages in, and its activities substantially affect, interstate trade and commerce. Google also sells advertising on searches run through its search engine.

## FACTUAL ALLEGATIONS

### I.   Google's History and the Development of Internet Search

24.     Google's aims were once noble, and its early history illustrates just how much has changed.

25.     Prior to Google's founding in 1998, early internet search engines relied on automatic indexing of web pages, focusing on keyword-based techniques to rank search results.

26.     Google co-founders Larry Page and Sergey Brin developed a novel method for general internet search. Instead of relying on keyword searching, they created a prototype (called BackRub) that crawled the internet, from page to page, following links from one page to another. As Google explains: "The web is like an ever-growing library with billions of books and no central filing system. We use software known as web crawlers to discover publicly available webpages. Crawlers look at webpages and follow links on those pages, much like you would if you were browsing content on the web. They go from link to link and bring data about those webpages back to Google's servers."

27.     Page and Brin's prototype mapped the internet through that connection of links, ranking pages more highly if other highly ranked webpages linked to it. This method, called PageRank, was a way to quality-control internet searching, ensuring that more relevant and high-

COMPLAINT

quality information (as measured by other webpages linking to that information) would move to the top of the search rankings. According to Google, PageRank operated "by counting the number and quality of links to a page to determine a rough estimate of how important the website is. The underlying assumption is that more important websites are likely to receive more links from other websites."[3]

28.    Page and Brin launched their search engine Google.com in 1998. Google's search engine used an algorithm based on PageRank, which still underlies Google search today.

29.    In its early days, Google revolutionized and democratized the internet. Its algorithm focused on returning quality results to users. As Page said in Google's initial public offering in 2004, "We want you to come to Google and quickly find what you want. Then we're happy to send you to the other sites. … We want to get you out of Google and to the right place as fast as possible." Acknowledging its important role in providing its "users unbiased access to information, focusing on their needs and giving them the best products and services," Google's unofficial motto, incorporated into the Google Code of Conduct, was: "Don't be evil." Unfortunately, upon obtaining dominance in general search, Google's desire to provide "unbiased" access to information vanished.

## II.    Search Monetization and Architecture

30.    As Google's dominance in general search grew, it became adept at monetizing search. When consumers search the internet, they provide Google with information on their focused interest in various topics. This information is valuable to Google and to advertisers, who can learn what specific terms users associate with their queries and reach customers at the point at which the customer is seeking the product or service. Starting in 2000, Google monetized that information through its AdWords program (later renamed Google Ads), which allows advertisers to purchase advertising tethered to various search terms to direct consumers to advertisers' websites. Starting in 2002, Google adopted a cost-per-click auction model in which advertisers

---

[3] *Google, Facts About Google and Competition: About Search*, The Wayback Machine, https://web.archive.org/web/20111104131332/https://www.google.com/competition/howgoogl esearchworks.html.

8

would bid on how much to pay per ad click. The winning bidder would receive preferential advertising placement on the search engine results page, or "SERP," when those keywords were used, and Google would receive a payment per click for each time a user clicked through the ad to the advertiser's site.

31.     This type of advertising is referred to as "search advertising" and includes any ad served on the SERP in response to a consumer's real-time search query. These can include sponsored links, which are simply text links to websites with related copy, or "product listing ads" ("PLAs"), also known as shopping ads, which include images. Search advertising is a powerful form of advertising because it captures the user at the moment of intent, when the user indicates that they want to purchase a specific product or service. As a result, advertisers view search advertising as a particularly efficient way at driving "conversion" from curiosity to intent to actual purchases.

32.     Within the Google SERP, those who purchase search advertising receive preferential placement at the top of the SERP, above links to organic search results. When a user submits a commercial query to Google (as recognized as such by Google's algorithm), generally the first results are sponsored results, rather than those organically selected by Google's algorithm as the highest-quality option.

33.     High placement on Google's SERP (either through paid advertising or through organic search results) is key to driving traffic. Consumers overwhelmingly focus on the top of the results page, the "visible area" that users immediately see when they open a webpage without having to scroll down or across.[4] The first-ranked search result is by far the most likely to receive clicks, accounting for 31% of user clicks.[5] Click-through rates decline precipitously from

---

[4] Dirk Lewandowski, Sebastian Sünkler, & Nurce Yagci, *The influence of search engine optimization on Google's results: A multi-dimensional approach for detecting SEO*, WebSci '21: Proceedings of the 13th ACM Web Science Conference 2021, at 12-20, The ACM Digital Library (June 22, 2021), https://doi.org/10.1145/3447535.3462479.

[5] Sebastian Schultheiß, Sebastian Sünkler, and Dirk Lewandowski, *We still trust in google, but less than 10 years ago: An eye-tracking study*, Information Research Vol. 23 No. 3 (September 2018), https://informationr.net/ir/23-3/paper799.html; Owen Fay, *Value Of #1 Position On Google – Positional Analysis Study [2023]*, Poll The People (May 6, 2022), https://pollthepeople.app/the-value-of-google-result-positioning-3/.

COMPLAINT

there—results six to ten, e.g., make up 3.73% of clicks combined.[6] Consumers also tend to trust Google's positioning of search results, believing that Google's search result rankings are accurate and trustworthy, sometimes over even their own relevance judgments.

34.     Google generates most of its revenue from search advertising. In 2023, Google brought in a staggering $175 billion in revenue from search advertising, accounting for the vast majority of its overall revenue. Search advertising is a key component of Google's business model, and it creates incentives to keep users *within* Google and its own properties, in contrast to its original promise of getting users out of Google and to the right place as fast as possible.

35.     As early as 2005, Google felt threatened by the rise of SVPs, which provide users with specialized search results and proprietary data that can attract traffic away from Google's general search. Given the cost-per-click nature of search advertising, Google only receives advertising revenue if users click on its own search advertising, and not the search advertising of its competitors. Google realized that allowing SVPs to develop scale and entice consumers would be detrimental to its own bottom line. In one internal document, a Google product manager wrote that one threat of SVPs gaining ground would be "loss of traffic from google.com because folks search elsewhere for some queries …."[7] Another internal email noted that "Google's core business is monetizing commercial queries. If users go to competitors … long-term revenue will suffer."[8] Google grew concerned that consumers would start going directly to those SVPs, creating a "risk to our monetizable traffic."[9]

36.     Google was particularly worried that SVPs would entice advertisers away from Google. A 2008 presentation, entitled "Online Advertising Challenges: Rise of the Aggregators," highlighted Google's concerns (in this case with respect to a finance vertical website called MoneySupermarket):

---

[6] *Id.*

[7] Federal Trade Commission, Bureau of Competition, Staff Memorandum Re: Google Inc. (August 8, 2012) at 20 n.102, https://stratechery.com/wp-content/uploads/2021/03/Staff-Memo.pdf (hereinafter, "FTC Staff Memo").

[8] *Id.*

[9] *Id.*

COMPLAINT

Issue 1. Consumers migrating to MoneySupermarket. Driver: General search engines not solving consumer queries as well as specialized vertical search . . . . Consequence: Increasing proportion of visitors going directly to MoneySupermarket … Google Implication: Loss of query volumes.

Issue 2: MoneySupermarket has better advertising proposition. Driver: MoneySupermarket offers cheaper, lower risk … leads to advertisers. Google Implication: Advertiser pull: Direct advertisers switch spend to MoneySupermarket/other channels.[10]

37.     Google thus wanted to remove the risk of disintermediation—that users would bypass Google and go directly to SVPs—and the related risk that advertisers would see those SVPs as more enticing than Google. To deal with this threat to its bottom line, Google has leveraged its dominant position in general search to keep users within its confines, hoarding traffic and advertising dollars, suppressing competition, and limiting escape from its walled garden despite an awareness that consumers want choice.

38.     Beginning in the mid-2000s, Google developed certain vertical properties in-house, such as travel and shopping. Initially, Google's verticals were displayed via tabs at the top of the general SERP, but traffic was limited. As Google complained privately, "few users [were] motivated to click on our tabs …."[11] This was problematic, as Google's SVP competitors were growing to compete for user traffic and advertising dollars. To combat this threat, and to give itself a leg up over its competitors, Google moved its own vertical search results to the main SERP in OneBoxes, which were actual boxes containing search results above all else. If a user queried Google for, say, "flights to NYC," Google would send that query to its own travel vertical and return any results in a travel OneBox, at the top of the SERP and above any organic search results.

39.     In 2007, Google launched "universal search." Per a Google blog post at the time, the purpose was to "blend content from Images, Maps, Books, Video, and News"—in other words, Google's other search verticals that were previously less popular with users—with

---

[10] *Id.* at 20.
[11] *Id.* at 21.

COMPLAINT

general web results.[12] Google's SERP now included OneBoxes for each of its own relevant search verticals, typically placed above organic search results.

40.     Through universal search, which operates substantially similarly today, when a user inputs a keyword search into Google's general search browser, and Google detects that either the search relates to one of Google's own vertical search services or that the top organic result is a competitor's vertical search service, Google deploys and prominently features a OneBox with Google's own related vertical search results. For example, if a consumer searches for "flights to NYC," and the Google algorithm determines that Expedia is the most relevant search hit, Google's SERP includes Google's own travel vertical at the top, in a OneBox, above even the best result for the user, as determined by Google's own algorithm and without regard for the quality of Google's own product.

41.     Beyond its automatic positioning in a prime location at the top of the SERP, the OneBox is also distinct from organic search results because it contains additional elements, such as images, maps, or product information, unlike traditional text links in organic search results. OneBoxes are even more likely to receive attention from users than traditional links, in part because of these large, graphic-driven features. A 2015 study showed that after looking at graphic-driven features on a SERP, users drastically reduce their attention to organic search results.[13] In other words, graphic-driven features stunt users' attention to organic search results, however superior. Thus, the very architecture of Google's SERP is designed to draw users toward its own vertical and away from competitors—a far cry from its original promise.

42.     While there have been numerous changes to the SERP since 2007, including to the names of various Google verticals, the general architecture concept is the same. Today, as shown below, if a user searches for "plumber San Francisco," they will invariably first receive sponsored results, followed by Google's OneBox results, and only then can they scroll down to

---

[12] Marissa Mayer, *Universal search: The best answer is still the best answer*, Google Blog (May 16, 2007) https://googleblog.blogspot.com/2007/05/universal-search-best-answer-is-still.html.
[13] Zeyang Liu, Yiqun Liu, Ke Zhou, Min Zhang, & Shaoping Ma, *Influence of Vertical Result in Web Search Examination*, SIGIR '15: Proceedings of the 38th International ACM SIGIR Conference on Research and Development in Information Retrieval, at 193-202, The ACM Digital Library (Aug. 9, 2015), https://doi.org/10.1145/2766462.2767714.

COMPLAINT

1  see organic search results—the highest-quality, relevant results promised by Google's original
2  algorithm (including Yelp.)

### Figure 1



13

COMPLAINT

43.     Google has thus capitalized on the primacy of the top of the search page by crowding it with Google products such as OneBox, while pushing organic search results out of view. This is even more pronounced on mobile displays, like iPhones and Androids, where the smaller screen size means that a user must scroll through several screens before even reaching organic search results.

44.     Google's increased use of features like OneBox, highlighting its own offerings over its competitors, has resulted in an increasing volume of searches, including local searches, where users do not leave Google's SERP at all, called zero-click searches.[14] And even when users do click through, Google has so successfully self-preferenced its own products that 30% of clicks go to a Google property.[15] Rather than getting users out of Google and to the right place as fast as possible, Google now keeps users within its system and prevents them from going anywhere else, irrespective of the quality of its results. This benefits Google, which keeps the cost-per-click revenues from its advertisers, and harms consumers and Google's competitors, who are deprived of the ability to fairly compete for traffic and advertising dollars, including by achieving scale. After all, and as Google knows well, users heavily favor the very first search results.

45.     Google recognizes that the competition from SVPs can be intense for commercial clicks. But Google's prominent display of the OneBox and self-preferencing of its own verticals is inherently exclusionary to Google's specialized search competitors. Rather than compete on the merits with companies like Yelp, Google has effectively used the OneBox and its manipulation of search results to suppress competition for users, clicks, and advertising revenues. While Google's anticompetitive conduct has had wide-ranging negative effects on the ability of specialized search providers to gain scale and compete on a level playing field by

---

[14] Erik Fubel, Niclas Michael Groll, Patrick Gundlach, Qiwei Han, Maximilian Kaiser, *Beyond Rankings: Exploring the Impact of SERP Features on Organic Click-through Rates*, arXiv (May 31, 2023), https://arxiv.org/abs/2306.01785.

[15] Rand Fishkin, *2024 Zero-Click Search Study: For every 1,000 EU Google Searches, only 374 clicks go to the Open Web. In the US, it's 360*, SparkToro (July 1, 2024), https://sparktoro.com/blog/2024-zero-click-search-study-for-every-1000-us-google-searches-only-374-clicks-go-to-the-open-web-in-the-eu-its-360.

COMPLAINT

offering innovative, high-quality products, Google's efforts in the local search market and the local search advertising market have been especially harmful to competition, consumers, and competitors like Yelp.

## MARKET ALLEGATIONS

I.   **General Search Services**

A.   **General Search Services in the United States Is a Relevant Antitrust Market**

46.    General search services in the United States is a relevant antitrust market, as Judge Mehta recently concluded in *United States v. Google*. General search services allow consumers to find responsive information on any topic on the internet by entering keyword queries in a general search engine ("GSE") such as Google, Bing, or DuckDuckGo.

47.    GSEs answer a wide range of commercial and non-commercial queries by providing organic search results culled from an index of the world wide web. These organic results appear on the SERP, along with other search features (such as knowledge panels, maps, images, and videos) and sometimes advertising.

48.    General search services are unique because they offer consumers the convenience of a "one-stop shop" to access an extremely large and diverse volume of information across the internet. Consumers use general search services to perform various types of searches, including navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase).

49.    Other search tools, platforms, and sources of information are not reasonable substitutes for general search services. Offline and online resources, such as books, publisher websites, social media platforms, and SVPs, such as Yelp, Amazon, or Expedia, do not offer consumers the same breadth of information or "gateway" to the internet. These resources are not "one-stop shops" and cannot respond to *all* types of consumer queries, particularly navigational queries. Elizabeth Reid, Google's VP of Search testified that while general search providers "are

COMPLAINT

aiming to answer any query," SVPs "are not aiming to answer all queries" that might be posed to a general search provider like Google.[16]

50.     GSEs possess a unique infrastructure and draw on unique production facilities. GSEs crawl the open internet (or syndicate results from a general search engine that does) and convert their copy of searchable databases, or indexes. Crawling and indexing require gathering and organizing links from billions of websites on the open web. Then, in response to a query, the GSEs provide the most relevant portion of that indexed information. The technology and engineers required for GSEs to perform these tasks cost billions of dollars each year. SVPs and other internet companies, meanwhile, do not invest in crawling and indexing the web or creating search indexes, and instead allocate resources appropriate to their differing functions. Thus, SVPs possess substantially different production facilities from GSEs.

51.     There are no reasonable substitutes for general search services, and a general search service monopolist can maintain quality below the level that would prevail in a competitive market. Alternative sources like SVPs are not a suitable substitute for general search services. Dr. Hal Varian, Google's Chief Economist, testified that if Google ceased to exist, its users would just switch to Bing.[17] Firms outside the market (i.e., SVPs like Yelp, as well as social networks like Facebook) do not pose a strong competitive constraint on Google as a general search provider.

52.     One common way to determine whether a product market is properly defined is to conduct a "Small but Significant Non-Transitory Increase in Price" test. The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable for the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined and does not encompass sufficient economic

---

[16] *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.), Trial Transcript (hereinafter "Trial Tr.") 8266:19–8268:23 (Reid).

[17] Trial Tr. 195:22–196:5 (Varian); *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.) UPX0340 at -59.

COMPLAINT

substitutes. Here, however, because consumers use search engines for free, an alternative method is a Small but Significant Non-Transitory Decrease in Quality (SSNDQ) test. For example, one can measure the quality of a search engine by whether the engine returned more or less relevant results, with higher-quality search engines returning more relevant results. If a search engine degrades the quality of its search results, it is economically akin to an increase in price.

53.     Google has experienced little to no market response to general search quality reductions. A SSNDQ test is not merely theoretical here. Google itself conducted ordinary-course experiments degrading its own search quality (by, for example, increasing latency or otherwise decreasing quality for some users) for testing purposes, which showed little user response to these quality reductions. The experiments show that substitutions by users to other alternatives was limited. For example, Google's quality-degradation experiments showed that users are not responsive to increases in Google's latency, an important barometer of quality for general search services.

54.     Google has long recognized that SVPs are complementary to, and not cannibalistic of, general search services. Google's own empirical research demonstrates that increased use of SVPs does not correlate with decreased use of GSEs. Notably, Google's "Project Charlotte" showed Amazon Prime loyalty members tend to search more—not less—on Google. Prabhakar Raghavan, Google's Head of Search, explained: "Prime members who in any way intend to shop at Amazon might come to Google and do a lot of research before they do it."

55.     Tellingly, Google also measures its market share (for its general search function) against other GSEs, not against SVPs like Yelp or any others. Google likewise measures the quality of its SERP by comparison with general search rivals like Bing and DuckDuckGo. Notably, too, Google's distribution contracts with Android OEMs and carriers only prohibit partners from pre-installing other GSEs such as Bing or DuckDuckGo.

56.     Other industry participants—such as web browser companies—also recognize that GSEs form a distinct product, and that SVPs and social networks, e.g., are not like GSEs. A web browser is software that allows users to access websites on the internet, among other things. Makers of web browsers recognize that using an SVP as a default search engine would not

17

provide the same broad-based search functions as a GSE. Thus, for leading browsers such as Chrome and Safari, only GSEs are available as alternative defaults—not Yelp, other SVPs, or social media sites like Facebook.

57.    Customers likewise recognize GSEs as a distinct product. Dr. Sridhar Ramaswamy—who was a Google engineer and executive before founding and serving as CEO of Neeva, a general search start-up launched in 2017—testified that a GSE is "what we would turn to . . . when we have like any information task generally in mind." Users recognize that a GSE can provide a source of information on any topic and thus can save consumers the time and mental effort otherwise required to determine the best place to conduct each search—a convenience reinforced by GSEs being the default on the most popular search access points.

58.    The United States is a relevant geographic market for general search services, as Google recently conceded at trial. General search services available in other countries are not reasonable substitutes for general search services offered in the United States. And Google's internal analyses, for example, inventory general market shares by country, further confirming the relevant geographic market.

**B.    Google Has Monopoly Power in the General Search Services Market in the United States**

59.    Google has monopoly power in the United States general search services market. There are currently only four significant general search competitors in this market: Google, Bing, Yahoo, and DuckDuckGo. According to public data sources, Google today dominates the market with approximately 88 percent market share, followed far behind by Bing with about 5.5 percent, Yahoo with less than 4 percent, and DuckDuckGo with less than 2 percent. Figure 2 provides a more detailed breakdown from the recent *United States v. Google* proceedings.

COMPLAINT

1

**Figure 2**

2

3



10

11      60.     Over the years, Google has steadily increased its dominant position in general

12  search services—including through a sprawling array of exclusive distribution agreements—

13  and, with this dominance, its ability to influence all aspects of search. In July 2007, Google

14  estimated its general search services market share at 68 percent. By June 2013, Google estimated

15  that its share in the United States had already increased to 77 percent on desktop computers. By

16  April 2018, Google estimated that its share was 79 percent on desktop computers and 93.5

17  percent on mobile. More recently, Google has accounted for almost 90 percent of all GSE queries

18  in the United States, and almost 95 percent of queries on mobile.

19

20

21

22

23

24

25

26

27

28

19

COMPLAINT

**Figure 3**



61.    There are significant barriers to entry in general search services. The creation, maintenance, and growth of a GSE requires a significant capital investment, highly complex technology, access to effective distribution, and adequate scale. For that reason, only two U.S. firms—Google and Microsoft—maintain a comprehensive search index, which is just one, albeit fundamental, component of a GSE. Moreover, the complexity of building a GSE—including crawling, indexing, and ranking—poses a significant challenge, which elevates the entry barriers for general search providers.

62.    The licensing necessary to obtain permission to crawl websites is another potent entry barrier. GSEs need permission to crawl websites, and webmasters limit which GSEs may crawl their websites because those websites pay for the bandwidth used by a GSE to crawl their pages. As such, websites frequently permit crawling by only the most popular GSEs. Thus, nascent GSE rivals face an uphill battle accessing the websites necessary to build a representative index.

63.    Scale is also a significant barrier to entry. Scale is crucial for a GSE's viability because it affects a GSE's ability to deliver a quality search experience. As Satya Nadella,

COMPLAINT

Microsoft's CEO testified, "the more queries you see, the better search quality you're going to have by definition."[18] The scale needed to successfully compete today is greater than ever.

64.     Google's numerous exclusive distribution contracts (with browser manufacturers, with cell-phone carriers, and with hardware manufacturers, for which Google pays about $26B annually) establish and fortify entry barriers by cementing Google's status as the default, "out-of-the-box" (i.e., pre-selected) general search provider and gateway across access points. Defaults are by far the most effective method of distribution because users are highly unlikely to change default settings and switch elsewhere, as behavioral economics teaches us. "Choice architecture" through defaults has a powerful impact on consumer decisions, and the vast majority of individual searches, or queries, are carried out by habit. Both Google and its rivals have observed that other distribution methods, like marketing, simply do not generate meaningful return in usage. Google's control of the defaults on its own Chrome Browser, which is the source of approximately one-fifth of all general search queries in the United States, compounds this entry barrier.

65.     Google's overwhelming brand recognition also limits rivals' ability to enter the market and to expand market presence. "Google" is not simply a noun that refers to a general search provider or a GSE; "Google" has become a verb to describe the act of entering a search query on a GSE precisely because of Google's monopoly in the general search services market. Mr. Ramaswamy, co-founder of Neeva who led Google's search infrastructure team, testified that Google's reputation is so entrenched that when users have a negative search experience with Google, users blame themselves, affording Google a margin of error not enjoyed by new entrants.[19]

66.     In recognition of these numerous barriers to entry, venture capital firms have in recent years designated general search startups as a "no-fly" zone, refusing to invest in any challenges to Google's incumbency given the likelihood of failure. Apple's John Giannandrea

---

[18] Trial Tr. 3496:12–16 (Nadella).
[19] Trial Tr. 3741:3–3742:16 (Ramaswamy).

COMPLAINT

and Microsoft's Satya Nadella have confirmed that general search is not an area of venture-capital interest even though it is a lucrative industry.

67.     Google's large and durable market share and the significant barriers to entry in general search services demonstrate Google's monopoly power in the United States. Indeed, the dearth of entry into general search services despite Google's high and persistent profits confirms the difficulty of entering and challenging Google. Bing—which Google acknowledges is its closest competitor—has a market share of about 5.5%. And all GSEs other than Google (including Bing) have only a little more than 10% market share *combined*. The only recent market entrant—Neeva—was unable to compete successfully in the general search services market. Neeva launched in 2017 but folded in May 2023.

68.     Google's persistently high profits and its ability to raise prices or decrease quality without user flight or competitive challenges from rivals are also sure signs of monopoly power. Google itself has observed that its revenues have "grown at an incredible rate over the past decade—typically in the high teens."[20]

## II.   Local Search Services

### A.  Local Search Services in the United States Is a Relevant Antitrust Market

69.     Local search services in the United States is a relevant antitrust market. Local search services enable consumers to search using keywords or categories for specific types of businesses (e.g., restaurants or gyms), types of professionals and services (e.g., accountants, electricians, or auto repair), or locations for activities (e.g., parks or beaches) within a relevant geographic area (e.g., a city, a neighborhood, or a zip code) and receive detailed information, typically including user-generated reviews, photos, and videos, as well as verified business information, that empowers consumers to make informed decisions based on recent feedback and in turn contribute their own feedback. Yelp is a prominent local search service provider, as is Google.

---

[20] *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.), UPX0012 at .002.

COMPLAINT

70.     General search services are not a reasonable substitute for local search services. General search's wide breadth leads to lower-quality results for consumers seeking a specific service, like plumbing services near their location coupled with user-generated reviews and verified information about that service (not offered by general search). For example, a user searching "golf" on a GSE may receive results about current golf tournament scores and standings, golf equipment, and the history of golf. But a user query for "golf" on a local search provider like Yelp (coupled with a geographic coefficient like "San Francisco," which can be automatically appended based on location), will yield a host of local places to play golf. Local search providers have a narrower and deeper focus than GSEs (acting as such), enabling local search providers to invest in greater and different information about local businesses and services, which ensures the steady flow of timely, high-quality results to their consumer audience.

71.     Google's own behavior confirms that general search services are not a reasonable substitute for local search services. Instead of resting on its primacy in general search, Google has developed its local search platform—and a method for its algorithm to identify local-search intent—in recognition of this distinct consumer demand.

72.     Local search is differentiated by consumer reviews and other user-generated content—as well as verified business information—that enhance consumers' ability to make informed decisions while incentivizing local businesses to compete on product quality, customer service, and price. Whereas GSEs crawl the internet and index websites of every type, local search providers build their "engines" by attracting consumer and business engagement, thereby creating a distinct product.

73.     Other forms of information, like industry-specific review websites and guidebooks authored by experts are likewise not a reasonable substitute for local search services. Professional critic reviews, whether online or offline, typically focus on a particular niche or audience, making them more specific and less comprehensive than local search services, and merely offer the limited editorial views of a single reviewer or publication. So, for example, Michelin star ratings provide critic reviews of high-end restaurants, whereas Yelp provides

COMPLAINT

listings, ratings, and reviews for substantially *all* restaurants (and many other types of businesses) in a geographic area (authored by consumers of every stripe). Consumer reviews on local search providers are also often timelier and more accurate than professionally curated reviews, which can lag by months or years.

74.    Local search also has peculiar characteristics and uses. Consumers in search of detailed and passionate reviews from their peers have little use, e.g., for general (and unverified) information about local businesses or the views of a single critic or publication. Other platforms simply cannot satisfy consumer needs in the same way.

75.    Market participants consider local search to be a distinct product with no adequate substitutes. Advertisers, for example, view local search providers as differentiated from other platforms because they allow targeted reach for maximum effect, even for local companies with small advertising budgets. Advertising or marketing agencies sell local search ads as a separate product. Google also sells local search ads as a separate product, and it does so on a nationwide basis.[21]

76.    Google routinely recognizes local search services as a distinct product and a separate market, as evidenced by its creation of a local search vertical to capture this specific category of searches (discussed in more detail below). In a 2014 study "Understanding Consumers' Local Search Behavior," Google recognized "[t]he prominence of local search" as distinct from other search, found that consumers' local search behavior is different from non-local search behavior, and advised advertisers to engage with local search consumers differently.[22] Moreover, Google's algorithm has a specific methodology to detect local search queries and inject Google's OneBox for local search in response.

77.    The general public, including consumers, also views local search as a distinct product, as evidenced by the unique queries they use to search for local businesses (i.e.

---

[21]    *About local search ads*, Google, https://support.google.com/google-ads/answer/3246303?sjid=14435120322630697623-NA (last accessed Aug. 9, 2024).

[22]    *Understanding Consumers' Local Search Behavior,* Google, at 5-6 (May 2014), https://www.thinkwithgoogle.com/_qs/documents/914/how-advertisers-can-extend-their-relevance-with-search_research-studies.pdf.

24

COMPLAINT

appending "near me" or a geographic location indicator onto a general search inquiry). As Google's study on consumers' local search behavior found, consumers specifically conduct searches "with their location and proximity in mind," and search for "store address, business hours, product availability and directions."[23] Google also found that a large portion of the consuming public use local search; 4 in 5 consumers conduct local searches and, when consumers are on the go or in a store, more than 50% of their smartphone searches "have local intent."[24] Additionally, consumers use local search SVPs like Yelp precisely because they are seeking a distinct local search product as opposed to a general search product.[25] Google's own expert Dr. Mark Israel's query overlap studies showed that SVPs like Yelp do not belong in the same product market as Google's general search and that of other GSEs.[26]

78.      Local search providers also utilize unique production facilities, in the form of verified local-business information and extensive consumer and business engagement across professions, service sectors, and neighborhoods nationwide, all cultivated over years. Absent considerable investment and time, other non-local search providers could not become a source for local search results.

79.      The United States is a relevant geographic market for local search services. Local search providers provide information about businesses, professionals, services, and activities based on location to a wide variety of consumers, from longtime "locals" to new visitors. Without a nationwide presence, local search providers could not depend on brand recognition, customer satisfaction, and familiarity in existing communities to drive consumer reviews and actions by locals and first-time (or frequent) visitors away from home.

---

[23] *Id.* at 4.
[24] *Id.* at 11.
[25] Trial Tr. 8411:3-13 (Israel) (discussing DXD29 at 21).
[26] *See id.* at 8406:5–8407:4 (Israel) (discussing DXD29 at 20) (analysis showing that a query sample of Google's top 25 non-navigational shopping queries attracts more queries weekly on Amazon (3.7 million) than Bing (0.4 million)); *id.* at 8411:3-13 (discussing DXD29 at 21) (finding that Yelp's local query volume is higher than Google's and much higher than Bing's); *see also id.* at 8401:4–8404:15 (Israel) (discussing DXD29 at 18) (analyzing the percentage of searches on GSEs as compared to SVPs for particular verticals).

COMPLAINT

80. Local search providers such as Yelp, Google, and YP.com (Yellow Pages) compete nationwide for customers. Local search services in other countries are not reasonable substitutes for local search services offered in the United States.

**B. Google Has Monopoly Power in the Local Search Services Market in the United States**

81. Google has monopoly power in the local search services market in the United States.

82. Google's own Gemini AI tool reports—in response to the query "what percentage of Google search queries are for local search?"—that "[a] significant portion of Google search queries are for local search. While Google doesn't release exact figures, studies and industry estimates suggest that **around 46% of all Google searches have local intent**. This means people are searching for businesses, products, or services near their specific location. This trend has become even more pronounced with the rise of mobile devices and the increasing use of location-based services."

83. Given that Google performs roughly 9 billion searches each day, of which approximately 27% come from the U.S., these estimates mean that Google performs over 1.1 billion local searches in the U.S. every day, dwarfing any other competitor. And according to Google's own Gemini AI tool—in response to the query "what is Google's market share for local search?"—"**Google dominates the local search market**. While exact figures can vary slightly depending on the source and the methodology, it's generally estimated that Google holds well over 90% of the market share in local search."

84. Other sources also confirm Google's monopoly power in local search. For example, a 2022 study found that Google's share of local business reviews has grown to 73% as compared to Yelp's 6%.[27] The study attributed Google's dominant market share to Google's ability to induce zero-click searches, in which a user may search for local content and then never leave Google's SERP due to placement of Google's local vertical.

---

[27] *Online Reviews Statistics and Trends: A 2022 Report by ReviewTrackers*, ReviewTrackers (Jan. 9, 2022), https://www.reviewtrackers.com/reports/online-reviews-survey.

COMPLAINT

85.     SearchEngineLand.com, a prominent search marketing publication, also reports that Google is "the dominant local search tool," citing a consumer survey finding that "77% of respondents use Google Maps [i.e., Google's local search] to find 'near me' business information well ahead of other sites."[28]

86.     Google's monopoly power is also demonstrated by Google's ability to offer lower-quality local search results than its competitors without facing diminished traffic or diminished advertising revenue resulting from consumer flight.

87.     One measure of quality is user engagement with search results. Higher-quality results in response to a user query would be expected to yield more user engagement than lower-quality results. In 2015, Yelp sponsored research by Columbia Law School professor Tim Wu and Harvard Business School professor Michael Luca concerning Google's practice of developing and promoting its own content to compete with other websites, like Yelp. The purpose of the study was to determine if Google's local search content, which received prime placement and thus was more likely to receive clicks, was comparable or superior to the competitor content it was replacing. Using a sample of 2,690 internet users, Wu and Luca randomly displayed one of two sets of search result screenshots; one set of users saw actual Google search results (including the OneBox, with Google's typical self-preferencing), and the other set saw an alternative version with a OneBox populated by Google's organic algorithm, according to which site delivers the best or most relevant information for the content in question. Wu and Luca found that users were 45% more likely to engage with search results when they were organically determined. This demonstrates that Google's SERP and OneBox-preferencing of its own local search vertical degrades quality to the user. However, despite this conduct, Google has continued to see gains in traffic, market share, and advertising revenues over that same time period. That Google can do so is evidence that it has monopoly power in the local search services market.

---

[28] Greg Sterling, *Google Maps the dominant local search tool, followed by Facebook and Yelp*, Search Engine Land (Nov. 25, 2019), https://searchengineland.com/google-maps-the-dominant-local-search-tool-followed-by-facebook-and-yelp-325699.

27

COMPLAINT

88.     Google's monopoly power in the local search services market is also protected by barriers to entry. First, local search service providers rely on network effects, which occur when the value of a service to its users increases as the total number of users increase. Users are more likely to rely on existing local search services providers that have achieved a broad base of reviews. A new competitor could not easily enter the market for local search services, but instead would have to build up scale by populating its platform by reviews to entice additional traffic and continued contribution of reviews. Other barriers to entry include overcoming Google's entrenched market position and history of anti-competitive conduct in the local search services market (as detailed below), and the amount of data (including business information) required to populate any local search services.

**III.     Local Search Advertising**

**A.  Local Search Advertising in the United States Is a Relevant Product Market**

89.     Local search advertising in the United States is a relevant antitrust market. The local search advertising market consists of all types of advertising generated in response to online search queries for specific types of businesses (e.g., restaurants or gyms), types of professionals and services (e.g., accountants, electricians, or auto repair), or locations for activities (e.g., parks or beaches) within a relevant geographic area (e.g., a city, a neighborhood, or a zip code) seeking detailed information, including user-generated reviews and content and verified business information, that empowers consumers to make informed decisions based on recent feedback. This includes paid, or "sponsored," listings for businesses published by a local search provider in response to a user query. This relevant product market excludes any advertising within a local search provider that is not generated by a user's online search query. Yelp is a prominent platform that provides local search advertising, as is Google.

90.     Local search advertising is a product market wholly contained within the broader search advertising market. As Judge Mehta concluded in *United States. v. Google*, search

COMPLAINT

advertising is a broad market that "includes all advertisements served in response to a query—whether entered on a GSE, an SVP, or a social media platform."[29]

91.     *First,* search advertising is a relevant market, distinct from non-search advertising, as Judge Mehta recently determined. Search ads are generated in response to a user's query, which is a direct expression of the user's specific motivation or interest at the time the query is entered. Search ads are therefore the product of a uniquely strong "signal" of a consumer's intent to purchase a good or service. For example, a user's query for "tennis racquet" is a much stronger indicator of their interest in buying a tennis racquet than what that user searched three days ago or what article they read yesterday. That search query gives advertisers a unique opportunity to connect with the user who is seeking to buy a tennis racquet.

92.     Advertisers view search ads as particularly efficient at driving conversions, i.e. driving users to a sale or, for some goods or services, a new account or enrollment. As Alexander Daniels, founder of Thumbtack, testified, search customers express "the clearest preference" available in the digital marketing ecosystem.[30]

93.     Other forms of digital advertising are not reasonable substitutes for search advertising. Non-search ads, such as display ads and social media ads, rely on indirect signals to decipher a user's latent intent and thus are less valuable to advertisers. Such signals include present and past interactions with a webpage, accounts the user follows, videos or photographs the user views, and how the user engages with a post. For example, a display ad is an image or video ad that appears on a website and that is not served to a user in response to a query. Advertisers therefore have to rely on other signals, both from the ad publisher and the user, in determining where to place a display ad. An advertiser may choose to place display ads on

---

[29] Mem. Op., *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.) (Aug. 5, 2024), ECF No. 1033 (at 166-67).

[30] *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.), Daniels Dep. Tr. at 31:13-19; *see, e.g., U.S. v. Google LLC,* 20-cv-3715 (D.D.C.), UPX441 at 802 (JPMorgan Chase email: "Search can drive acquisition based on some of the strongest intent signals made available[.]"); *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.), Alberts Dep. Tr. at 45:18–46:16 ("[P]aid search can be an incredibl[y] powerful way to get in front of the consumer who is . . . actively looking to make a purchase or looking to sign up or enroll.").

COMPLAINT

content-relevant websites, such as placing an ad for a mixer next to an article on baking, or on content-relevant or industry-relevant websites that a user has visited or whose ads the user has clicked.

94.     Advertisers also use different ad channels—search ads and types of non-search ads—to accomplish different marketing goals. Those objectives often are correlated to the ad channel's unique features.

95.     Marketing professionals in industry and academia have used a "funnel," pictured below, as a visual depiction of the consumer journey from awareness, to interest, to desire, to purchase.

**Figure 4**



96.     The top of the funnel focuses on generating consumer inspiration and awareness of the product. In the middle is the consideration phase, where the consumer evaluates a class of products or a particular product. The bottom of the funnel seeks to persuade a user to carry out a transaction.

97.     Marketers view different ad channels in terms of their relative strength at achieving objectives along the funnel. Generally, display ads are superior at establishing product awareness, whereas search ads are more effective at driving conversions, or "action." As

COMPLAINT

Google's Chief Economist Hal Varian explained: "One way to think about the difference between search and display/brand advertising is to say that search ads help *satisfy* demand, while brand advertising helps to *create* demand."[31] Search ads are therefore uniquely suited to lower-funnel tools, to drive a user with an existing desire to conversion. Display ads are more suitable for upper-funnel tools to create awareness about a product or service.

98.    Industry participants use the funnel to shape marketing strategies, including on digital platforms. This includes advertisers and platforms JPMorgan Chase, Home Depot, Booking.com, Expedia, Skai, Tripadvisor, Thumbtack, Amazon, Yahoo, OpenTable, and Microsoft, as well as Yelp.

99.    Large advertisers also typically organize themselves along ad channels, with different teams and distinct budgets for search ads as opposed to other, non-search ads. For example, JP Morgan Chase has three departments: paid social, search, and programmatic. Amazon has different teams and leadership for paid search, social marketing, display, and video. Advertising agency Tinuiti has different teams for paid search and paid social.

100.    Advertisers do not substitute away significantly from search ads to other channels, like display or social. These channels are less effective at achieving the same marketing goals as search ads. A presentation by department store company Kohl's, for example, showed search spend as unchanging while other ad types, including display, social, and video, fluctuated.[32] A Booking.com record explains that "Search and Display Ads are not seen as substitutable to one another . . . because they target users in very different situations/environments," and the "resulting performance is very different."[33]

101.    *Second,* local search advertising is a relevant product market within the broader search advertising market. Local search advertising is distinct from other forms of search

---

[31] Mem. Op., *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.) (Aug. 5, 2024), ECF No. 1033 at 73 (citing UPX411 at 638 (2008 internal Google email written by Hal Varian) (internal quotation marks omitted) (emphasis added)).
[32] *U.S. v. Google LLC,* 20-cv-3715 (D.D.C.), DX412 at 665.
[33] Trial Tr. 5450:6-10 (Jerath) (discussing UPXD103 at 23).

COMPLAINT

advertising, such as general search advertising, in ways that limit their substitutability for most purposes, including targeted audience, advertisers, and format.

102.    Local search advertising has peculiar characteristics and uses. Local search advertising allows advertisers to respond to user queries for specific types of businesses (e.g., restaurants or gyms), types of professionals and services (e.g., accountants, electricians, or auto repair), or locations for activities (e.g., parks or beaches) within a geographic area (e.g., a city, a neighborhood, or a zip code) relevant to the consumer. Because local search advertising responds to narrower and deeper user queries, and takes place on platforms that specialize in and provide in-depth information about local businesses and services, it uniquely reaches users with a high and specific commercial intent. In contrast, general search advertising responds to a wide breadth of queries and therefore is not as effective in reaching users with a high purchase intent.

103.    Consider a user interested in a haircut from a local barber. A user with this interest may first go to a GSE like Google to research hairstyles, and then use a local search provider like Yelp to find a local hairdresser once they have determined what they want and are ready to book or purchase a service. Advertisers recognize that local search ads serve this purpose, which cannot be satisfied by general search ads. As marketing executive Joshua Lowcock explained: "So if a user goes to a retailer's website, they've got a high probability and intent to buy. And if they type something into search, typically they type in the brand and product that they're specifically looking for. So they know what they're going to do."[34] Similarly, a user that goes to a local search provider knows the specific type of business and geographic area that they are looking for, and has a high probability and intent to spend.

104.    Google's 2014 study "Understanding Consumers' Local Search Behavior" confirms that local search is more likely to lead to purchase than non-local search. Google found that 18% of local searches on smartphones led to a purchase within a day, compared to 7% of non-local searches on smartphones.[35] Google also found that 50% of consumers visit a store

---

[34] Trial Tr. 3860:20-24 (Lowcock).
[35] *Understanding Consumers' Local Search Behavior*, Google, at 14 (May 2014), available at https://www.thinkwithgoogle.com/_qs/documents/914/how-advertisers-can-extend-their-relevance-with-search_research-studies.pdf.

32

COMPLAINT

within a day of their local search on smartphones, and 34% of consumers visit a store within a day of their local search on a computer or tablet.

105.    Local search advertisers also cannot reasonably substitute local search ads with general search ads because they need to use features unique to local search ads to reach local search consumers. Based on the findings of its 2014 study "Understanding Consumers' Local Search Behavior," Google concluded that advertisers should engage with local search consumers differently. To reach local search consumers, Google advised advertisers: "You should make sure your product availability, address and directions appear in your ads across smartphone and computer/tablet" and "ensure your locations are in Google Places [a Google local search vertical]"; "You should use radius bidding to reach consumers near stores and build an attribution model for local searches"; "You should use location extensions. And you can use location bid adjustments to fine-tune bids for specific areas, like cities or zip codes."[36]

106.    Google recognizes local search advertising is a distinct product with no adequate substitutes. Google sells local search ads as a separate product and does so on a nationwide basis.[37] Like local search ads on a specialized local search platform, Google's local search ads allow advertisers who "run a local business" to feature their business locations when users search for nearby businesses on Google.com or on Google Maps.[38] Google requires advertisers to turn on "location assets" in order to use its local search ads. Google offers advertising features that are unique to local search, such as "leads" that allow potential customers to click or tap on the ad to call, send a message, or schedule a booking with a local services business directly through the ad, and "Google Guaranteed Ads" that include a Google Guaranteed badge next to the

---

[36] *Id.* at 12, 18, 24.

[37] *About local search ads*, Google, https://support.google.com/google-ads/answer/3246303?sjid=14435120322630697623-NA (last accessed Aug. 9, 2024).

[38] *Id.* ("About local search ads. Ads on Google can feature your business locations and lead users to call or visit your locations. When people search on their mobile devices for nearby businesses on Google.com or Google Maps, for example, "coffee near me," they may view local search ads that feature your business locations. Set up location assets to show local search ads."); *Show local search ads on Google Maps*, Google, https://support.google.com/google-ads/answer/7040605?sjid=15272336753359431287-NA ("Advertising on Google Maps is a powerful way to attract nearby customers. If you run a local business, ads on Maps make it easy for people to get to your location.") (last accessed Aug. 14, 2024).

COMPLAINT

business name on Local Services listings for home service providers that pass Google's background and license checks.[39]

107.     Other market participants recognize local search advertising as a separate product market. For example, many ad or marketing agencies sell local search ads as a separate product.

108.     The United States is a relevant geographic market for local search advertising. While they provide targeted advertising opportunities, local search providers like Yelp, Google, and their competitors operate nationwide, offer their services nationwide, and utilize the same basic advertising terms, interfaces, and capabilities nationwide, attracting a range of local, statewide, and national advertisers, which often seek to advertise across neighborhoods and locales.

109.     Local search advertising available in other countries is not a reasonable substitute for local search advertising offered in the United States. Google, for example, offers local search advertising in the United States separate from similar offerings abroad, recognizing the geographic contours of the local advertising market.

**B.  Google Has Market Power in the Local Search Advertising Market in the United States**

110.     Google has market power in the local search advertising market in the United States.

---

[39]     *Getting started with Local Services Ads*, Google, https://support.google.com/localservices/answer/6224841?hl=en&co=GENIE.CountryCode%3DUS ("How Local Services Ads work. The Local Services unit is shown at the top of Google Search results when people search for the services you offer in areas you've chosen. Potential customers can click or tap on your ad to either call you or send you a message request (US only). They can also schedule a booking with you directly through your ad. Learn how to Manage leads and jobs (US only). When a customer reaches out, you'll get an email and notification from the Local Services Ads app. From this point on, the lead is yours to turn into a customer … Google Guaranteed Ads. Google Guarantee helps home service providers build a trusted reputation online. Providers with this badge go through extensive background and license checks … On Local Services listings, you will find the Google Guaranteed badge [] next to these providers.") (last accessed Aug. 14, 2024).

COMPLAINT

111.    Yelp understands and believes that Google is the largest provider of local search advertising in the United States. Yelp estimates that Google's share of the market for local search advertising in the United States (by ad revenue) exceeds 50% and continues to grow each year.

112.    Google's Gemini AI tool reports—in response to the query "What is Google's market share of the local search advertising market?"—"**Google has a dominant market share in the local search advertising market**." Additionally, Gemini reports that "Google's revenue from local search advertising is significant" and makes up "a substantial portion of [Google's] overall ad revenue."

113.    Google's market power in the local search advertising market is also evident in Google's ability to raise prices without facing competitive consequences. With respect to search advertising more broadly, Google has been able to raise prices and costs-per-click rates for advertising without facing a meaningful competitive response. Google's own research confirms this: an internal Google study concluded that the company would retain enough advertisers after a 15% increase in text ad prices to see profits rise. Thus, Jerry Dischler, Google's former head of ads, testified that Google has previously increased search ads prices by 5% resulting in an overall increase in Google's revenue even though the number of search ads sold likely decreased. As a result, Google has increased its year-over-year search advertising revenue by 20% or more for the better part of the last decade. Similarly, Google's year-over-year local search advertising share has grown, even despite the inferior quality of its local search product.

114.    Like the local search services market, the local search advertising market is protected by barriers to entry, including network effects necessary for advertisers to find a new entrant attractive from a traffic perspective, and Google's entrenched position and past anti-competitive conduct. Another barrier to entry is the amount of data to which Google and other local search platforms already have access concerning user behaviors and preferences in local search, data which would be unavailable to a new entrant and would hinder their ability to compete effectively for advertisers.

COMPLAINT

**ANTICOMPETITIVE CONDUCT IN THE RELEVANT MARKETS**

**I.    Google's Anticompetitive Conduct in Local Search Services Market**

115.    Google acknowledged the importance of local search services early in its history. In 2004, it created its fledgling Google Local search vertical, to help users find local businesses. Around the same time, Yelp was growing in popularity—and Google took notice.

116.    When Yelp was founded in 2004, it was not the only local search option. Yahoo Local and Citysearch were the two dominant websites for reviews of local businesses in the early 2000s. Yelp was an innovator in a stagnant market, where providing online reviews was a fairly novel concept. Yelp invested heavily in creative direction, branding, and a focus on community-building, creating a network of passionate reviewers who provided their word-of-mouth opinions to help other members of their communities find great local businesses. Yelp also provided an opportunity for Yelpers to connect with each other, through online forums, messaging, and even in-person events. Yelp even hired community managers to cultivate networks of its most prolific reviewers. This community of motivated reviewers also drove businesses to join Yelp and maintain their pages. Through this investment and innovation, and as demonstrated below, Yelp gained significant market share quickly, fomented competition, and encouraged the proliferation of high-quality online business reviews, all to the benefit of consumers.[40]

---

[40] Matt McGee, *How Yelp Crushed Citysearch & Yahoo Local ... & Why Google Is Stealing Yelp's Playbook*, Search Engine Land (May 26, 2011), https://searchengineland.com/yelp-crushed-citysearch-yahoo-why-google-stealing-yelps-playbook-78623.

36

COMPLAINT

**Figure 5**



Number of Restaurant Reviews at Citysearch and Yelp over Time

117. Recognizing the value of Yelp's investment and wanting to improve Google Local, Google signed a two-year licensing agreement with Yelp in 2005 that allowed Google to feature Yelp's crowd-sourced reviews and business information on Google's search page. This was a symbiotic relationship, as Yelp earned revenue from Google and Google was able to populate Google Local with photos, addresses, hours, and reviews for local businesses. But Google also recognized that review content was "critical to winning in local search" and that Google had an "unhealthy dependency" on Yelp in that regard.[41] Google was concerned that if Yelp became successful in its own right and users went directly to it rather than coming to Google, Yelp would compete against Google for users and advertisers.[42] When the licensing deal came up for renewal, Google informed Yelp that it intended to offer a competing product. Yelp grew concerned that Google would take Yelp's data—community reviews and business pages that had been organically developed through years of Yelp's investment and innovation—and

---

[41] FTC Staff Memo at 34.
[42] *Id.*

37

COMPLAINT

use it to support its competing product, increasing Google's revenues to Yelp's detriment. For these reasons, Yelp declined to renew the licensing agreement.

118.    In 2007, Google launched a review feature within Google Maps and began competing with Yelp. Prior to the launch, Yelp's CEO Jeremy Stoppelman wrote directly to a Google executive requesting that Google "remove [Yelp's] review and photo content from Google Maps before launching" the new feature and expressing discomfort at Google offering a competitive product using Yelp's data.[43] Google agreed to do so. At the time, Google internally acknowledged the risk of its new product offering—it had lost its local search licensing partner in Yelp, and it would likely take time to build up its own set of user reviews.[44]

119.    Two years later, those fears had borne out, according to another internal Google document: "We have partially ended up where we feared we would in 2007 … 3rd party content providers abandon Google … Limited success with our Reviews … Users begin to start at review sites for key categories/regions …."[45] Unable to match the number and quality of Yelp's user reviews, and therefore unable to gain scale on its own, Google attempted to acquire Yelp. One analyst explained, "It's the strongest testament that Google really wants to own this local market, not vicariously but directly."[46] In December 2009, the proposed deal fell apart.

120.    By 2009, one out of five searches on Google were related to location,[47] and so Google faced continued pressure to create a viable local search product to keep revenues flowing to itself and away from any potential competitors. Enter Google Places. According to Google, the purpose of Google Places was to create a landing spot for businesses with details including location, reviews, website, and other information. But without having invested in creating a review infrastructure or innovating in any way to provide a distinct product to potential reviewers, Google did not have the critical mass of reviewers it needed for Google Places to be

---

[43] FTC Staff Memo at 34 n.193.
[44] *Id.* at 34 n.192.
[45] *Id.* at 34 n.194.
[46] Claire Cain Miller, *Google Said to Be Near a Yelp Deal*, N.Y. Times (Dec. 18, 2009), https://www.nytimes.com/2009/12/19/technology/companies/19yelp.html.
[47] *Place Pages for Google Maps: There are places we remember!*, Google Blog (Sept. 24, 2009), https://googleblog.blogspot.com/2009/09/place-pages-for-google-maps-there-are.html.

COMPLAINT

successful. So, rebuffed on both a licensing deal and a takeover offer, and unable to compete on a level playing field, Google simply helped itself to Yelp's content.

121.     To populate its local vertical, Google compiled reviews from across the internet, including reviews "scraped" from Yelp and other local search sites, into one destination, along with its own slight number of reviews, and claimed all of those reviews as Google's own reviews. An internal Google document acknowledged the need to seed Google Places with Yelp's content, without attribution: "We do not have much user-user or user-business communication on the Google platform."[48] "We run the risk that competitors like…[Y]elp become the site where local businesses are discovered…"[49]

122.     By scraping without attribution, Google was passing its local search product off as a self-contained entity, using its competitors' content to appear to achieve scale and thus encouraging additional business registrations and user reviews. In 2010, Google started selling advertising on Google Places, so that businesses could pay Google a fee to make their Places page stand out.

123.     Google took Yelp's data, used it for its own competing property to siphon users away from Yelp, and profited. In July 2010, Yelp noticed that Google was misappropriating its content, without any license or permission, and immediately protested. Google responded by telling Yelp and other rival local search providers that either they could permit Google's use of their proprietary content or they would not appear in Google search results *at all*. This choice was no choice at all—Google knew, given its dominance in general search, that it was effectively forcing Yelp and others to provide their content to Google so Google could build out its own competing product. In other words, Google used its monopoly power in general search to grow its (then nascent) position in local search.

---

[48] FTC Staff Memo at 36 n.205.
[49] *Id.*

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

124.    In 2011, the Federal Trade Commission opened an investigation into Google's practices, resulting in a staff report condemning them.

> Staff has investigated whether Google has unlawfully "scraped," or appropriated, the content of vertical rivals in order to improve its own vertical products. We conclude that Google's conduct should be condemned as a conditional refusal to deal under Section 2 because (i) Google's prior voluntary course of dealing with vertical rivals offers clear evidence that the relationship was mutually beneficial, (ii) Google's threats to remove rival content from its general web search results was designed solely to coerce rivals into allowing Google to user [sic] their content for Google's competing vertical product, and (iii) the natural and probable effect of Google's conduct is to diminish the incentives of vertical websites to invest in, and to develop, new and innovative content.[50]

125.    The FTC staff memorandum also found that Google engaged in numerous practices that diminished competition and deceptively self-preferenced its own verticals at the expense of Yelp and other competitors. For example, Google sought to increase triggering of OneBox results—highlighting Google's own properties—not only to provide users with the right answers to their inquiries, but also to drive traffic to Google's verticals. Per the FTC staff memorandum, "Google recognized that the frequent display of its vertical properties on the SERP was necessary to drive traffic to its properties, and thus, grow user share in highly commercial areas such as shopping and local."[51] The FTC staff memorandum also noted Google's practices of using eye-catching graphics and other embellishments to drive traffic towards its own properties, features not available to its competitors.[52] Further, Google gave itself featured placement of the OneBox at the top of the SERP, with no regard for the quality of Google's content quality as compared to its competitors.[53] Indeed, the FTC staff memorandum cited to evidence that users actually preferred organic search results to Google's own properties, even despite Google's substantial thumb on the scale.[54]

126.    The FTC staff memorandum went on to reveal that, rather than fairly comparing its content to its competitors, Google used the occurrence of competing vertical websites (like

---

[50] *Id.* at ii-iii.
[51] *Id.* at 24.
[52] *Id.*
[53] *Id.* at 24-25.
[54] *Id.* at 25.

COMPLAINT

Yelp) in its organic search results "to automatically boost the ranking of its own vertical properties above that of its competitors."[55] For example, when Google's organic search would deem Yelp relevant to a user's query, Google would automatically return its own local vertical at the top of the SERP, *above* Yelp. To add further insult to injury, Google developed several algorithm updates that resulted in demotion of its competitors, while excluding itself from the same metrics that resulted in those demotions.[56] The FTC staff memorandum concluded: "Unlike Google's vertical competitors, who expend considerable resources on optimizing their websites in order to rank highly on Google's SERP, Google does not expend the time and resources to optimize its own vertical properties; it simply places them on the SERP."[57]

127.    The FTC ultimately did not bring suit against Google. Instead, Google entered into certain commitments, including that any website owner could opt out from display on Google's local pages, and Google would cease using that website's content. Google agreed that exercising that option would not prevent content from the website from appearing in organic search results or being used as a signal, via PageRank, in determining other search results.[58]

128.    Even an FTC investigation and settlement did not deter Google's efforts to hamstring its competitors. As the FTC recognized, SVPs like Yelp are highly dependent on Google to reach users. Therefore, changes to Google's SERP or algorithm can have outsized effects on the commercial viability of SVPs. For Yelp, the effects were almost immediate. In 2015, Google adjusted its algorithm with the effect of decreasing traffic to its local search competitors, causing Yelp to have its first ever decline in year-over-year traffic.[59] This and other algorithm changes caused a significant drop in traffic, harming Yelp as a competitor and helping

---

[55] *Id.* at 26.

[56] *Id.* at 28-30.

[57] *Id.* at 30.

[58] Letter from David Drummond (Google Inc. Senior Vice President of Corporate Development and Chief Legal Officer) to Federal Trade Commission Chairman Jon Leibowitz (Dec. 27, 2012), http://www.ftc.gov/system/files/documents/closing_letters/google-inc./130103googleletterchairmanleibowitz.pdf.

[59] Jillian D'Onfro, *Yelp traffic could decline for the first time ever after Google changed its search algorithm*, Yahoo! Finance (July 6, 2015), https://finance.yahoo.com/news/yelp-traffic-could-decline-first-185511700.html.

41

COMPLAINT

1 Google obtain more market share in the local search and local search advertising markets. This

2 conduct disincentivizes investment and innovation in vertical search markets, like local search,

3 as competitors know they are at Google's whims and can suffer a crushing blow at any moment.

4     129.    Today, Google self-preferences itself over its competitors across all of its

5 verticals, promoting its own offerings and relegating competitor appearances in the organic

6 search results that trail down the page. Google has degraded quality, demoted rivals, and grown

7 its monopoly power by (1) inserting Google's own vertical search results at the top of its

8 horizontal search results page to divert user attention away from organic search results and (2)

9 excluding rivals and their vertical content from that prime placement in the vertical search

10 sections that populate the top of the SERP.

11     130.    Google's conduct has been so brazen that it has attracted the attention of

12 European antitrust regulators who initially launched investigations into Google's shopping

13 vertical.

14     131.    As with local search, Google maintained its own shopping vertical, which it self-

15 preferenced over competitors. When a user would query, for example, "red shoes," Google

16 would include its own shopping vertical either at the top of the SERP or in reserved space on the

17 right side, displayed in rich format to attract visibility away from organic search links. Google's

18 own shopping vertical was not subject to Google's generic search algorithms, meaning that

19 Google not only gave itself a leg up in placement on the SERP, it also exempted itself from the

20 quality indicators inherent in its organic search algorithm.

21     132.    The European Commission ("EC") initiated an investigation against Google in

22 2010. In 2015, the EC filed formal antitrust charges, and in 2017 the EC concluded that Google

23 has given itself, and specifically its shopping vertical, an illegal advantage over its competitors

24 in violation of EU antitrust laws. The EC concluded that Google has "leveraged its market

25 dominance in general internet search into a separate market, comparison shopping." It concluded

26 that Google abused its dominance by promoting its own shopping vertical in search results while

27 demoting its rivals, depriving "consumers of the benefits of competition on the merits, namely

28 genuine choice and innovation."

COMPLAINT

133.     The EC determined that "[e]vidence shows that even the most highly ranked rival comparison shopping service appears on average only on page four of Google's search results, and others appear even further down. In practice, this means consumers 'very rarely see rival comparison shopping services in Google's search results."[60] Citing evidence of consumer behavior, the EC noted how important search result placements are, with the top search result receiving about 35% of all clicks, and the first result on page 2 of the search results receiving only about 1% of clicks. Those effects could not be explained by relevance alone; even moving the first result to the third in the SERP's page rankings lead to a reduction in the number of clicks by about 50%. Therefore, the EC concluded, Google's practice of self-preferencing distorted competition, allowing it to make "significant market share gains at the expense of rivals." Ultimately, the EC fined Google €2.42 billion and required it "to apply the same processes and methods to position and display rival comparison shopping services in Google's search results pages as it gives to its own comparison shopping service."

134.     Nor has Google changed its behavior. Just this year, the EC opened a non-compliance investigation against Google's parent company, Alphabet, based on Google's continued self-preferencing in search, in violation of the Digital Markets Act. The EC reported: "The Commission is concerned that Alphabet's measures implemented to comply with the DMA may not ensure that third-party services featuring on Google's search results page are treated in a fair and non-discriminatory manner in comparison with Alphabet's own services."[61]

135.     Similar to the EC's findings in Europe, Google's conduct in the U.S. in the local search market harms competition. Rather than creating its own superior product and competing on the merits, Google has developed an inferior product off the back of its competitors (including Yelp). It then gives itself a leg up over its competitors by using its dominance in general search

---

[60] *Antitrust: Commission fines Google €2.42 billion for abusing dominance as search engine by giving illegal advantage to own comparison shopping service – Factsheet*, European Commission (June 27, 2017), https://ec.europa.eu/commission/presscorner/detail/en/MEMO_17_1785.

[61] *Commission opens non-compliance investigations against Alphabet, Apple and Meta under the Digital Markets Act*, European Commission (Mar. 25, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_1689.

COMPLAINT

and its gateway status to give its inferior local search vertical prime placement on its SERP, in a OneBox setting it apart from text search results and above any organic search results. Not only does this degrade quality for consumers, it also has the effect of raising costs for competitors and preventing them from achieving scale.

136.    Empirical research confirms that Google's anticompetitive conduct harms competition and consumers. As noted above, research by Columbia Law School professor Tim Wu and Harvard Business School Professor Michael Luca demonstrated that quality, as measured by user engagement, was higher for organic local search results than from Google's self-preferenced results. These findings confirm similar findings from the EC concerning Google's shopping vertical—Google's self-preferencing harms consumers with a lower-quality experience.

137.    Google's local search results are on average shorter, more prone to error, less subject to quality control, and less likely to result in user engagement than Yelp's local search results and those of other local search competitors. Yelp's reviews are consistently longer than those found on Google local search throughout the United States, often by 500% or more. And contrary to survey results showing that 97% of users find written reviews to be the most helpful type of online review of local businesses, a third of Google's reviews consist of only star ratings, with no text at all.[62] Google labels full-text reviews and textless star ratings as "reviews" without distinguishing them, even though textless ratings are inferior and far less useful to consumers. Google's own past behavior confirms this quality delta. Instead of innovating and expending resources to secure high quality reviews, Google misappropriated Yelp's data, including through its larger scraping campaign, and now elevates its own local search results above all else while obscuring those of other local search providers, notwithstanding Google's own algorithmic indications of quality that would dictate a different result.

---

[62] *Survey finds what makes reviews trustworthy – consumers want more than ratings*, Yelp Blog (Dec.  7,  2021),  https://blog.yelp.com/news/survey-finds-what-makes-reviews-trustworthy-consumers-want-more-than-ratings/#:~:text=Nine%20out%20of%20ten%20people,a%20business's%20overall%20review%20count.

COMPLAINT

138.    Against this, some might mistake Google's large local search review "counts" (the total number of reviews used to tally an overall rating for a business) as a proxy for quality. But review counts do not necessarily reflect the informational content of different platforms. Fifty reviews that consist of nothing more than a five-star rating are less useful for consumers (and more likely to be spam) than 35 detailed, descriptive reviews that include photos or tell consumers, e.g., what suppliers a roofer uses, which barber at a barbershop is the most talented, how many times a reviewer has visited (and for how long), and recent changes to the hours of operation. Google knows that users find reviews without text to be less helpful, burying those behind its text reviews but including them in the overall review count to inflate its public metrics.

139.    Other empirical evidence, including rating distribution and rating inflation, also shows that Google has consistently inferior local search results as compared to Yelp's local search results. A study published by the FTC's Deputy Director for Consumer Protection considered the business ratings distributions of local search providers when measured against the quality of business.[63] Google's rating distributions of local businesses are heavily skewed toward higher star ratings: on Google, the percentage of businesses with at least four-star ratings was 59%. That average business ratings on Yelp are "much more uniform across the rating distribution" — about 32% of businesses are above four stars, 58% are between two and four stars, and 10% are below two stars. When measured against business quality, the study concluded that a low quality business on Google has about the same (inflated) average rating as a medium quality business on Yelp.

140.    Nor does Google permit true competition on the merits in which users could independently assess the merits of Google's local search results alongside other local search results, as determined by organic search results. In these ways, Google's conduct prevents consumers—and competitors in local search—from enjoying the benefits of investment in content moderation, community management, and user design that result in more engaging

---

[63] Devesh Raval, *Do Bad Businesses Get Good Reviews? Evidence Across Several Online Review Platforms*, (May 23, 2024), https://deveshraval.github.io/reviews.pdf. Businesses were categorized as high, medium, or law quality based on the number of complaints filed with and assessments by various consumer protection related organizations.

COMPLAINT

reviews. And by limiting the returns on this investment by competitors, Google's conduct reduces incentives for all local search providers (including Google) to pursue these goals that increase consumer welfare and efficiency. Far from demonstrating superiority on the merits, Google's ability to dramatically increase its overall number of reviews, albeit with objectively lower quality, demonstrates how successful its self-preferencing has been in diverting traffic to its local search option and away from competitors.

141. Differing quality measures also underscore the inefficient outcomes for consumers under the current status quo. Google's rampant self-preferencing foists Google's local results on users, even though Google's local results may not supply the information needed or provide inaccurate information. As a result, consumers need to spend more time trying to find trustworthy content, such as on Yelp or other local search competitors.

142. Despite users' preference for organic search results (and therefore higher quality reviews) when using Google, users cannot opt out of Google's self-preferenced local search content when they enter a search query in Google. Users are bound by Google's Terms of Service when they use its services such as Google Search and Google Maps. As Google warns its users, "Understanding these [Terms of Service] is important because, by accessing or using our services (whether you're signed in to a Google account or not), you're agreeing to these terms."[64] Under Google's Terms of Service, users must take Google's local search product when they use Google's general search product, because the products are "designed to work together" and users are prohibited from modifying "any part of [Google's] services or software."[65]

143. Unlike in a competitive market, where consumers can choose what they wish to "purchase," Google exercises its monopoly power to force users to "buy" Google's local search services and in doing so effectively deprives them of organic search results that are more relevant and trustworthy. In this way, Google prevents competition on the merits (i.e., head to head, as determined by organic search) among local search platforms.

---

[64] *Privacy & Terms*, Google, https://policies.google.com/terms?hl=en-US#footnote-services.
[65] *Id.*

COMPLAINT

144.    Google's conduct also raises costs for its rivals to operate. When a user conducts a local search query, the entire top of the SERP is dominated by results selected and monetized by Google—either sponsored links, for which Google receives a cost-per-click payment, or Google's own local search. To compete, local search competitors like Yelp must pay Google for advertising or else resign themselves to appearing far below Google's own self-preferenced local results, in organic results that a user may never even see. Google thus "unlevels" the playing field and ultimately excludes competitors by imposing costs on rivals through its exercise of monopoly power and control of the SERP. This in turn insulates Google from competition and enables Google to sustain and increase its market share over time.

145.    Finally, Google's self-preferencing of its local vertical search service prevents competitors from achieving or maintaining scale in local search services. When Google artificially reduces the number of users visiting Yelp and other local search provider competitors, it does more than limit those sites' advertising revenues—it also frustrates those sites' ability to attract active users who contribute to the site's growth and continued viability. Local search providers improve and become more valuable to consumers through network effects: as more content is created (in the case of Yelp, user-generated reviews and other consumer contributions), more users are attracted to the vertical and the quality improves, and the vertical is better able to monetize its product through advertising. But if users are diverted away from the local search provider—for example, if they are sent to Google's local vertical to write reviews, instead of to Yelp—that prevents the local search provider from achieving network effects and scaling to compete. Google's ability to leverage its monopoly position in general search to keep users within its own local vertical, rather than showing them organic results with higher-quality rival SVPs, has the actual and intended consequence of making it more challenging for those rival SVPs to compete on the merits and constrain Google through competition.

146.    Google itself previously warned of the very self-preferencing in which it engages as an "insidious" way for companies to impact markets. Back in 2000, Google co-founders Larry Page and Sergey Brin explained:

47

Since it is very difficult even for experts to evaluate search engines, search engine bias is particularly insidious. A good example was OpenText, which was reported to be selling companies the right to be listed at the top of the search results for particular queries…. This business model resulted in an uproar, and OpenText has ceased to be a viable search engine. But less blatant bias are likely to be tolerated by the market. For example, a search engine could add a small factor to search results from "friendly" companies, and subtract a factor from results from competitors. This type of bias is very difficult to detect but could still have significant effect on the market.

That view was prescient; Google is doing exactly what it previously decried, biasing local search in its favor and against its competitors, to the detriment of competition in the local search services market.

## II.   Google's Anticompetitive Conduct in Local Search Advertising

147.   Google's focus on local search recognizes the revenue-generating potential of local search advertising as a separate and distinct revenue stream from general search advertising. As with general search, a user who searches for a local service or business type demonstrates a present intent to purchase services or goods but with *greater* specificity. For example, a user querying "barbers near me" is signaling that they are looking to spend money on a local barber. Barbershops in that user's local area, including nationwide chains, are interested in reaching that user and so are incentivized to purchase local search advertising.

148.   As the FTC staff memorandum noted, Google's dedicated ads do not compete for placement on Google's SERP. "Instead, they enjoy automatic placement in the most effective advertising places on the SERP, usually above the natural search results. Google also does not compare the quality of its own ads to the quality of competitors' ads that provide the same vertical service."[66]

149.   Yelp sells local search advertising in competition with Google and other local search providers nationwide. Approximately 95% of Yelp's revenue comes from local search advertising, largely cost-per-click text advertising, like the sponsored links at the top of Google's SERP. Yelp also offers paid upgrades for business's Yelp pages (such as "Business Highlights," which allow businesses to showcase certain highlights that make their business unique, e.g.,

---

[66] FTC Staff Memo at 28.

COMPLAINT

"Family Owned," "Pet Friendly," etc.). Like other local search providers, Yelp's ability to sell local search advertising is highly dependent on traffic and achieving enough scale to make its advertising attractive. If Yelp's user traffic declines, its ability to sell advertising to local businesses also declines.

150. As detailed above, Google manipulates traffic away from Yelp and other local SVPs. When Google self-preferences its own local vertical, it increases its share of users at the expense of competitors like Yelp. Given that advertising dollars follow user traffic, this also reroutes advertisers to Google and away from Yelp and other rivals. Over time, this sabotages the ability of local search competitors to continue offering their products, diminishing choice for advertisers and increasing prices. Google, meanwhile, benefits from this gatekeeping arrangement despite the absence of any innovation, quality improvements, or other welfare-enhancing actions that might drive increased adoption in a competitive market.

151. This loss of choice harms advertisers. When Google is unconstrained by competition from SVPs for local search advertising dollars, it can increase its local search advertising pricing without the threat of advertisers switching away. This has also happened in general search advertising; a recent study by the United Kingdom's Competition and Markets Authority found that, in the U.K., Google has progressively increased monetization, both in terms of revenue per search and the ad load on its SERP, both of which harm advertisers through higher costs and dilution of the value of their advertising dollars. This, in turn, forces rival SVPs to increase their own ad loads in order to attempt to off-set traffic losses resulting from Google's self-preferencing.

## III.  Yelp Has Been Injured by Google's Anticompetitive Conduct

152. Google's self-preferencing harms Yelp. As FTC staff concluded, "[v]ertical websites, such as comparison shopping and local websites, are heavily dependent on Google's web search results to reach users. Thus, Google is in the unique position of being able to make or break any web-based business."[67]

---

[67] *Id.* at 30 (internal quotations omitted).

COMPLAINT

153.    Given Google's monopoly power in the GSE market, and the fact that most users start their web searching on Google.com, Yelp is highly dependent on Google for traffic. From 2012-2019, for example, more than 70% of Yelp U.S. web traffic came through Google, making it a critical source of traffic (so too today; that number has only grown). As is true for so many other businesses, Yelp relies on organic general search results to acquire and retain users who may then sometimes access Yelp.com through other means. This "gateway" to the internet is a critical source of new and existing users that cannot be replaced by other traffic sources such as direct navigation or apps. And in a race to accumulate network effects, no competitor can afford to forgo meaningful sources of traffic and new users, lest the amount and quality of user content (and advertiser engagement) decline. When Google self-preferences its own inferior local search vertical (including through OneBox) and demotes its rivals in organic search results, it deprives Yelp and other rivals of an even playing field and redirects traffic away from superior results, which often come from Yelp, and toward Google's own product.

154.    Through its conduct, Google deprives Yelp of the traffic upon which it depends to maintain scale and act as a competitive counterweight to Google. Because Google in particular is the most significant source of web traffic to Yelp, Yelp's success depends on its ability to maintain a prominent presence in search results for queries regarding local businesses on Google. Google's success in siphoning users away from Yelp in the local search market deprives Yelp of user traffic. This loss of traffic has had a three-fold negative effect on Yelp's business. First, it has directly caused Yelp to lose advertising revenues; but for Google's anticompetitive conduct, Yelp would have had more traffic and users and more advertising dollars would have followed. Second, it has increased Yelp's own costs to compete, by forcing Yelp to purchase advertising from Google just to be able to reach users, given Google's preferential treatment of its own local vertical at the top of the SERP in combination with sponsored links. Third, it has impaired Yelp's ability to improve its content every day, and thus has harmed Yelp's ability to compete. Yelp innovated the local search market with high-quality, user-generated reviews. Less traffic to Yelp's platform hampers its ability to grow and improve content, which it needs to satisfy new and existing users (and attract advertisers).

COMPLAINT

155.   As a result of Google's unlawful conduct, Yelp has suffered quantifiable damages.

**IV.   Google's Anticompetitive Conduct Persists and Recurs Every Day**

156.   Google's anticompetitive conduct, as outlined herein, recurs every day. While this narrative begins as early as 2007, Google's conduct has worsened in recent years, despite an FTC investigation, a successful suit by the U.S. Department of Justice, and increased scrutiny and fines from European and other regulators internationally. And Google's market share in local search services and local search advertising has steadily grown by dint of its exclusionary conduct.

157.   Every day, Google performs roughly 9 billion searches, of which 30% of desktop searches and nearly 50% of mobile searches relate to local businesses.

158.   When Google's algorithm detects a local search intention, based on the user query, Google delivers its OneBox, promotes its own search results, and demotes that of its local search competitors, including Yelp. Today, a Google user query for "restaurants in Brooklyn" will yield a SERP prominently featuring Google's colorful, attractive OneBox result in a way that draws the user's attention away from more relevant organic search results, which trail down the page and are skewed based on Google's perceived competition. This is because Google's inferior local search vertical is not subject to Google's generic search algorithms.

159.   With each new local search query and response, Google renews its anticompetitive conduct, harming consumers, competition, and local search competitors such as Yelp. As such, Yelp experiences a new and accumulating injury—and damages—from Google's conduct every few seconds; each instance is a new and independent act by Google.

**<u>INTERSTATE COMMERCE AND TRADE</u>**

160.   Google's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States.

161.   The market for general search services is a national market.

162.   The market for local search services is a national market.

163.   The market for local search advertising is a national market.

51

COMPLAINT

164.    Google has marketed and provided its general search services throughout the United States.

165.    Google and Yelp have each marketed and provided local search services throughout the United States.

166.    Google and Yelp have each marketed and provided local search advertising throughout the United States.

167.    Google has entered into agreements for providing general and local search services, and local search advertising, throughout the United States.

168.    Google has used instrumentalities of interstate commerce to provide general and local search services, and local search advertising, throughout the United States.

169.    In furtherance of the anticompetitive conduct and scheme alleged herein, Google executives and employees have traveled between states and exchanged communications through interstate wire communications and via U.S. mail.

170.    Google's anticompetitive actions have had a substantial effect on interstate trade and commerce in the markets for general and local search services, as well as local search advertising.

171.    The anticompetitive conduct and scheme alleged herein has affected millions, if not billions, of dollars of interstate commerce.

## CLAIMS FOR RELIEF

### Count I:

### Monopolization of the Local Search Services Market in Violation of Sherman Act § 2 (15 U.S.C. § 2)

172.    Yelp hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

173.    The market for local search services is a relevant antitrust market, and the United States is the relevant geographic market.

COMPLAINT

174.    Google possessed (and currently possesses) monopoly power in the local search services market in the United States. Barriers to entry are high in this market. Google has the power to control prices and exclude competition in that market.

175.    Google has willfully and intentionally obtained and/or maintained its monopoly in the local search services market by engaging in the exclusionary, anticompetitive conduct set forth in this complaint. This conduct includes self-preferencing its own inferior local search vertical over its competitors, driving traffic and revenue away from its competitors, precluding competitors from achieving scale, and increasing rivals' costs to gain market share for itself— and it can be characterized as a tying arrangement, a refusal to deal, monopoly leveraging, and monopolistic product design/redesign.

176.    The direct, foreseeable, and proximate result of Google's anticompetitive conduct was to reduce quality and harm competition in the market for local search services.

177.    Google's anticompetitive conduct lacks any non-pretextual procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

178.    To the extent that Google offers any non-pretextual procompetitive justification for its conduct, it could have achieved any such benefit through less restrictive means.

179.    As a direct, material, and proximate result of Google's violation of § 2 of the Sherman Act, Yelp has suffered and continues to suffer injury to its business and property within the meaning of § 4 of the Clayton Act, including measurable damages in an amount to be calculated at trial.

180.    Yelp is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

181.    Yelp further seeks equitable relief in the form of an injunction preventing Google from continuing the unlawful conduct alleged herein and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Google is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the local search services market, as well to Yelp and other competitors in that market.

COMPLAINT

**Count II:**

**Attempted Monopolization of the Local Search Services Market in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

182.    Yelp hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

183.    The market for local search services is a relevant antitrust market, and the United States is the relevant geographic market.

184.    Google possessed (and currently possesses) sufficient market power in the local search services market to pose a dangerous probability of monopolizing that market.

185.    Google has attempted to monopolize the market for local search services in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Google's actions individually and collectively increased Google's market power in the local search services market.

186.    Google has willfully and intentionally engaged in exclusionary, anticompetitive conduct that creates a dangerous probability of successfully monopolizing the local search services market. This conduct includes self-preferencing its own inferior local search vertical over its competitors, driving traffic and revenue away from its competitors, precluding competitors from achieving scale, and increasing rivals' costs to gain market share for itself— and it can be characterized as a tying arrangement, a refusal to deal, monopoly leveraging, and monopolistic product design/redesign.

187.    Google's actions were carried out willfully and with the specific intent to monopolize the market for local search services through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

188.    The direct, foreseeable, and proximate result of Google's anticompetitive conduct was to reduce quality and harm competition in the market for local search services.

189.    Google's anticompetitive conduct lacks any non-pretextual procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

COMPLAINT

190.    To the extent that Google offers any non-pretextual procompetitive justification for its conduct, it could have achieved any such benefit through less restrictive means.

191.    As a direct, material, and proximate result of Google's violation of § 2 of the Sherman Act, Yelp has suffered and continues to suffer injury to its business and property within the meaning of § 4 of the Clayton Act, including measurable damages in an amount to be calculated at trial.

192.    Yelp is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

193.    Yelp further seeks equitable relief in the form of an injunction preventing Google from continuing the unlawful conduct alleged herein and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Google is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the local search services market, as well to Yelp and other competitors in that market.

### Count III:

### Attempted Monopolization of the Local Search Advertising Market in Violation of Sherman Act § 2 (15 U.S.C. § 2)

194.    Yelp hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

195.    The market for local search advertising in the United States is a relevant antitrust market, and the United States is the relevant geographic market.

196.    Google possessed (and currently possesses) sufficient market power in the local search advertising market to pose a dangerous probability of monopolizing that market.

197.    Google has attempted to monopolize the market for local search advertising in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Google's actions individually and collectively increased Google's market power in the local search advertising market.

198.    Google has willfully and intentionally engaged in exclusionary, anticompetitive conduct that creates a dangerous probability of successfully monopolizing the local search

COMPLAINT

advertising market. This conduct includes self-preferencing its own inferior local search vertical over its competitors, driving traffic and revenue away from its competitors, precluding competitors from achieving scale, and increasing rivals' costs to gain market share for itself— and it can be characterized as a tying arrangement, a refusal to deal, monopoly leveraging, and monopolistic product design/redesign.

199.     Google's actions were carried out willfully and with the specific intent to monopolize the market for local search advertising through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

200.     The direct, foreseeable, and proximate result of Google's anticompetitive conduct was to increase prices, reduce quality, and harm competition in the market for local search advertising.

201.     Google's anticompetitive conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

202.     To the extent that Google offers any non-pretextual procompetitive justification for its conduct, it could have achieved any such benefit through less restrictive means.

203.     As a direct, material, and proximate result of Google's violation of § 2 of the Sherman Act, Yelp has suffered and continues to suffer injury to its business and property within the meaning of § 4 of the Clayton Act, including measurable damages in an amount to be calculated at trial.

204.     Yelp is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

205.     Yelp further seeks equitable relief in the form of an injunction preventing Google from continuing the unlawful conduct alleged herein and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Google is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the local search advertising market, as well to Yelp and other competitors in that market.

COMPLAINT

**Count IV:**

**Unlawful Tying of Local Search Services to General Search Services in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

206.    Yelp hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

207.    The market for general search services is a relevant antitrust market, and the United States is the relevant geographic market. Google has monopoly power in the general search services market.

208.    The market for local search services in the United States is a relevant antitrust market, and the United States is the relevant geographic market.

209.    The general search services market and the local search services market are separate and distinct markets, with separate and distinct products and services.

210.    By virtue of the anticompetitive conduct alleged herein, Google has unlawfully tied its local search product to its general search product. Google has done so via policy, practice, and contract as alleged herein.

211.    Google uses its monopoly power in general search services (*i.e.,* the tying product) to compel users to use Google's own local search product (*i.e.,* the tied product). Google does this by designing its SERP so that users are directed towards its own, inferior local search vertical and away from its competitors, without any ability for consumers to choose otherwise. In practice and under Google' Terms of Services, users are compelled to use Google's local search product when they use Google's general search product. Under Google's Terms of Services, users are prohibited from modifying any part of Google's services or software when they use Google's general search services. Users cannot opt out of using Google's local search product when they use Google's general search product.

212.    Google's tying conduct as described herein is exclusionary vis-à-vis its competitors in local search services. By automatically populating and self-preferencing Google's inferior local search vertical in its general search, Google drives traffic and revenue away from its local search competitors, precluding competitors from achieving scale, and increasing rivals'

57

costs to gain market share for itself. Google's anticompetitive conduct affects a substantial volume of commerce, because Google's local search competitors depend highly on traffic from Google's general search. Google has behaved as alleged herein to achieve, maintain, and grow its monopoly in the markets for general search services and local search services, with the result of foreclosing competition, diminishing users' choice, and diminishing innovation and quality.

213.    Given Google's monopoly power in the tying market for general search services, and the substantial effect on commerce in the tied market for local search services, this tie is per se unlawful.

214.    There is no valid business necessity or procompetitive justification for Google's conduct. Instead, Google's actions are designed to destroy competition in the local search services market as alleged herein.

215.    To the extent there are available non-pretextual procompetitive justifications for Google's conduct, there exist less restrictive alternatives to achieve any justifications posited. Moreover, Google's behavior fails a balancing test between anticompetitive harms and procompetitive benefits.

216.    As a direct, material, and proximate result of Google's violation of § 2 of the Sherman Act, Yelp has suffered, and will continue to suffer, injury to its business and property within the meaning of § 4 of the Clayton Act, including measurable damages in an amount to be calculated at trial.

217.    Yelp further seeks equitable relief in the form of an injunction preventing Google from continuing the unlawful conduct alleged herein and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Google is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the local search services market, as well to Yelp and other competitors in that market.

COMPLAINT

**Count V:**

**Illegal Monopoly Leveraging in the Local Search Services Market in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

218.    Yelp hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

219.    The market for general search services is a relevant antitrust market, and the United States is the relevant geographic market. Google has monopoly power in the general search services market.

220.    The market for local search services is a distinct market from general search services and also a relevant antitrust market. The United States is the relevant geographic market for local search services.

221.    Google possesses sufficient market power in the local search services market to pose a dangerous probability of successfully monopolizing the local search services market.

222.    Google has leveraged its monopoly power in the general search services market in an attempt to create or maintain a monopoly in the local search services market.

223.    Google has willfully and intentionally engaged in exclusionary, anticompetitive conduct that creates a dangerous probability of successfully monopolizing the local search services market. This conduct includes self-preferencing its own inferior local search vertical over its competitors, driving traffic and revenue away from its competitors, precluding competitors from achieving scale, and increasing rivals' costs to gain market share for itself— and it can be characterized as a tying arrangement, a refusal to deal, monopoly leveraging, and monopolistic product design/redesign.

224.    Google's actions were carried out willfully and with the specific intent to monopolize the market for local search services through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

225.    The direct, foreseeable, and proximate result of Google's anticompetitive conduct was to reduce quality and harm competition in the market for local search services.

COMPLAINT

226.    Google's anticompetitive conduct lacks any non-pretextual procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

227.    To the extent that Google offers any non-pretextual procompetitive justification for its conduct, it could have achieved any such benefit through less restrictive means.

228.    As a direct, material, and proximate result of Google's violation of § 2 of the Sherman Act, Yelp has suffered injury to its business and property within the meaning of § 4 of the Clayton Act, including measurable damages in an amount to be calculated at trial.

229.    Yelp is entitled to threefold or trebled damages, as well as costs, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

230.    Yelp further seeks equitable relief in the form of an injunction preventing Google from continuing the unlawful conduct alleged herein and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Google is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the local search services market, as well to Yelp and other competitors in that market.

**Count VI:**

**Illegal Monopoly Leveraging in the Local Search Advertising Market in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

231.    Yelp hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

232.    The market for general search services is a relevant antitrust market, and the United States is the relevant geographic market. Google has monopoly power in the general search services market.

233.    The market for local search advertising in the United States is a distinct market and also a relevant antitrust market. The United States is the relevant geographic market.

234.    Google possesses sufficient market power in the local search advertising market to pose a dangerous probability of successfully monopolizing the local search advertising market.

COMPLAINT

235.   Google has leveraged its monopoly power in the general search services market in an attempt to create or maintain a monopoly in the local search advertising market.

236.   Google has willfully and intentionally engaged in exclusionary, anticompetitive conduct that creates a dangerous probability of successfully monopolizing the local search advertising market. This conduct includes self-preferencing its own inferior local search vertical over its competitors, driving traffic and revenue away from its competitors, precluding competitors from achieving scale, and increasing rivals' costs to gain market share for itself—and it can be characterized as a tying arrangement, a refusal to deal, monopoly leveraging, and monopolistic product design/redesign.

237.   The direct, foreseeable, and proximate result of Google's anticompetitive conduct was to increase prices, reduce quality, and harm competition in the market for local search advertising.

238.   Google's anticompetitive conduct lacks any non-pretextual procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

239.   To the extent that Google offers any non-pretextual procompetitive justification for its conduct, it could have achieved any such benefit through less restrictive means.

240.   As a direct, material, and proximate result of Google's violation of § 2 of the Sherman Act, Yelp has suffered injury to its business and property within the meaning of § 4 of the Clayton Act, including measurable damages in an amount to be calculated at trial.

241.   Yelp is entitled to threefold or trebled damages, as well as costs, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

242.   Yelp further seeks equitable relief in the form of an injunction preventing Google from continuing the unlawful conduct alleged herein and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Google is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the local search advertising market, as well to Yelp and other competitors in that market.

COMPLAINT

## Count VII:

## California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)

243.    Yelp hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

244.    Google has engaged, and continues to engage, in the acts or practices described herein, which are unlawful, and which constitute unfair competition within the meaning of section 17200 of the California Business and Professions Code.

245.    Google has engaged, and continues to engage, in the acts or practices described herein, which are unfair, irrespective of the violation of any other law, and which constitute unfair competition within the meaning of section 17200 of the Business and Professions Code.

246.    Google's conduct harms Yelp.

247.    Yelp seeks injunctive relief and restitution under California's Unfair Competition Law.

## **PRAYER FOR RELIEF**

WHEREFORE, Yelp respectfully requests that the Court enter judgment in favor of Yelp and against Google:

a.   Awarding monetary damages, including treble damages, together with the expenses of litigation and costs of this action, including attorneys' fees and expenses;

b.   Awarding pre- and post-judgment interest;

c.   Awarding restitution;

d.   Issuing an injunction prohibiting Google from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose and effect as the challenged practices;

e.   Awarding any other equitable relief necessary to prevent and remedy Google's anticompetitive conduct;

f.   Awarding a declaration that the restraints complained of herein are unlawful; and

g.   Granting such other and further relief as this Court deems just and proper.

62

COMPLAINT

**JURY DEMAND**

Yelp demands a trial by jury on all issues so triable.

Dated: August 28, 2024

HAUSFELD LLP

By: */s/ Sathya S. Gosselin*
Sathya Gosselin (SBN 269171)
Swathi Bojedla (*pro hac vice* motion
forthcoming)
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
sgosselin@hausfeld.com
sbojedla@hausfeld.com

Renner K. Walker (*pro hac vice* motion
forthcoming)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
rwalker@hausfeld.com

Joanne Bui (SBN 340378)
**HAUSFELD LLP**
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
jbui@hausfeld.com

*Counsel for Yelp Inc.*

63

COMPLAINT