1  [*Submitting counsel on signature page*]

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10                          **SAN JOSE DIVISION**

11                                          Case No. 5:24-cv-06101-SVK
    YELP INC.,
12                                          **DEFENDANT GOOGLE'S MOTION TO**
                          Plaintiff,        **DISMISS COMPLAINT;**
13                                          **MEMORANDUM OF POINTS AND**
                     v.                     **AUTHORITIES IN SUPPORT THEREOF**
14
    GOOGLE LLC,                             Date:      December 17, 2024
15                                          Time:      10 a.m.
                                            Place:     Courtroom 6, 4th Floor
16                        Defendant.        Judge:     Magistrate Judge Susan van Keulen

17

18

19

20

21

22

23

24

25

26

27

28

1   <u>**NOTICE OF MOTION AND MOTION TO DISMISS**</u>

2   **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

3   Please take notice that at 10:00 am on December 17, 2024, or as soon thereafter as the

4   matter may be heard by the Court, at the courtroom of Magistrate Judge Susan van Keulen,

5   Courtroom 6, 4th Floor, United States District Court, 280 South 1st Street, San Jose, CA 95113,

6   Defendant Google LLC will and hereby does move the Court, pursuant to Rule 12(b)(6) of the

7   Federal Rules of Civil Procedure, for an order dismissing Counts I–VII (all counts) of Plaintiff

8   Yelp Inc.'s Complaint.

9   Google's motion is based upon this Notice of Motion and the Memorandum of Points and

10   Authorities that follows, the accompanying Request for Consideration of Documents

11   Incorporated by Reference and for Judicial Notice, the Declaration of John E. Schmidtlein and

12   exhibits attached thereto, the pleadings and other papers on file in this action, any reply papers

13   that may be filed, and on the arguments of counsel.

14   **STATEMENT OF ISSUES TO BE DECIDED**

15   The Complaint should be dismissed.  As set forth in detail below, dismissal is necessary

16   because (1) Yelp's claims are time-barred; (2) Yelp fails to plead an unlawful tying arrangement

17   (Count IV); (3) Yelp fails to plead claims for monopoly leveraging (Counts V and VI); (4) Yelp

18   fails to plead claims for refusal to deal; and (5) Yelp fails to plead a separate California Unfair

19   Competition Law claim (Count VII).

20

21   DATED: October 28, 2024

22   By: */s/ John E. Schmidtlein*
     John E. Schmidtlein

23   WILLIAMS & CONNOLLY LLP
     680 Maine Avenue SW

24   Washington, DC 20024
     Tel: 202-434-5000

25   jschmidtlein@wc.com

26   Amit Gressel
     WILSON SONSINI GOODRICH & ROSATI P.C.

27   One Market Plaza, Spear Tower, Suite 3300
     San Francisco, CA  94105-1126

28   Tel: 415-947-2087

1     agressel@wsgr.com

2     Franklin M. Rubinstein (*pro hac vice*)
3     WILSON SONSINI GOODRICH & ROSATI P.C.
      1700 K Street NW
4     Washington, DC 20006
      Tel: 202-973-8800
5     frubinstein@wsgr.com

6     *Attorneys for Defendant Google LLC*

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    Google Search ................................................................................ 2

    B.    Yelp ................................................................................................ 4

    C.    The Google-Yelp Relationship and 2011 FTC Investigation ...................... 5

    D.    Yelp's 2024 Lawsuit ................................................................... 7

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ...................................................................................................... 10

I.    YELP'S CLAIMS ARE TIME-BARRED. ........................................ 10

    A.    The statute of limitations began to run in 2007. ........................ 10

    B.    Google's continued implementation of the challenged product design does not save Yelp's untimely claims. ........................... 11

    C.    Yelp does not plead any basis to toll the statute of limitations. ................. 13

    D.    For the same reasons, Yelp's requests for equitable relief are time-barred. ................................................................................. 14

II.    COUNT IV DOES NOT PLEAD AN UNLAWFUL TYING ARRANGEMENT ................................................................................ 15

    A.    Yelp fails to plead that Google's SERP ties together two "distinct products." ....................................................................... 15

    B.    Yelp fails to plead that Google sells either the tying or tied product. ......................................................................................... 16

    C.    Yelp fails to plead that Google "coerces" users to use its local results. ........................................................................................... 17

III.    COUNTS V AND VI DO NOT PLEAD CLAIMS FOR MONOPOLY LEVERAGING ...................................................................................... 18

IV.    YELP FAILS TO STATE COGNIZABLE REFUSAL-TO-DEAL

CLAIMS. ...........................................................................................20

V.    COUNT VII DOES NOT PLEAD A SEPARATE CLAIM UNDER

CALIFORNIA'S UCL.........................................................................22

CONCLUSION.........................................................................................23

1

**TABLE OF AUTHORITIES**

2

**CASES**

3    *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) .............9, 15, 16, 20, 21

4    *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) ...............................19

5    *AMF, Inc. v. General Motors Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d

6        68 (9th Cir. 1979)...............................................................................................................11, 13

7    *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799 (N.D. Cal. 2011) ....................6

8    *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)....................................20

9    *Athos Overseas, Ltd. v. YouTube, Inc.*, 2022 WL 910272 (S.D. Fla. Mar 29, 2022) ...................16

10   *Aurora Enterprises, Inc. v. Nat'l Broad. Co.*, 688 F.2d 689 (9th Cir. 1982)............................9, 14

11   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................................8

12   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) .................................................17

13   *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)...................22

14   *City of San Jose v. Off. of the Com'r of Baseball*, 776 F.3d 686 (9th Cir. 2015) .........................22

15   *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018) .....................................7

16   *Doe 1 v. Abbott Laboratories*, 571 F.3d 930 (9th Cir. 2009) ....................................................9, 19

17   *Dream Big Media Inc. v. Alphabet Inc.*, 2024 WL 3416509, at *3 (N.D. Cal. July 15,

18       2024) ..............................................................................................................................17, 18

19   *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) .......17, 18

20   *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022) ........................................21

21   *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074 (N.D. Cal. 2017) ........................................22

22   *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)..............................................................22

23   *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) ............................19, 21

24   *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015).......................10

25   *In re Google Digit. Advert. Antitrust Litig.*, 2021 WL 2021990 (N.D. Cal. May 13, 2021) .........17

26   *In re Google Digit. Advert. Antitrust Litig.*, 2024 WL 895155 (S.D.N.Y. Mar. 1, 2024) .............13

27   *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp. ("ITT")*, 518 F.2d 913 (9th Cir. 1975)..........14

28   *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002) ...............................14

1  *Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016)................................................................16

2  *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861 (D. Del. 1987)...............................................17

3  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)...........................................18

4  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) .......................................................................10

5  *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008) .....................................21

6  *Moore v. James H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977)...........................................17

7  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir. 1987)..................................11, 13

8  *Paladin Assocs. Inc. v. Mont. Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ...................................17

9  *Pampena v. Musk*, 705 F. Supp. 3d 1018 (N.D. Cal. 2023).........................................................6

10  *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014)....................19

11  *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020).........9, 14, 15

12  *SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023)..................................12

13  *SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845 (N.D. Cal. May 26, 2022)..........................12, 14

14  *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013).......................................................22

15  *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953)................................................16

16  *Top Rank, Inc. v. Haymon*, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)...................................19

17  *Unigestion Holdings, S.A. v. UPM Tech., Inc.*, 412 F. Supp. 3d 1273 (D. Or. 2019) .................19

18  *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ....7, 9, 19, 20

19  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010)..............9

## STATUTES

21  15 U.S.C. § 15b..............................................................................................................................9

22  15 U.S.C. § 16(i)..........................................................................................................................14

23  California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)................... *passim*

24

25

26

27

28

**INTRODUCTION**

Yelp's lawsuit challenges a product innovation that Google first introduced in Google Search in 2007.  Yelp has been peddling these same claims to antitrust authorities around the world for over a decade, and no such authority has raised them in any antitrust action against Google.  Yelp's claims are meritless, are untimely on their face, and should be dismissed with prejudice.

Google launched in 1998 as a general search engine, crawling the web to find the best results to a wide range of user queries and presenting those web results, ranked by relevance and quality.  ECF No. 1 ("Compl.") ¶¶ 23–27, 47.  Originally, the Google search results page only displayed web results, or links to webpages; but by 2004, Google also offered so-called "specialized" results—designed to help a user more easily find detailed information relating to a particular category of queries, such as local or news.  *Id.* ¶¶ 27–28, 38–39, 41, 115.

Google worked constantly to innovate and launch improvements to search.  The gravamen of Yelp's Complaint is Google's 2007 decision to incorporate specialized results into its main search engine results page ("SERP"); Yelp refers to this design change as "self-preferencing."  *E.g.*, *id.* ¶¶ 44–45, 87.  Specifically, Yelp alleges that Google's decision to display specialized local results at the top of the SERP harmed Yelp because it "invariably" pushed web results that included links to webpages like Yelp further down, allegedly making it less likely a user would click on a link to Yelp.  *Id.* ¶¶ 42–45.  Every one of the seven counts in Yelp's Complaint has as its theory of liability this 2007-era supposed "preferencing" of Google's allegedly inferior local results over web results that Yelp says ranked higher on the SERP prior to 2007.  *E.g.*, *id.* ¶¶ 5, 9–10, 12, 40–45, 175, 186, 198, 212, 223, 236, 244–45.

The four-year statute of limitations applicable to Yelp's claims ran long ago.  Indeed, Yelp has been a vocal critic of Google for many years.  In testimony before Congress in 2011, for example, Yelp's founder and CEO complained about the very same design change that Yelp now sues over, testifying that the 2007 product design implementation favored Google's specialized results, "pushing objectively ranked websites down the page."  Ex. B at 37.  Yelp also made the same allegations to the Federal Trade Commission ("FTC") in the FTC's 2011

1 investigation of Google.  In a 2012 memorandum that Yelp incorporates into its Complaint, the

2 FTC staff ultimately recommended not filing a complaint, "not only because of the legal hurdles

3 [it] would face, but because of the strong procompetitive justifications Google ha[d] set

4 forth."  Ex. A at 86.  Yet Yelp inexplicably waited until 2024 to file this lawsuit.  All of Yelp's

5 claims are barred by the statute of limitations and doctrine of laches.  *Infra* Part I.

6       Counts IV, V, VI, and VII are subject to dismissal for additional independent reasons

7 beyond being untimely.  Yelp's tying claim (Count IV)—alleging that Google's 2007 design

8 innovation tied its specialized local search results to its general search results—fails because

9 Yelp does not plausibly allege that Google's local search results and general search results are

10 separate products, that users purchase any of these search results, or that Google coerces

11 consumers to use its local results instead of Yelp's.  *Infra* Part II.  Counts V and VI fail because

12 monopoly leveraging is not a standalone claim in the Ninth Circuit and, in any event, Yelp has

13 not pled any separate exclusionary conduct to support such a claim.  *Infra* Part III.  In addition,

14 none of Yelp's allegations of "refusal[s] to deal" states any claim.  *Infra* Part IV.  And finally,

15 Yelp's California Unfair Competition Law ("UCL") claim (Count VII) fails because it mirrors

16 Yelp's federal claims and thus must be dismissed for the same reasons.  *Infra* Part V.

17 **BACKGROUND**[1]

18     **A.**    **Google Search**

19       Google operates a general search engine that seeks to answer a wide range of user

20 queries.  Compl. ¶ 23.  In its early years, Google's SERP showed only unpaid (commonly known

21 as "organic") web results, which are hyperlinks to webpages pulled from Google's index of the

22 web.  *Id.* ¶¶ 30, 47.[2]  Beginning in 2000, Google launched its first advertising product, allowing

23 advertisers to buy keyword-targeted text ads that would appear on the SERP when relevant to the

24 user query.  *Id.* ¶ 30.

25

26

27 [1] This motion assumes the truth of Yelp's allegations solely for purposes of Rule 12(b)(6).

28 [2] The Complaint uses the terms "general web results" and "organic" search results interchangeably to refer to unpaid web results on Google's SERP.  *E.g.*, Compl. ¶¶ 38–39.

1   Starting in the mid-2000s, Google began providing specialized results for certain

2   categories of searches, known as "verticals."  *Id.* ¶¶ 38, 115.[3]  A "vertical" in the search industry

3   context refers to groupings of queries by subject matter, "such as local, product or shopping

4   comparison, and travel."  *Id.* ¶ 23.  In 2004, Google launched specialized local results in order

5   "to help users find local businesses."  *Id.* ¶ 115.

6   When Google first launched specialized results in the mid-2000s, it "displayed [such

7   results] via tabs at the top of the general SERP," *i.e.*, users would need to click on different tabs

8   in order to receive results for a specific vertical.  *Id.* ¶ 38.  For example, a Google user who

9   wanted to access Google's specialized local results had to navigate to a dedicated "local" tab.  In

10  2007, Google introduced a design innovation known as "universal search."  *Id.* ¶¶ 38–

11  39.  Through universal search, Google implemented a new SERP design that incorporated

12  specialized results on the same page as the traditional web results and text ads.  *Id.* ¶ 38.  In other

13  words, Google "moved its own vertical search results to the main SERP" instead of displaying

14  them separately in individual tabs, *id.*, and thereby "blend[ed] content from Images, Maps,

15  Books, Video, and News" with its web results, *id.* ¶ 39 & n.12.  Yelp alleges that with the launch

16  of universal search, Google began displaying its specialized results on the SERP in units

17  (referred to in the Complaint as "OneBoxes").  *Id.* ¶ 39.  These OneBoxes "contain[] additional

18  elements, such as images, maps, or product information, unlike traditional text links in organic

19  search results."  *Id.* ¶ 41.

20  Yelp's Complaint concedes that universal search "operates substantially similarly today"

21  as it did in 2007.  *Id.* ¶ 40.  "While there have been numerous changes to the SERP since 2007,

22  including to the names of various Google verticals, ***the general architecture concept is the***

23  ***same***."  *Id.* ¶ 42 (emphasis added).  As shown below in Figure 1, Yelp alleges that "if a user

24  searches for 'plumber San Francisco,' they will invariably first receive sponsored results,

25  followed by Google's [specialized] results, and only then can they scroll down to see organic

26  search results[.]"  *Id.*

27

28  _____

[3] The Complaint uses the term "vertical search results" to refer to what are also known as
"specialized results."  Compl. ¶ 40.

1

**Figure 1**[4]

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     **B.      Yelp**

24          Yelp was founded in 2004.  Compl. ¶ 19.  Yelp is a "specialized vertical provider" (or

25     "SVP"), meaning that it "respond[s] to user queries on a particular subject matter with

26     proprietary, structured data[.]"  *Id.* ¶ 7.  In Yelp's case, the particular subject matter is local

27     search.  *Id.*  SVPs generate revenue by offering narrow subject matter, enticing their customers to

28

---

[4] *See* Compl. ¶ 42 & Fig. 1 ("Specialized results" and "Web results" labels have been added).

1   use their search platform, and then selling advertisements or otherwise monetizing their

2   content.  *Id.* ¶ 8.  Yelp's mission is "to provide a local search platform to connect consumers

3   with great local businesses."  *Id.* ¶ 19.  Other examples of SVPs include Expedia for travel,

4   Glassdoor for jobs, and Zillow for apartment rentals and real estate.  *Id.* ¶ 7.  Users can access

5   Yelp and other SVPs directly via their websites, via their mobile applications, or by clicking on a

6   link through a general search engine like Google.  *Id.* ¶¶ 7, 20.

7        Competition between Google and SVPs "can be intense," especially for user clicks on

8   commercial search results, *i.e.*, the results typically served in response to a user seeking to make

9   a purchase.  *Id.* ¶¶ 45, 48.  Google and Yelp compete for local search queries and local search

10   advertisers.  *Id.* ¶¶ 12–13.  "SVPs like Yelp are a threat to Google" because SVPs can "siphon

11   traffic (and thus revenue) away from [Google]."  *Id.* ¶ 8.

12        **C.**     **The Google-Yelp Relationship and 2011 FTC Investigation**

13        In 2005, Google and Yelp entered into a two-year licensing agreement under which

14   Google had access to and could feature in its local results Yelp's review content and business

15   information.  Compl. ¶ 117.  Yelp characterizes the parties at that time as "peacefully

16   coexist[ing]."  *Id.* ¶ 9.

17        When the licensing deal came up for renewal in 2007, Google allegedly "informed Yelp

18   that it intended to offer a competing product."  *Id.* ¶ 117.  Allegedly concerned that Google

19   would use Yelp's data to compete with Yelp, Yelp declined to renew the agreement.  *Id.*  Several

20   years later, allegedly recognizing the value of Yelp's user reviews, "Google attempted to acquire

21   Yelp."  *Id.* ¶ 119.  When that deal fell apart, Yelp claims that Google began "compil[ing] reviews

22   from across the internet, including reviews 'scraped' from Yelp."  *Id.* ¶ 121.  Yelp alleges it

23   learned of this in 2010 "and immediately protested."  *Id.* ¶ 123.  (While these events are

24   described in the Complaint's background, Yelp does not plead any claim on the basis of alleged

25   scraping.)

26        As set forth in a document that Yelp refers to as the "FTC Staff Memo," located at a

27   website cited in its Complaint (and attached herein as Ex. A), in 2011, the FTC opened an

28   investigation into (1) whether Google "'scraped,' or appropriated, the content of vertical rivals,

1   in order to improve its own vertical products," *id.* ¶ 124 (citing Ex. A at ii–iii), and (2) whether

2   "Google has unlawfully preferenced its own content over that of rivals, while simultaneously

3   demoting rival websites," Ex. A at ii, *cited by* Compl. ¶ 124 n.50.[5]

4          Yelp actively participated in the FTC's investigation.  The FTC issued Yelp a civil

5   investigative demand, and Yelp submitted responses and produced documents to the FTC.  *E.g.*,

6   *id.* at nn.129, 184–85.  At the same time, Yelp founder and CEO Jeremy Stoppelman testified

7   before Congress and submitted written responses to questions from members of Congress

8   regarding the FTC's investigation, alleging that Google preferenced its own vertical content.  *See*

9   Ex. B (excerpt), at 37, 170.[6]

10         With Yelp's assistance and involvement, the FTC investigated whether Google had

11   implemented a product design that "gave itself featured placement of the OneBox at the top of

12   the SERP, with no regard for the quality of [its] content."  Compl. ¶ 125 (citing Ex. A at 24–25);

13   *see also* Ex. A at ii.  As part of this review, the FTC investigated whether Google also "sought to

14   increase triggering of OneBox results . . . not only to provide users with the right answers to their

15   queries, but also to drive traffic to Google's verticals," and to "automatically boost the ranking of

16   its own vertical properties above that of its competitors."  Compl. ¶¶ 125–26 (first citing Ex. A at

17   24–25, then citing *id.* at 26–30).  After an extensive investigation, the FTC staff did "not

18   recommend that the Commission proceed on [a] cause of action . . . premised on anticompetitive

19   product design."  Ex. A at ii.  The memo concluded that "Google's efficiency justifications are

20   strong" and "Google can legitimately claim that at least part of the conduct at issue improves its

21   product and benefits users."  *Id.*  Among the reasons by FTC staff for its recommendation were

22   that "[p]roduct design change is an area of conduct where courts do not tend to strictly scrutinize

23

24   [5] The document Yelp referred to as the "FTC Staff Memo," dated August 8, 2012 and located at
     the website referenced in Yelp's Complaint, https://stratechery.com/wp-
25   content/uploads/2021/03/Staff-Memo.pdf (Ex. A), is incorporated into the Complaint and so of
     record on this motion to dismiss.  *See Pampena v. Musk*, 705 F. Supp. 3d 1018, 1037–38 (N.D.
26   Cal. 2023); *see also* Google's Motion for Judicial Notice ("Mot. for Jud. Notice").

27   [6] The Court may take judicial notice of the existence of congressional testimony.  *See Anschutz
     Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 834 (N.D. Cal. 2011); *see also* Mot. for
28   Jud. Notice.

1    asserted procompetitive justifications," *id*. at 81; "it seems clear that [u]niversal [s]earch is a

2    useful improvement to the product," *id*.; and some courts have read Supreme Court authority to

3    hold "that Google is privileged in blocking rivals from its search platform unless its conduct falls

4    into one of several specific exceptions referenced in *Trinko*[7] (*e.g.*, where there is an affirmative

5    voluntary prior course of dealing)." *Id.* at 84–85.

6          In 2013, the FTC closed its investigation of Google's business practices.  Compl. ¶ 127.

7    Google entered into certain commitments regarding the scraping allegations, "including that any

8    website owner could opt out from display on Google's local pages, and Google would cease

9    using that website's content." *Id*.  The FTC took no action with regard to the allegations of self-

10   preferencing, announcing as follows:

11

12          While Google's prominent display of its own vertical search results
            on its search results page had the effect in some cases of pushing
13          other results "below the fold," the evidence suggests that Google's
            primary goal in introducing this content was to quickly answer, and
14          better satisfy, its users' search queries by providing directly relevant
            information. Notably, the documents, testimony and quantitative
15          evidence the Commission examined are largely consistent with the
            conclusion that Google *likely benefited consumers* by prominently
16          displaying its vertical content on its search results page . . .
            Challenging Google's product design decisions in this case would
17          require the Commission – or a court – to second-guess a firm's
            product design decisions where plausible procompetitive
18          justifications have been offered, and where those justifications are
            supported by ample evidence.
19

20   Ex. C (emphasis added).[8]

21          **D.    Yelp's 2024 Lawsuit**

22          More than a decade after the FTC closed its investigation, as cited in the Complaint, Yelp

23   now brings claims under Section 2 of the Sherman Act (Counts I–VI) and California's Unfair

24   _____

25   [7] *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

     [8] Statement of the Federal Trade Commission Regarding Google's Search Practices, *In the*
26   *Matter of Google Inc.*, No. 111-0163, at 2 (Jan. 3, 2013), *available at*
     https://www.govinfo.gov/content/pkg/CHRG-112shrg71471/pdf/CHRG-112shrg71471.pdf
27    (last accessed Oct. 28, 2024) (attached as Ex. C).  *See DeHoog v. Anheuser-Busch InBev SA/NV*,
     899 F.3d 758, 763 n.5 (9th Cir. 2018) (taking judicial notice of government records); *see also*
28   Mot. for Jud. Notice.

1    Competition Law ("UCL") (Count VII).  Counts I–III for monopolization of the putative local

2    search services market and attempted monopolization of the putative local search services and

3    local search advertising markets assert that Google engaged in "exclusionary, anticompetitive"

4    conduct by allegedly "self-preferencing its own inferior local search vertical over its

5    competitors." Compl. ¶¶ 175, 186, 198.  Each of Counts I–III also refers to alleged "refusal[s] to

6    deal," "monopoly leveraging," and "tying."  *Id.*  Count IV, for purported "unlawful tying of local

7    search services to general search services," alleges that Google's "designing its SERP so that

8    users are directed towards its own, inferior local search vertical and away from its competitors"

9    constitutes an unlawful tie between Google's general search results and its local search

10   results.  *Id.* ¶ 211.  Counts V and VI, for "illegal monopoly leveraging in the [putative] local

11   search services market" and putative "local search advertising market," similarly assert that

12   Google engaged in "exclusionary, anticompetitive" conduct by allegedly "self-preferencing its

13   own inferior local search vertical over its competitors."  *Id.* ¶¶ 223, 236.  Finally, Count VII

14   alleges a violation of section 17200 of the California Business and Professions Code based on

15   the same conduct outlined in Counts I–VI, and seeks equitable relief on that basis.  Yelp does not

16   offer separate or unique allegations for Count VII, which is coextensive with the claims for relief

17   under the federal antitrust laws.

18        As reflected in each count of its Complaint, every one of Yelp's claims centers on

19   Google's 2007 product design implementation.  The conduct alleged to be anticompetitive is

20   Google's decision to place its specialized results on top of its SERP to the alleged exclusion of

21   rivals, thereby "self-preferenc[ing] itself over its competitors across all of its verticals, promoting

22   its own offerings and relegating competitor appearances in the organic search results that trail

23   down the page."  *Id.* ¶ 129.  This "general architecture concept" has been "the same" since

24   2007.  *Id.* ¶ 42.

25                                      **LEGAL STANDARD**

26        A complaint must be dismissed if it fails to state a claim that is "plausible on its face."

27   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim is facially plausible when it

28   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

1    alleged." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 989 (N.D. Cal.

2    2020) (internal quotation marks omitted).  On a Rule 12(b)(6) motion, "the Court accepts as true

3    all well-pled factual allegations and construes them in the light most favorable to the plaintiff,"

4    but need not accept as true "allegations that are merely conclusory, unwarranted deductions of

5    fact, or unreasonable inferences." *Id.* (citation omitted).  "A claim may be dismissed under Rule

6    12(b)(6) on the ground that it is barred by the applicable statute of limitations . . . when 'the

7    running of the statute is apparent on the face of the complaint.'"  *Von Saher v. Norton Simon*

8    *Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (citation omitted).

9         Actions under the Sherman Act are subject to a four-year statute of limitations.  *See* 15

10   U.S.C. § 15b.  And claims for equitable relief under the Sherman Act and California's Unfair

11   Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)[9] are subject to the doctrine of laches,

12   which typically follows the Sherman Act's four-year limitations period.  *See Aurora Enterprises,*

13   *Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982); *Reveal Chat Holdco, LLC*, 471 F.

14   Supp. 3d at 991.

15        To plead an unlawful tying arrangement, a plaintiff must plausibly allege "(1) that [the

16   defendant] tied together the sale of two distinct products or services; (2) that [the defendant]

17   possesses enough economic power in the tying product market to coerce its customers into

18   purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume

19   of commerce in the tied product market."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d

20   1171, 1178 (9th Cir. 2016) (citation omitted).  The Ninth Circuit does not recognize a standalone

21   monopoly leveraging claim; separate, actionable exclusionary conduct must be pleaded.  *Doe 1*

22   *v. Abbott Laboratories*, 571 F.3d 930, 935 (9th Cir. 2009).  Finally, a cognizable refusal-to-deal

23   claim requires an actual refusal to deal with a competitor, *not simply* a refusal to "deal under the

24   terms and conditions preferred by [a competitor's] rivals."  *Aerotec Int'l, Inc.*, 836 F.3d at 1183–

25   84 (alternation in original) (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438,

26   457 (2009)); *accord Trinko*, 540 U.S. at 407–08 ("Enforced sharing also requires antitrust courts

27

28   ───────────────
     [9] Because California's Unfair Competition Law only provides for equitable relief, *see id.* §
     17203, Yelp seeks only equitable relief under the statute, Compl. ¶ 247.

1    to act as central planners, identifying the proper price, quantity, and other terms of dealing—a

2    role for which they are ill suited.").

3                                           **ARGUMENT**

4    **I.      Yelp's Claims Are Time-Barred.**

5            Yelp's Complaint is premised on Google's 2007 launch of universal search, whereby

6    Google redesigned its SERP to incorporate and allegedly prioritize its specialized results over

7    web results linking to Yelp and other webpages.  Compl. ¶ 39.  Yelp's claims accrued in 2007

8    and are therefore untimely today.

9            **A.  The statute of limitations began to run in 2007.**

10           In antitrust, a cause of action "accrues and the statute begins to run when a defendant

11   commits an act that injures a plaintiff's business."  *In re Animation Workers Antitrust Litig.*, 87

12   F. Supp. 3d 1195, 1208 (N.D. Cal. 2015) (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401

13   U.S. 321, 338 (1971)); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997) (holding the

14   statute of limitations begins to run "when the [challenged] act first caused injury").  The face of

15   Yelp's Complaint puts that date in 2007, because that is when Google introduced universal

16   search and redesigned its SERP to include and rank specialized results amongst its general web

17   results.  Compl. ¶ 39.  It is this allegedly "monopolistic product design/redesign" that

18   purportedly injured Yelp.  *E.g., id*. ¶ 175.  According to Yelp, universal search "operates

19   substantially similarly today" as it did in 2007.  *Id*. ¶ 40.

20           Yelp made these same claims in 2011, at the time of the FTC investigation—in which

21   Yelp participated heavily; the investigation was ultimately closed in 2013 with no action.  Yelp's

22   CEO submitted to Congress in 2011 that "Google simply favors [its local results] as a matter of

23   design."  Ex. B, at 249.  Google of course vigorously disputed that mischaracterization in 2011,

24   and it disputes it today, but the point here is that these very same claims that were publicly

25   asserted in 2011 are untimely today.

26           The Complaint contains passing references to two other allegedly anticompetitive acts:

27   Google's alleged "scraping" of Yelp's content between 2007 to 2009, Compl. ¶¶ 121–23, and an

28   unidentified and undescribed algorithm change in 2015 that purportedly "caus[ed] Yelp to have

-10-

1   its first ever decline in year-over-year traffic," *id.* ¶ 128.  Setting aside Yelp's failure to articulate

2   how these alleged acts constitute antitrust claims in themselves (and the Complaint nowhere so

3   pleads), those claims would likewise be untimely.

**B.  Google's continued implementation of the challenged product design does not save Yelp's untimely claims.**

6   Yelp's Complaint implicitly acknowledges the untimeliness of Yelp's claims and,

7   *without pleading* any *new conduct* by Google within the limitations period, *argues*:

> With each new local search query and response, Google renews its anticompetitive conduct, harming consumers, competition, and local search competitors such as Yelp.  As such, Yelp experiences a new and accumulating injury—and damages—from Google's conduct every few seconds; each instance is a new and independent act by Google.

12  Compl. ¶ 159.  This is a legal conclusion, not a pleading of fact.  It is also wrong as a matter of

13  law.

14  "[T]wo elements characterize an overt act which will restart the statute of limitations:

15  1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and

16  2) it must inflict new and accumulating injury on the plaintiff."  *Pace Indus., Inc. v. Three*

17  *Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987).  Simply to announce that Yelp's injury is "new

18  and accumulating," *and* that it is purportedly caused by "new and independent act[s] by Google,"

19  Compl. ¶ 159, is not to plausibly plead either of those required elements to resuscitate a stale

20  claim.  The Complaint does not plead any new act by Google, *much less one "that is not merely*

21  *a reaffirmation of a previous act."  Pace*, 813 F.2d at 238 (emphasis added).  Quite to the

22  contrary, Yelp admits that universal search "operates substantially similarly today" as it did in

23  2007, Compl. ¶ 40, and Yelp's lawsuit is *not* about "changes to the SERP *since* 2007," but rather

24  about "the general architecture concept" of the SERP, which "is the same" today as it was then,

25  *id.* ¶ 42 (emphasis added).  Put another way, the alleged "promotion" of Google's specialized

26  local search results and alleged "demotion" of Yelp's (*see id.* ¶ 40) are allegedly the "unabated

27  inertial consequences" of Google's alleged 2007 SERP redesign.  *AMF, Inc. v. General Motors*

28  *Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68, 72 (9th Cir. 1979) (citation

-11-

1    omitted).  As Yelp's CEO put it in 2011, Google allegedly favored its specialized results "as a

2    matter of design."  Ex. B, at 249.

3        Courts in the Ninth Circuit have repeatedly required new and independent acts that are

4    not merely a reaffirmation of a previous act outside of the limitations period—without which

5    statutes of limitations would effectively never expire.  Most recently, in *SaurikIT, LLC v. Apple,*

6    *Inc.*, the Ninth Circuit affirmed dismissal of portions of the plaintiff's 2020 lawsuit as time-

7    barred where the allegedly exclusionary warranty terms and developer agreements dated to

8    2008.  2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023).  The Ninth Circuit specifically rejected

9    the plaintiff's contention that Apple committed a "new and independent act" each time it sold a

10    new iOS device with the warranty term at issue; given that the at-issue warranty term had been

11    in-place since 2008, the plaintiff "failed to allege that the new warranty agreements constitute

12    anything more than 'a reiteration or extension of' prior ones."  *Id.* (citation omitted).  The Ninth

13    Circuit likewise rejected the plaintiff's contention that allegedly exclusionary developer contracts

14    restarted the statute of limitations; while the plaintiff contended that those contracts "ha[d] not

15    stayed static over the years," the complaint lacked "factual allegations about the changes in the

16    character of these preexisting contracts . . .  to render them a 'new and independent act.'"  *Id.*;

17    *SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845, at *3 (N.D. Cal. May 26, 2022).  So too

18    here:  Yelp does not establish new and independent exclusionary conduct by simply pointing out

19    that new queries on Google Search yield new results "every few seconds."  Compl. ¶ 159.  That

20    is not the *conduct* complained of in this antitrust lawsuit.  Regardless, it is clearly not "new and

21    independent" conduct; rather, it is the operation of an "architecture," which has been "the same"

22    since 2007.  *Id.* ¶ 42.

23        Similarly, in *MedioStream, Inc. v. Microsoft Corp.*, the court dismissed a challenge to

24    Microsoft's allegedly decade-long practice of entering into purportedly exclusionary agreements

25    and anticompetitively integrating its Windows Media Player with its Windows Operating

26    System.  869 F. Supp. 2d 1095, 1105 (N.D. Cal. 2012).  Because the challenged practices were

27    pleaded to have been imposed *prior* to the limitations period, and because the plaintiff alleged

28    "no additional anticompetitive conduct associated with subsequent releases of the Windows

1  operating system," any subsequent conduct was "merely a reaffirmation" of the earlier

2  conduct.  *Id.* at 1107 (emphasis omitted).

3       Other courts have followed this approach, too.  The court in *In re Google Digital*

4  *Advertising Antitrust Litigation*, for example, rejected as time-barred a challenge to Google's

5  2017 design change to an advertising product that allegedly "limit[ed] the number of line items"

6  available to publishers.  2024 WL 895155, at *29 (S.D.N.Y. Mar. 1, 2024).  "A repeated

7  manifestation of the same overt act"—in that case, enforcement of an ad auction policy—"[are]

8  not new and independent acts."  *Id.* at *30.

9       As these cases make clear, where the defendant implements a challenged policy outside

10  the four-year limitations period—be it a design change, an exclusionary warranty term, or an

11  exclusionary policy—subsequent reiteration of the same conduct falls within the "merely a

12  reaffirmation" zone of *Pace* and its progeny.  *See also AMF, Inc.*, 591 F.2d at 72 (continuing to

13  decline invitations to deal with a competitor is not a "new and independent act," but rather the

14  "unabated inertial consequences" of the original refusal (citation omitted)).

15       This is not a case, for example, where the plaintiff alleges that a refusal to deal caused

16  harm that did not materialize to users for over a decade; Yelp claims it suffered the exact same

17  harm in 2007 as today.  Nor is it a case where the plaintiff alleges that a conspiracy changed, or

18  grew, over time; here there are no conspiracy claims at all, and the lawsuit is centered entirely on

19  a purportedly monopolistic design change implemented 17 years ago.  Compl. ¶¶ 42,

20  118.  Google's continued maintenance of its 2007 product design is "merely a reaffirmation" of

21  the initial design implementation.  *Pace*, 813 F.2d at 238.  Any injury to Yelp resulting from

22  Google's maintenance of the product design stems from the initial decision to implement it in

23  2007.  *See id.* at 239 ("Any injury to Pace resulting from continued prosecution through the

24  normal course of the appellate process relates back to the initial decision to file.").

25       **C.  Yelp does not plead any basis to toll the statute of limitations.**

26       Yelp does not plead any basis upon which to toll the statute of limitations.  Yelp does not

27  plead, for example, fraudulent concealment of its cause of action.  To the contrary, Google's

28  product design change was public upon its launch in 2007, and Yelp admittedly had sufficient

-13-

1   knowledge thereof to complain to the FTC and to Congress.  *See supra* Part I.A.  Nor does Yelp

2   plead tolling under 15 U.S.C. § 16(i) for "proceeding[s] [] instituted by the United States"; while

3   its Complaint repeatedly notes the findings of the District Court for the District of Columbia in

4   monopolization cases brought by the Department of Justice and various state attorneys general,

5   Yelp does not suggest that the filing of those lawsuits renders Yelp's claims timely (nor would

6   the filing of the lawsuits matter since the statute of limitations expired before the lawsuits were

7   filed).

8       **D.  For the same reasons, Yelp's requests for equitable relief are time-barred.**

9       Yelp's requests for equitable relief under the Sherman Act and California's Unfair

10  Competition Law are similarly barred by the doctrine of laches.

11      Antitrust claims seeking injunctive relief are subject to the equitable defense of laches.

12  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).  "[T]he four-

13  year statute of limitations in [the Clayton Act] furnishes a guideline for computation of the

14  laches period."  *Reveal Chat Holdco, LLC*, 471 F. Supp. 3d at 991 (quoting *Samsung Elecs. Co.

15  v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014)); *see also Aurora Enterprises, Inc.*, 688

16  F.2d at 694.  And courts apply the same laches inquiry to claims for equitable relief brought

17  under the UCL.  *See SaurikIT*, 2022 WL 1768845, at *4.

18      Laches prohibits a plaintiff from "sleep[ing] through their competitors' antitrust

19  violations and then su[ing] many years later," because "[t]he potential for economic disruption is

20  so great" from a belated lawsuit of this nature.  *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs.

21  Corp. ("ITT")*, 518 F.2d 913, 927 (9th Cir. 1975).  Yelp has been wide awake—indeed, it has

22  been an active participant in challenging the alleged conduct—over the past 17 years.  It has no

23  excuse for sleeping on its rights.  *Jarrow Formulas, Inc.*, 304 F.3d at 835 ("Laches is an

24  equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks

25  the help of a court of equity must not sleep on his rights." (citation and internal quotation marks

26  omitted)).

27      Finally, "[t]he bare fact of delay creates a rebuttable presumption of prejudice."  *ITT*, 518

28  F.2d at 926.  Here, where Yelp asks the Court for an injunction seeking to reverse a product

1    design implemented nearly two decades ago, the prejudice suffered by Google from Yelp's delay

2    is evident from the face of the Complaint.  *See Reveal Chat Holdco, LLC*, 471 F. Supp. 3d at

3    991–92 (applying laches to bar plaintiffs' antitrust claims).

4    **II.      Count IV Does Not Plead an Unlawful Tying Arrangement.**

5         Yelp's tying claim, Count IV, should independently be dismissed.  Yelp alleges that

6    "Google has unlawfully tied its local search product to its general search product," because

7    Google has "design[ed] its SERP so that users are directed towards its own, inferior local search

8    vertical and away from competitors."  Compl. ¶¶ 210–11.  To state a valid tying claim, Yelp

9    must allege: "(1) that [Google] tied together the sale of two distinct products or services; (2) that

10   [Google] possesses enough economic power in the tying product market to coerce its customers

11   into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial

12   volume of commerce in the tied product market."  *Aerotec Int'l, Inc.*, 836 F.3d at 1178 (citation

13   omitted).  Yelp fails to allege at least the first two elements, and its claim should be dismissed.

14        **A.  Yelp fails to plead that Google's SERP ties together two "distinct products."**

15        To proceed on a tying claim, Yelp must plausibly plead that Google ties together "two

16   distinct" products.  Yelp pleads the opposite: that Google offers a *single* product—its general

17   search results, which are designed to respond flexibly to user searches on any topic.  Yelp alleges

18   that "if a user searches for 'plumber San Francisco,' they will invariably first receive sponsored

19   results, followed by Google's OneBox results, and only then can they scroll down to see organic

20   search results."  Compl. ¶ 42 & Fig. 1.  As Yelp concedes, Google's SERP includes the "organic

21   results [that] appear on the SERP, along with other search features (such as knowledge panels,

22   maps, images, and videos) and sometimes advertising."  *Id.* ¶ 47.  Accordingly, Yelp concedes

23   that Google "operates a general, 'horizontal' search engine" that includes "numerous *integrated*

24   vertical search options."  *Id.* ¶ 23 (emphasis added).  In other words, Google offers a single

25   product—general search results—that may include both general web results and appropriate

26   topical results.  *See id.* ¶ 40.

27        Because Google's search results page may *include* local search results, the premise of a

28   tying claim would have to be that these allegedly separate results should be "untied."  But

-15-

1    nowhere in its Complaint does Yelp seek any such request for relief, or describe any such "but-

2    for" world.  Yelp does not so plead because its quibble is not the "tying" of general and local

3    search results, but rather the design of the page that displays them.  *See Times-Picayune Pub. Co.*

4    *v. United States*, 345 U.S. 594, 614 (1953) (no tying claim because "in fact, since space in

5    neither the Times-Picayune nor the States can be bought alone, one may be viewed as 'tying' as

6    the other").  Similarly, nowhere does Yelp plead that any other general search engine it identifies

7    (Bing, Yahoo! and DuckDuckGo, Compl. ¶ 59) somehow *separates* the display of web results

8    and local results in the manner that a "tying" claim would envision.

9         Importantly, it is of no moment to the tying analysis whether Yelp has plausibly alleged

10   separate *relevant markets* for general search services and local search services.  Even taking such

11   allegations as true, at most, that suggests simply that Google competes for both kinds of queries

12   with its same unified product—search results—in two allegedly different markets, while Yelp

13   allegedly only competes for queries in a local search market.  *See Kaufman v. Time Warner*, 836

14   F.3d 137, 145 (2d Cir. 2016) (affirming dismissal of claim that defendant tied the sale of cable

15   set-top boxes to cable television services where complaint failed to allege that the products were

16   purchased separately in any market).

17        **B.  Yelp fails to plead that Google sells either the tying or tied product.**

18        For Yelp's tying claim to proceed, Yelp also must plead that Google "conditions the

19   *sale*" of its general search results (the alleged tying product) on the user's "purchase" of local

20   search results (the tied product).  *Aerotec Int'l, Inc.*, 836 F.3d at 1178 (emphasis added).  Yelp

21   does not allege that Google forced users to "purchase" its local results because Yelp does not

22   allege that Google sells its product at all.  Instead, Yelp concedes that consumers use search

23   engines "for free."  Compl. ¶ 52.

24        Where the allegedly tied product "is a free service offered by Defendants, Plaintiff's

25   claim must fail because the acceptance of a free service does not constitute an impermissible tie-

26   in."  *Athos Overseas, Ltd. v. YouTube, Inc.*, 2022 WL 910272, at *3 (S.D. Fla. Mar 29,

27   2022).  Likewise, in a recent case alleging that Google tied three different mapping interface

28   services together, the court dismissed the claim because plaintiffs failed to allege "that either

-16-

1   entity paid for any Google mapping API services at all[].”  *Dream Big Media Inc. v. Alphabet*

2   *Inc.*, 2022 WL 16579322, at *4 (N.D. Cal. Nov. 1, 2022)[10]; *see also Kellam Energy, Inc. v.*

3   *Duncan*, 668 F. Supp. 861, 881 (D. Del. 1987) (“Merely accepting something provided for free

4   does not constitute an impermissible tie-in.”).  Yelp’s failure to allege any sale or purchase of

5   Google’s search results is a separate ground on which its tying claim fails.

6           **C.  Yelp fails to plead that Google “coerces” users to use its local results.**

7           “Essential to the second element of a tying claim is proof that the seller *coerced* a buyer

8   to purchase the tied product.”  *Paladin Assocs. Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159

9   (9th Cir. 2003); *see also In re Google Digit. Advert. Antitrust Litig.*, 2021 WL 2021990, at *4

10  (N.D. Cal. May 13, 2021) (explaining that a plaintiff must plead facts demonstrating that a

11  defendant’s “conduct was coercive, as opposed to merely persuasive”).  “Coercion occurs when

12  the buyer must accept the tied item and *forego* possibly desirable substitutes.”  *Moore v. James*

13  *H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977) (emphasis added); *see also Brantley v.*

14  *NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) (describing a “potential injury to

15  competition threatened by . . . [a] tying arrangement” as “forc[ing] buyers into giving up the

16  purchase of substitutes for the tied product” (citation omitted)).

17          As an initial matter, a plaintiff cannot allege coercion without alleging a *purchase* of the

18  purportedly tied product.  *Dream Big Media*, 2022 WL 16579322, at *4 (“Because they fail to

19  allege they purchased any Google [product], [the plaintiffs] fail to allege coercion.”).  As noted,

20  Yelp has failed to make such an allegation here.  *See supra* Part II.B.

21          Nor does Yelp allege that a user *“must”* use Google’s local results and “forego possibly

22  desirable substitutes” such as Yelp or other local search services.  Indeed, Yelp concedes that

23  links to Yelp may appear on Google’s SERP for users to use, if they wish to.  Compl. ¶ 42 & Fig.

24  1.  Yelp also concedes that users are free to search directly on www.yelp.com or on Yelp’s

25

26  _____

    [10] After the plaintiffs amended their complaint in *Dream Big Media*, the case was reassigned to

27  Chief Judge Seeborg, who did not reach the issue of whether the mapping products were free or
    not, and dismissed the plaintiffs’ tying claims on different grounds.  *See* 2023 WL 8285808, at

28  *3–4 (N.D. Cal. Nov. 30, 2023); *see also Dream Big Media*, 2024 WL 3416509 (N.D. Cal. July
    15, 2024), *appeal pending*.

1    mobile app.  *Id.* ¶ 20 ("Via its websites and mobile applications, Yelp provides a one-stop local

2    platform for consumers . . . .").  Yelp certainly does not (and cannot) allege that Google prohibits

3    users from clicking on links to Yelp (or links to other local search providers), that Google

4    somehow prevents users from accessing Yelp directly (*e.g.*, by navigating to www.yelp.com or

5    downloading Yelp's mobile app), or that Google requires users to engage with or click on

6    Google's local results at all.

7            The most Yelp can plead are statements in Google's terms of service that "the products

8    are 'designed to work together'" and "users are prohibited from modifying 'any part of

9    [Google's] services or software.'"  Compl. ¶ 142 (citing *Privacy & Terms*, Google (May 22,

10   2024), https://policies.google.com/terms?hl=en-US#footnote-services).  Google's terms of

11   service (incorporated into the Complaint and attached as Ex. D)[11] do *nothing* to prevent a user

12   from using another search product, let alone Yelp specifically.  Google's terms of service make

13   no reference to, or distinction between, general search services and local search services.  *Cf.*

14   *Dream Big Media*, 2022 WL 16579322 at *3 ("[T]he Terms of Service do not condition the sale

15   of one Google product on the purchase of [a] second, separate Google product" or "require that a

16   customer purchase any Google . . . service as a condition of using another Google . . . service.");

17   *see also Dream Big Media*, 2024 WL 3416509, at *3 (N.D. Cal. July 15, 2024) (subsequent

18   dismissal on similar grounds).

19           Because Yelp has failed to allege a tying arrangement, Count IV should be dismissed.

20   **III.    Counts V and VI Do Not Plead Claims for Monopoly Leveraging.**

21           Yelp also cannot sustain independent causes of action for monopoly leveraging.  Yelp's

22   monopoly leveraging claims (Counts V and VI) are contrary to Ninth Circuit law, are duplicative

23   of its monopolization and attempted monopolization claims (Counts I–III), and fail to plead any

24   separate anticompetitive conduct.

25

26

---

27   [11] "[I]f the plaintiff refers extensively to the document or the document forms the basis of the
     plaintiff's claim[,]" then that document is incorporated by reference.  *Khoja v. Orexigen*
28   *Therapeutics, Inc*., 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted).

1    The case law is clear:  In the Ninth Circuit, "[m]onopoly leveraging, on its own, is not

2 proscribed."  *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *9 (N.D. Cal. Apr. 25,

3 2014) (citation omitted); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547–48 (9th

4 Cir. 1991) (rejecting "monopoly leveraging . . . as an independent theory of liability").  The

5 Supreme Court has consistently held that the mere possession of monopoly power is not

6 unlawful.  *Trinko*, 540 U.S. at 407.  Nor is it unlawful to use monopoly power in one market to

7 gain a competitive advantage in another.  *Alaska Airlines, Inc.*, 948 F.2d at 547–48.  Rather,

8 "[m]onopoly leveraging is just one of a number of ways that a monopolist can *permissibly*

9 benefit from its position."  *Id.* at 548–59 (emphasis added); *see also Unigestion Holdings, S.A. v.*

10 *UPM Tech., Inc.*, 412 F. Supp. 3d 1273, 1286 (D. Or. 2019) ("A mere unfair advantage

11 combined with the use of upstream monopoly power is not sufficient to state a claim for a

12 monopoly or attempted monopoly of the second market under a leveraging theory.").

13    As a result, the Ninth Circuit does not recognize monopoly leveraging as a standalone

14 Section 2 claim.  *See Doe 1*, 571 F.3d at 935 (rejecting a "free-standing monopoly leveraging

15 claim").  Instead, a plaintiff must allege separate conduct that is actionable under Section 2 to

16 state a claim.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1155 (N.D. Cal.

17 2020).  Yelp purports to allege such conduct in support of its claims for monopolization and

18 attempted monopolization (Counts I–III).  *See, e.g.*, Compl. ¶¶ 175, 186, 198 (alleging Google

19 engaged in "exclusionary, anticompetitive conduct" that "can be characterized as a tying

20 arrangement, a refusal to deal, monopoly leveraging, and monopolistic product

21 design/redesign").  But Yelp offers no independent allegations of any separate allegedly

22 exclusionary conduct that would constitute "leveraging"; Counts V and VI instead are a mere

23 repackaging of Counts I–III, are superfluous, and should be dismissed.  *See, e.g.*, *hiQ Labs, Inc.*,

24 485 F. Supp. 3d at 1155; *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *12 (C.D. Cal. Oct.

25 16, 2015) (noting "leveraging of a monopoly does not constitute an independent Section 2

26 claim").  If the Court holds the Complaint timely, only Counts I–III should proceed to discovery

27 (and only as narrowed on the bases set forth herein).

28

**IV.    Yelp Fails To State Cognizable Refusal-To-Deal Claims.**

In addition to framing its claim for self-preferencing as tying and monopoly leveraging, Yelp also "characterize[s]" Google's alleged preferencing of its specialized local results over the results of its competitors as anticompetitive "refusal[s] to deal."  Compl. ¶¶ 175, 186, 198.  To the extent Yelp's claims for monopolization and attempted monopolization (Counts I–III) rest upon alleged refusal-to-deal theories, those claims should be dismissed.

"[A]s a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."  *Aerotec Int'l, Inc.*, 836 F.3d at 1183 (quoting *Trinko*, 540 U.S. at 408) (internal quotation marks omitted).  The Supreme Court and Ninth Circuit have recognized that only under certain, "limited exception[s]," may a plaintiff plead actionable refusal-to-deal claims.  *Id.* at 1184.  Yelp fails to do so here.

The premise of a refusal-to-deal claim is an actual refusal to deal or cooperate with a competitor.  *See Trinko,* 540 U.S. at 408 ("Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2."); *Aerotec Int'l, Inc.*, 836 F.3d at 1184 (describing the refusal to deal in *Aspen Skiing* where "the defendant—who owned three of the four ski resorts in the market—discontinued a joint lift-ticket package with a smaller rival, the only other competitor in the market, and then flatly refused to sell the rival any lift tickets so it could create its own bundles" (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 592–94 (1985)).

Yelp fails to plead such refusal-to-deal claims here because it does not allege that Google refused to deal with Yelp.  Nor could Yelp make any such allegations because, as Yelp concedes, Google includes search results linking to Yelp's website directly on its SERP.  *See* Compl. ¶ 42 & *supra* Fig. 1.  Instead, Yelp's claims boil down to an allegation that Google refuses to deal *on the specific terms preferred by Yelp*.  Yelp's complaints are not that Google refuses to include Yelp amongst Google's search results, but that Google "self-preferenc[es] its own inferior local search vertical over its competitors." *E.g.*, Compl. ¶ 175.  Yelp's refusal-to-deal-on-preferred-terms complaints are nothing more than "an effort to sidestep the reality that there was no actual

-20-

1   refusal to deal." *Aerotec Int'l, Inc.*, 836 F.3d at 1183.  "As the Supreme Court has repeatedly

2   emphasized, there is '*no duty to deal under the terms and conditions preferred by [a*

3   *competitor's] rivals.*'"  *Id.* at 1184 (quoting *Pac. Bell Tel. Co.*, 555 U.S. at 457) (emphases

4   added); *see also Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022)

5   ("Section 2 does not require [a defendant] to enter into a partnership with [a plaintiff] like the

6   one it has with [other competitors].").  For example, in *Pacific Steel Group v. Community Metals*

7   *Co.*, the court dismissed the plaintiff's so-called refusal-to-deal claim where the plaintiff did "not

8   allege that it was barred from contracting with another builder of steel mills, or with [defendant]

9   to build a different type of steel mill, such as a mini mill, within the exclusivity zone," but rather

10  that "it was barred from contracting with [defendant] for one specific type of steel mill, i.e. a

11  micro mill, that it preferred at a location of its choosing."  2021 WL 2037961, at *7 (N.D. Cal.

12  May 21, 2021).

13          Moreover, in the limited instances where an alleged refusal to deal may state a claim, it is

14  because the refusal is alleged to reflect a short-term profit sacrifice by the defendant.  That is,

15  courts recognize "a duty not to refrain from dealing where the only conceivable rationale or

16  purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from

17  the exclusion of competition,'" *Aerotec Int'l, Inc.*, 836 F.3d at 1184 (quoting *MetroNet Servs.*

18  *Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004)).  This requirement, as in the

19  foregoing cases, presupposes at least a refusal to deal, as opposed to a refusal to deal on

20  preferred terms.  Regardless, Yelp's Complaint is devoid of *any* allegation that Google's only

21  conceivable rationale in implementing its 2007 design innovation was to "sacrifice short-term

22  benefits in order to obtain high[] profits in the long run."  *Id.* (citation omitted).  This is an

23  independent basis to dismiss Yelp's refusal-to-deal claims.  *See LiveUniverse, Inc. v. MySpace,*

24  *Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (dismissing claim where plaintiff failed to allege any

25  refusal was "contrary to [defendant's] short-term business interests"); *hiQ Labs, Inc.*, 485 F.

26  Supp. 3d at 1151 (plaintiff failed to allege that "LinkedIn sacrificed a profitable course of dealing

27  in the short term in order to benefit long term from the exclusion of competition").  Accordingly,

28

-21-

1  Yelp fails to plead cognizable refusal-to-deal claims, and so much of Counts I–III that plead

2  refusals to deal should be dismissed.

3  **V.      Count VII Does Not Plead a Separate Claim Under California's UCL.**

4          Yelp's UCL claims are not unique from its federal antitrust claims.  Therefore, they are

5  time-barred, *see supra* Part I.D., and also suffer from the same flaws as discussed in Parts II–

6  IV.  The UCL's unlawful business act prong essentially "borrows violations of other laws and

7  treats them as unlawful practices that the unfair competition law makes independently

8  actionable."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 180

9  (1999) (citing *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992)) (internal

10  quotation marks omitted).  Yelp's claim of unlawful acts under the UCL should accordingly be

11  dismissed for the same reasons as their Sherman Act claims.

12          Yelp then makes a facially insufficient attempt to plead "unfair" conduct, failing to allege

13  any acts separate from the alleged unlawful conduct and federal antitrust claims.  *See* Compl. ¶¶

14  243–47.  "[I]f the same conduct is alleged to be both an antitrust violation and an 'unfair'

15  business act or practice for the same reason . . . the determination that the conduct is not an

16  unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward

17  consumers."  *City of San Jose v. Off. of the Com'r of Baseball*, 776 F.3d 686, 691 (9th Cir. 2015)

18  (quoting *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)).  Claims for unfair

19  conduct under the UCL cannot survive a motion to dismiss if they "overlap entirely with the

20  business practices addressed in the . . . unlawful prong[] of the UCL[.]"  *Hadley v. Kellogg Sales*

21  *Co*., 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017); *see also Hicks v. PGA Tour, Inc*., 897 F.3d

22  1109, 1124 (9th Cir. 2018); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1181 (N.D. Cal.

23  2013).  Accordingly, if the Court dismisses Yelp's tying, leveraging, and refusal-to-deal claims

24  for failure to state a claim under the Sherman Act, Google respectfully submits it should do the

25  same under the UCL.

26

27

28

**CONCLUSION**

For the foregoing reasons, Yelp's Complaint should be dismissed in its entirety as time-barred.  In the alternative, the Court should dismiss Counts IV, V, and VI, along with any claims for refusal to deal, and the corresponding claims under Count VII, for failure to state a claim.


DATED: October 28, 2024

By: */s/ John E. Schmidtlein*
John E. Schmidtlein
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com

Amit Gressel
WILSON SONSINI GOODRICH & ROSATI P.C.
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA  94105-1126
Tel: 415-947-2087
agressel@wsgr.com

Franklin M. Rubinstein (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI P.C.
1700 K Street NW
Washington, DC 20006
Tel: 202-973-8800
frubinstein@wsgr.com

*Attorneys for Defendant Google LLC*

Google's Motion To Dismiss