# EXHIBIT B

**Testimony and Written Responses of Jeremy Stoppelman for a Congressional Hearing titled**
***The Power of Google: Serving Consumers or Threatening Competition?***

S. HRG. 112–168

# THE POWER OF GOOGLE: SERVING CONSUMERS OR THREATENING COMPETITION?

# HEARING

BEFORE THE

## SUBCOMMITTEE ON ANTITRUST, COMPETITION POLICY AND CONSUMER RIGHTS

OF THE

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

ONE HUNDRED TWELFTH CONGRESS

FIRST SESSION

—————

SEPTEMBER 21, 2011

—————

**Serial No. J–112–43**

—————

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE

71–471 PDF                WASHINGTON : 2011

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON THE JUDICIARY

PATRICK J. LEAHY, Vermont, *Chairman*

HERB KOHL, Wisconsin
DIANNE FEINSTEIN, California
CHUCK SCHUMER, New York
DICK DURBIN, Illinois
SHELDON WHITEHOUSE, Rhode Island
AMY KLOBUCHAR, Minnesota
AL FRANKEN, Minnesota
CHRISTOPHER A. COONS, Delaware
RICHARD BLUMENTHAL, Connecticut

CHUCK GRASSLEY, Iowa
ORRIN G. HATCH, Utah
JON KYL, Arizona
JEFF SESSIONS, Alabama
LINDSEY GRAHAM, South Carolina
JOHN CORNYN, Texas
MICHAEL S. LEE, Utah
TOM COBURN, Oklahoma

BRUCE A. COHEN, *Chief Counsel and Staff Director*
KOLAN DAVIS, *Republican Chief Counsel and Staff Director*

————

SUBCOMMITTEE ON ANTITRUST, COMPETITION POLICY AND CONSUMER RIGHTS

HERB KOHL, Wisconsin, *Chairman*

CHUCK SCHUMER, New York
AMY KLOBUCHAR, Minnesota
AL FRANKEN, Minnesota
RICHARD BLUMENTHAL, Connecticut

MICHAEL S. LEE, Utah
CHUCK GRASSLEY, Iowa
JOHN CORNYN, Texas

CAROLINE HOLLAND, *Democratic Chief Counsel/Staff Director*
DAVID BARLOW, *Republican General Counsel*

(II)

# CONTENTS

STATEMENTS OF COMMITTEE MEMBERS

|  | Page |
|---|---|
| Feinstein, Hon. Dianne, a U.S. Senator from the State of California | 5 |
| Grassley, Hon. Charles, a U.S. Senator from the State of Iowa, prepared statement | 20 |
| Kohl, Herb, a U.S. Senator from the State of Wisconsin | 1 |
| Leahy, Hon. Patrick J., a U.S. Senator from the State of Vermont, prepared statement | 217 |
| Lee, Hon. Michael S., a U.S. Senator from the State of Utah | 3 |
| charts | 219 |

WITNESSES

| | |
|---|---|
| Barnett, Thomas O., Partner, Covington & Burling, LLP, Washington, DC | 33 |
| Creighton, Susan A., Partner, Wilson Sonsini Goodrich & Rosati, PC, Washington, DC | 38 |
| Katz, Jeff, Chief Executive Officer, Nextag, Inc., San Mateo, California | 35 |
| Schmidt, Eric, Executive Chairman, Google Inc., Mountain View, California | 6 |
| Stoppelman, Jeremy, Co-founder and Chief Executive Officer, Yelp, Inc., San Francisco, California | 36 |

QUESTIONS AND ANSWERS

| | |
|---|---|
| Responses of Thomas O. Barnett to questions submitted by Senators Grassley, Kohl and Lee | 53 |
| Responses of Susan A. Creighton to questions submitted by Senators Grassley and Kohl | 65 |
| Responses of Jeff Katz to questions submitted by Senators Grassley, Kohl and Lee | 84 |
| Responses of Eric Schmidt to questions submitted by Senators Blumenthal, Cornyn, Franken, Grassley, Kohl and Lee | 102 |
| Responses of Jeremy Stoppelman to questions submitted by Senators Kohl, Grassley and Lee | 170 |

SUBMISSIONS FOR THE RECORD

| | |
|---|---|
| Alschuler, John, Chair, Friends of the High Line, New York, New York, September 14, 2011, letter | 178 |
| Barnett, Thomas O., Partner, Covington & Burling, LLP, Washington, DC, statement | 180 |
| Camara, Karim, New York State Assembly, 43rd District, Kings County, Albany, New York, July 26, 2011, letter | 195 |
| Chiames, Chris, Vice President, Corporate Affairs, Orbitz Worldwide, Chicago, Illinois, statement | 196 |
| Creighton, Susan A., Partner, Wilson Sonsini Goodrich & Rosati, PC, Washington, DC, statement | 198 |
| Cumbo, Laurie A., MoCADA Founder & Executive Director, Brooklyn, New York, September 8, 2011, letter | 209 |
| Heastie, Carl, New York State Assembly, 83rd District, Bronx County, Albany, New York, August 15, 2011, letter | 213 |
| Katz, Jeff, Chief Executive Officer, Nextag, Inc., San Mateo, California, statement | 214 |
| New York Post, Garett Sloane, New York, New York, February 25, 2011, article | 223 |

(III)

IV

Page

New York Times, Jonathan Vatner, New York, New York, April 19, 2011, article .................................................................................................. 225
Rice, Arva R., President & CEO, New York Urban League, New York, New York, August 16, 2011, letter .................................................... 228
Rudin, William C., Chairman, Abny, New York, New York, July 26, 2011, letter ..................................................................................... 230
Sampson, John, New York State Senate, Albany, New York, July 27, 2011, letter ..................................................................................... 231
Schmidt, Eric, Executive Chairman, Google Inc., Mountain View, California, statement ......................................................................... 232
Simpson, John M., Consumer Advocate, Consumer Watchdog, Santa Monica, California, statement ........................................................ 240
Stoppelman, Jeremy, Co-founder and Chief Executive Officer, Yelp, Inc., San Francisco, California, statement ..................................... 247
Terry, Angela, Therapy Wine Bar, Brooklyn, New York, August 5, 2011, letter ..................................................................................... 274
Titus, Michele, New York State Assembly 31st District, Queens County, Albany, New York, July 20, 2011, letter ............................... 276
Tosney, Jason, Vice President, Centro, Chicago, Illinois, letter ......................... 278
Wilshire, Albert, President Board Trustees, Brooklyn Music School, Brooklyn, New York, August 20, 2011, letter ............................ 280
Wright, Keith L.T., New York State Assembly 70th District, New York County, New York, New York, July 21, 2011, letter ............ 281
Zaccaria, Gary, Salt Lake City, Utah, September 13, 2011, letter ..................... 283
Zuckerman, Bob, Executive Director, New York, New York, August 18, 2011, letter ..................................................................................... 295

tomer from Nextag directly to their store's website that is highly
likely to buy the trailer jack that customer was searching for. For
that same price, there is virtually no way for that merchant to put
an ad in a local newspaper or to get that customer, nor to get that
same customer from Google on their own. It's a good deal for the
merchant.

We are pleased to have helped Google grow their business and
we are appreciative they helped us grow ours. Now, however, they
are not innovating. They helped us grow our business, but they are
copping our business after we invested hundreds of millions of dol-
lars to perfect it, and they are very politely, deftly, and assuredly
moving us aside.

Today, honorable Committee members, when you search for a
product like running shoes or washing machines, Google is not a
search engine anymore. A search engine organizes and presents in-
formation that is hard to find in an unbiased way. But Google of
today doesn't present the information that users want, it presents
the information that Google wants you to see based on its commer-
cial interests.

The company that dominates the information highway controls
all of the digital billboards and off-ramps, doesn't even tell the con-
sumer this search favors Google's preferred vendors, preferred ad-
vertisers, and some beneficial results may be excluded or obscured.

A company that dominates a marketplace at least has the re-
sponsibility to provide fair access. I hope this Committee, and
Google itself, will act to balance the forces that enable competition
to persist. This is a very big deal. We should get it right and we
should make it right.

Mr. Chairman and members of the Committee, thank you very
much for your time and attention.

Senator KOHL. Thank you, Mr. Katz.

[The prepared statement of Mr. Katz appears as a submission for
the record.]

Senator KOHL. Now we'll hear from Mr. Stoppelman.

## STATEMENT OF JEREMY STOPPELMAN, CO-FOUNDER AND CHIEF EXECUTIVE OFFICER, YELP, INC., SAN FRANCISCO, CALIFORNIA

Mr. STOPPELMAN. Thank you, Mr. Chairman and distinguished
members of the Committee. I appreciate your interest and invita-
tion to appear today. My name is Jeremy Stoppelman and I'm the
CEO of Yelp, a company I co-founded in 2004 with my former col-
league from PayPal, Russell Simmons.

At Yelp our mission is to connect people with great local busi-
nesses. The site allows people throughout the country to share de-
tailed and passionate reviews about businesses in their neighbor-
hood. In turn, businesses that provide great value and good service
are able to establish and promote themselves online.

Today, Yelp employs more than 800 people throughout the coun-
try. More than 60 million consumers use Yelp every month to de-
cide how and where to spend their hard-earned money. And on the
flip side, job growth in this country relies on small, but fast-grow-
ing and successful businesses. Yelp helps them reach new cus-
tomers by amplifying their positive word-of-mouth online.

This hearing is important because it examines issues that go to the heart of innovation: whether new ideas can compete fairly against expanding monopolies. In our case, I wonder if we would have been able to start Yelp today given Google's recent actions.

Let's be clear. Google is no longer in the business of sending people to the best sources of information on the web. It now hopes to be a destination site itself for one vertical market after another, including news, shopping, travel, and now local business reviews.

It would be one thing if these efforts were conducted on a level playing field, but the reality is they're not. The experience in my industry is telling. Google forces review websites to provide their content for free to benefit Google's own competing product, not consumers. Google then gives its own product preferential treatment in Google search results.

Google first began taking our content without permission a year ago. Despite public and private protests, Google gave the ultimatum that only a monopolist can give: in order to appear in web search you must allow us to use your content to compete against you. As everyone in this room knows, not being in Google is equivalent to not existing on the internet. We had no choice.

Recently, Google has inexplicably softened its stance. What changed? Well, the FTC announced an antitrust investigation, the State Attorneys General took notice, and this Committee proposed this hearing. Was this an admission of anti-competitive conduct? Perhaps, but questionable practices remain. Websites and Google search results now take a backseat to Google's own competing products. This is typically accomplished by calling special attention to Google-owned properties through larger text, bright graphics, isolated placement, and pushing objectively ranked websites down the page.

What we're most concerned about is that Google is no longer satisfied with pointing users at the best content anywhere on the web it can be found. Instead, it seems they prefer to send users to the most profitable content on the web, which is naturally their own.

Is a consumer—or a small business, for that matter—well served when Google artificially promotes its own properties, regardless of merit? This has little to do with helping consumers get to the best information. It has everything to do with generating more revenue.

So where is the harm? I live and work in San Francisco, which sits on the border of Silicon Valley, a place that has participated in the development of some of the most amazing products and services over the last few decades, including Google. Today represents a rare opportunity for the government to protect innovation. Allowing a search engine with monopoly market share to exploit and extend its dominance hampers entrepreneurial activity.

Ensuring open and equal competition will sustain and foster innovation and job growth. It will also ensure that the price of internet advertising paid by small businesses will not—will be set by the market and not solely by a monopolist. When one company controls the market it ultimately controls consumer choice.

If competition really were just a click away as Google suggests, why have they invested so heavily to be the default choice in web browsers and mobile phones? Clearly they're not taking any

38

chances. So again, I thank the Committee for its time and interest, and I look forward to assisting in any way that I can. Thank you.

Senator KOHL. Thank you, Mr. Stoppelman.

[The prepared statement of Mr. Stoppelman appears as a submission for the record.]

Senator KOHL. Ms. Creighton.

## STATEMENT OF SUSAN A. CREIGHTON, PARTNER, WILSON SONSINI GOODRICH & ROSATI, PC, WASHINGTON, DC

Ms. CREIGHTON. Thank you, Senator. Before I begin my remarks, Mr. Schmidt asked me to clarify for the record that Google Places and Yelp are both applications, or apps—mobile apps.

Senator KOHL. I'm sorry?

Ms. CREIGHTON. Mr. Schmidt asked me to clarify that both Places—Google Places and Yelp are mobile apps.

Senator KOHL. Oh. In response to my question?

Ms. CREIGHTON. In response to—that's correct.

Senator KOHL. All right. Thank you.

Ms. CREIGHTON. Thank you, Chairman Kohl, Ranking Member Lee, and members of the subcommittee.

From 2001 through 2005, I had the privilege of serving as the Deputy Director, and then Director of the Bureau of Competition at the Federal Trade Commission, serving as the chief antitrust enforcer at the FTC. During my tenure we brought more monopolization cases to put a stop to anti-consumer conduct than during any comparable period at the FTC, going back to the late 1970s.

As this strong enforcement record reflects, I firmly believe there is an important role for government in enforcing our antitrust laws. The same experience, however, underscored for me the need for the government to exercise extreme caution before acting against a company for its day-to-day business decisions.

These unilateral business decisions are the heart of the competition and innovation underlying our free market system. Because of the very real risk of deterring innovation and other beneficial activities, extraordinary care must be taken to ensure that government intervention in the market is truly essential, otherwise, such action is much more likely to harm consumers than to help them.

As an attorney based in Silicon Valley who has worked with high-tech companies for more than 20 years, I believe that the danger of harmful intervention is especially acute in the high-tech sector. In Silicon Valley, disruptive innovations are the rule and not the exception, and companies can watch their market positions disappear overnight.

For example, just 4 years ago My Space had a 72 percent share in social networking; today it is a fraction of 1 percent. We all know what happened. In the same length of time, Facebook grew to become the most popular destination on the internet, with 750 million registered users.

In this sector the only constant has been changed. The pace of technological innovation has been extraordinary, competition is robust, and the competitive landscape is constantly evolving. We have seen the incredible benefits to consumers that this vibrant competition has delivered, developments that were nearly unimaginable when I started in Silicon Valley 20 years ago.

170



**U.S. Senate Committee on the Judiciary, Subcommittee on Antitrust, Competition
Policy and Consumer Rights**

**"The Power of Google: Serving Consumers or Threatening Competition?"**

**Responses of Jeremy Stoppelman, Cofounder and CEO, Yelp! Inc.**

**Senator Kohl**

**1.  Do you depend on links from Google's search engine for a substantial portion of your
business?**

Yes, like many other websites, we draw a sizable portion of our traffic from Google.

**How much?**

Approximately 75% of Yelp traffic comes from Google in one form or another.

**And what would happen to your business in the United States if you no longer appeared near
the top of Google search results?**

I would like to think that Yelp features some of the most relevant information when it comes to
local businesses, but I can only assume that Yelp would be negatively affected if Google
prevented links to the Yelp site from appearing near the top of Google search results.

**2. Do you believe the experience of Yelp and similar companies could deter new, innovative
web companies from entering the market and competing with Google?**

Yes.

**3. The Federal Trade Commission and several state attorneys general are currently pursuing
an antitrust investigation against Google.  Should they conclude the law has been violated,
are there any specific remedies you believe they should pursue?**

Google has demonstrated it cannot be trusted to police itself.  It is my hope that regulators will
ensure that Google competes on a level playing field.  For example, Google should not be
permitted to preference its own products ahead of its competitors in search results.  In
addition, Google should not be permitted to incorporate third party content from its web
search index into its other products without permission.  Similarly, competitors should not be

Yelp! Inc. 706 Mission Street, San Francisco, California 94103

171

forced to contribute their content to Google under the threat of removal from any portion of
Google's web search results.

172

**Senator Grassley**

**1. Would you create Yelp today knowing what you know about Google's business practices?**

It is my belief that markets work best when the competitive landscape allows innovators to challenge the entrenched interests (regardless of whether the innovators ultimately succeed). It is extraordinarily difficult to innovate, however, if a single company abuses its dominant position in the market.

Yelp has worked hard to build a fantastic product and credible brand. It is difficult for me to imagine if we would have been able to accomplish what we have accomplished had Google engaged in anticompetitive practices in the early going. Were I to tackle a new industry tomorrow, I would undoubtedly look to a market that is less prone to the manipulative influences of a dominant market power.

**Do you think this is a good environment for innovation?**

I see wonderful innovations in areas which -- at least today -- are not threatened by Google's anticompetitive practices. At the same time, it is hard to ignore the sentiment I hear from entrepreneurial veterans every day: it is no longer enough to focus on your own business – you also need to spend substantial time and energy worrying about the 800-lb Google gorilla in the room.

**2. What trends are you seeing in the industry that suggest content companies are under threat from anti-competitive behavior?**

Google's conduct may ultimately spell trouble for a number of content verticals, such as news and travel, as long as the conduct goes unchecked. We may see less original content, and as a result, less choice for consumers in those verticals.

**What can we do about them?**

Congress can shine a light on anticompetitive practices, encourage voluntary compliance, and provide guidance for regulatory authorities to enforce laws that are already on the books. More simply, it is my hope and expectation that Google will learn to compete on a level playing field -- that it will agree not to take content from third parties without permission for the benefit of its own competing products, and that it will treat its own competing products consistent with the manner in which it treats its competitors.

**3. Do you have any concerns with Google's search algorithm? Do you believe that Google manipulates search placement at the expense of competition?**

Google's tactics have less to do with its search algorithm than its design decisions. These design decisions effectively push objectively ranked search results off the screen, and give Google's

173

own products more prominent placement, larger fonts, and eye-catching graphics.

For example, while Google's own finance product may not always have the best or most relevant information about a particular stock, its link always appears first. Similarly, Google gives Google Places special treatment when users search for information about local businesses, even if other sites rank higher in relevance.

Indeed, the much-discussed and little-understood algorithm has proven an effective red herring in the debate, allowing Google to insist that the algorithm uses objective criteria to rank websites while ignoring difficult questions about results that have nothing to do with the algorithm.

**4.  One of my constituents is concerned that the goal of FTC's investigation into Google's business practices "is to . . . place new rules and regulations on [a] very successful internet technology company" and that the investigation is "counterproductive, totally unwarranted, and goes against all the principles that truly make a capitalist free market economy work for the betterment of all."  Do you agree with these concerns?**

**Why or why not?**

I share your constituents' concerns about "new rules and regulations."  That said, I believe that we should enforce rules and regulations that are already on the books for very good reasons. Antitrust enforcement exists precisely to protect the free market.

**5.  One of my constituents indicated that Google's search engine is "highly satisfactory" for his use and if he "wanted something different, it is readily available on the internet."  He says that "with unemployment at an all time high and the country being spent into bankruptcy, [he hopes that Congress] will not waste more time on these hearings and vote to keep out further government intrusion into how the internet is used by private citizens and private businesses."  What do you think?**

**Are you concerned that government intervention will impact innovation?**

Google has a great product, but it also uses its dominant position in the market to limit access to the competition.  Antitrust laws serve an extraordinarily important purpose, and their enforcement provides a rare opportunity for the government to positively impact job growth, innovation, and the broader free market.

**6.  Google often responds to its critics by saying that "Competition is just one click away."  Do you agree with that statement?**

**Why or why not?**

Google goes to great lengths to reduce choice in the marketplace, preferencing its own

174

products ahead of competitors and investing heavily to be the world's default web browser, search provider, mobile platform, and content publisher, among other functions.  Google appears entirely unwilling to allow consumers to make their own choices.

175

**Senator Lee**

**1.   Until very recently, Google Places featured significant portions of Yelp reviews, without your permission.**

**a.   How did Google's use of Yelp reviews on its Places pages differ from traditional use of content displayed in search results?**

Google's use of Yelp reviews on its Places pages differed significantly from the way Google uses content from Yelp in Google web search results.

First, although most web services otherwise prohibit third parties from scraping or indexing content from their websites, they usually allow and enable search engines like Google to index the content on their websites for search purposes only.  This is typically accomplished by technical means through the "Robots Exclusion Standard."  When Google uses third party content for other purposes -- specifically, to construct a competing service -- it exceeds the authority that the third parties grant it in the first place.

In Yelp's case, Google had previously acknowledged in 2005 that it required a license in order to use Yelp's content in its competing Google Places product.  When Yelp later balked because of the growing competitive threat from Google, the executives responsible for Google Places simply took Yelp's content over Yelp's express objection.  As a threshold matter, then, Google's use of Yelp's content in Google Places differs from its use of Yelp's content in web search results because Google simply does not have permission to use Yelp's content in Google's competitive products.

Second, Google's use of Yelp content in its own local products is different in the sense that it is intended to direct users to Google's own products rather than the information that users seek.  For example, Google boasted that Google Places featured more than one thousand reviews of a well-known steakhouse in Washington D.C., but in reality, it only featured a handful of reviews – the rest were taken from Yelp.  As a result, users were lured into Google Places, but could not find the information they were looking for.

Third, Google uses content from its competitors to power search results *within* its own local products, even when its own local products do not have the information that its users seek.  For example, Google has very little of its own information about pizzerias in San Francisco, but it relies on information from Yelp to drive users to its own Place pages.  Indeed, the most prominent links in Google Maps search results appear at first glance to link to local businesses, but they really link to Google Place pages.

Put differently, Google's use of Yelp's content in web search results is intended to be mutually beneficial: it allows Google to direct its users to the information they seek, and it allows Yelp to be discovered by those same users.  In contrast, Google's use of Yelp's content in its own competing product is only intended to benefit Google since it creates an interstitial page

176

(monetized by Google) between users and the information they seek.

**b.   What went into developing Yelp's collection of reviews?**

Yelp has focused obsessively on consumers, fostering relationships both online and offline between and among our community of users.  The community is diverse, but the one commonality is that its members love to share local information.  Yelp's users have contributed more than 21 million reviews to the site since we started in 2004.

**c.   What role does scale – the number of reviews available – play in the amount of traffic to a user-review site like Yelp?**

Scale matters to the extent that it drives trust and branding, which in turn should drive traffic and new contributors.  For example, Craigslist is one of the most recognized classified listing brands because of the sheer volume and breadth of its classified listing database.  As a result, Craigslist would likely have an exponential (and not just a proportional) advantage over a comparable new classifieds service with only a few listings in its database.

In addition, scale may matter for the purposes of "page rank" in Google's organic search results. Using the same Craigslist example above, Craigslist likely features more prominently in organic search results as compared to an upstart because of its massive classified listing database -- even when the upstart has more relevant information in response to a particular search query.

**d.   How did Google use Yelp's reviews to grow scale for its Places pages?**

Google used Yelp reviews to avoid the long, arduous, and expensive task of building its own compendium of reviews from scratch.  In effect, Google used Yelp's content as a "honeypot" to attract new users and content contributors in order to achieve scale more quickly and cheaply than it otherwise could without Yelp's content.  Indeed, Google publicly touted the growth of review content and mobile traffic during the period when it misappropriated Yelp's content.

**e.   Were the Google Places pages beneficial in directing more attention and traffic to your reviews?**

No.  Less than one half of one percent of the traffic that Yelp received from Google came from Google Places.

**f.   What was Google's reaction when Yelp requested that Google stop using its review content on Google Places?**

Google explained that the only circumstance under which Google would stop using Yelp's content was if Yelp removed itself entirely from Google's web search index.  Even now, Google

177

still insists that it must remove links to Yelp in portions of its web search results in order to comply with Yelp's demand that Google cease using Yelp's content in Google Maps.

**2.    In response to your company's complaints, Google removed the links to Yelp on Google Places, although links to reviews by Urban Spoon, Metro Mix, and local newspapers and magazines remain.  How has this affected Yelp's traffic?**

While it is difficult to measure the impact in isolation, once Google removed Yelp's content from Google Places, Yelp's traffic increased significantly across several metrics.

**3.    The prominence and size of Google Places listings often push competing sites to a significantly lower position on the page.  How have the search rank and placement of Google Places affected traffic to Yelp?**

It is difficult to measure the impact in isolation, particularly because Google's practices apparently differ from month to month, market to market, and search to search.  We do know that studies routinely indicate that prominence and placement matter, and Eric Schmidt underscored this point in his testimony to the Subcommittee.

**4.    Google recently acquired Zagat, a review-based site similar in many ways to Yelp.  In your view, how might Google's acquisition of Zagat affect Yelp's traffic?**

Google's acquisition of Zagat is presumably designed to bolster Google's review content, and strengthen its local product offering.  It is unclear at this point how the acquisition will affect Yelp's traffic.

**5.    What corrective action could Google take to ameliorate the current situation?**

Google has demonstrated it cannot be trusted to police itself.  It is my hope that regulators will ensure that Google competes on a level playing field.  For example, Google should not be permitted to preference its own products ahead of its competitors in search results.  In addition, Google should not be permitted to incorporate third party content from its web search index into its other products without permission.  Similarly, competitors should not be forced to contribute their content to Google under the threat of removal from any portion of Google's web search results.

247

S U B M I S S I O N

| | |
|---|---|
| **TO:** | U.S. Senate Committee on the Judiciary, Subcommittee on Antitrust, Competition Policy and Consumer Rights |
| **FROM:** | Jeremy Stoppelman, Cofounder and CEO, Yelp! Inc. |
| **DATE:** | September 21, 2011 |
| **RE:** | The Power of Google: Serving Consumers or Threatening Competition? |

## I.    ABOUT YELP

My name is Jeremy Stoppelman, and I am the CEO of Yelp! Inc., a company I co-founded in 2004 with my former colleague from PayPal, Russell Simmons.

At Yelp, our mission is to connect consumers with great local businesses. The site allows people throughout the country to share detailed and passionate reviews about businesses in their neighborhoods. In turn, businesses that provide great service and good value are able to establish and promote themselves online. [See Exhibit A]

Today, Yelp employs more than 800 people throughout the country. More than 60 million consumers use Yelp every month to decide how and where to spend their hard earned money. And on the flip side, job growth in this country relies on small, but fast growing and successful businesses. Yelp helps them reach new customers by amplifying their positive word-of-mouth, online.

This hearing is important because it examines issues that go to the heart of innovation: whether new ideas can compete fairly against expanding monopolies. In our case, I wonder if we would have been able to start Yelp today given Google's recent actions.

## II.    ABOUT GOOGLE

Google is no longer in the business of sending people to the best sources of information on the web. It now hopes to be a destination site itself for one vertical market after another, including news, shopping, travel, and now, local business reviews. It would be one thing if these efforts were conducted on a level playing field, but the reality is they are not.

The experience in my industry is telling: Google forces review websites to provide their content for free to benefit Google's own competing product – not consumers. Google then gives its own product preferential treatment in Google search results.

## III.    GOOGLE LOCAL

248

Google's destination site for local business reviews is dubbed Google Local. In its original form, Google Local looked like little more than an online version of the phonebook, featuring names, addresses, and phone numbers, but little in the way of rich, social, qualitative information. [See Exhibit B]

Perhaps recognizing this deficiency, Google Local sought a license from Yelp in 2005 to use portions of Yelp's rating and review content, a relationship which ended in 2007 after Google Local began soliciting ratings and reviews from its own users. In 2009, the media reported that Google tried to acquire Yelp and its consumer review content outright, though the reported acquisition never came to pass, and Yelp remained an independent company.

Google Local remained relatively threadbare during these years, and services like Yelp remained better positioned than Google itself to provide the sort of information that users were seeking about local businesses. In 2010, Google appointed a new executive to lead Google Local, and they launched a series of anticompetitive initiatives designed to shore up the threat posed by partial substitutes like Yelp.

A.     **Google Uses its Dominant Position to Force Services Like Yelp to Contribute their Content to Benefit Google Local**

Websites typically allow search engines like Google to crawl and index their sites so that links to their sites can appear in response to relevant search engine queries. For example, if you search for "antitrust law", Google will display a relevant link to the FTC website as its fifth search result because the FTC has allowed Google to crawl and index that portion of its website.

In 2010, Google began incorporating the content that it indexed from its competitors into Google Local without permission. Although Google had previously acknowledged that it needed a license to use Yelp's content, it was now using it without permission to prop up its own, less effective product. In some instances, Google even presented this content to its users as if it were its own. [See Exhibit C]

1.     **Google's Offers a False Choice**

In response to our objections, Google informed us that it would cease the practice only if we agreed to be removed from Google's web search index, thereby preventing Yelp from appearing anywhere in Google web search results. This, of course, was a false choice. Google's dominant position in the market prevents services like Yelp from exercising any sort of meaningful choice in the matter: it is a choice between allowing Google to co-opt one's content and not competing at all.

Google's private position with companies like Yelp was in stark contrast to its public position, which curried the public's favor. For example, in the wake of a lawsuit relating to Google News, a Google spokesman insisted: "We wouldn't demand that anyone include their content in any of

249

our services at risk of being removed from search."[1]  For whatever reason, this message clearly had not yet made its way to the executives in charge of Google Local.

### 2.  Google Backtracks Under Public Scrutiny, But Privately Reprises the False Choice

Shortly after the FTC announced its investigation into Google's practices, and shortly after Yelp publicly presented its concerns at the Conference of Western Attorneys General in July 2011, Google announced that it would cease misappropriating content from its competitors.

The victory was short-lived, however.  Just one week later, it was revealed that Google Local was continuing to use content from services like Yelp in order to power its own local business search product, driving traffic to its own pages.  [See Exhibit D]

We again asked that Google cease its practice of co-opting content from Yelp for its own benefit. Google responded by removing Yelp links from portions of Google's web search product, providing a new twist on the same old false choice: if we chose not to help power Google Local, we could not appear in the "merged" portions of Google's web search results.[2]  To date, consumers cannot find links to Yelp in Google's merged results, belying Google's public pronouncements that "the competition is just one click away."[3]  [See Exhibit E]

### B.  Forget the Algorithm: Google Favors its Own Sites by Design

Google favors its own Google Local product in web search results, too.  Rather than favoring them algorithmically, however, Google simply favors them as a matter of design.

For example, when users search for a barber in Madison, Wisconsin, Google will always present links to its own consumer review website in the most prominent position regardless of whether the algorithm has actually determined that it has the most relevant content.  Put differently, it is impossible for any of Google's competitors to be displayed as prominently as Google itself, even if Google's own algorithm rates them higher.  In some instances, Google simply excludes competitor results as a matter of design, not as a matter of objective, algorithmically-driven analysis.  [See Exhibit F]

Is a consumer (or a small business, for that matter) well served when Google artificially promotes its own properties regardless of merit?  This has nothing to do with helping consumers get to the best information; it has everything to do with generating more revenue.  [See Exhibit G]

---

[1] Source: Simon Morrison of Google, July 18, 2011 (http://allthingsd.com/20110718/after-copiepresse-boycott-google-restores-search-of-news-sites/).

[2] The "merged" portion of Google search results have effectively replaced organic search results for local searches.

[3] Source: Google Public Policy Blog, May 8, 2009 (http://googlepublicpolicy.blogspot.com/2009/05/googles-approach-to-competition.html).

- 3 -

250

## IV.   <u>CONCLUSION</u>

I live and work in San Francisco which sits on the border of Silicon Valley, a place that has participated in the development of some of the most amazing products and services over the last few decades – including Google.

Today represents a rare opportunity for the government to protect innovation.  Allowing a search engine with monopoly market share to exploit and extend its dominance hampers entrepreneurial activity.  Ensuring open and equal competition will sustain and foster innovation and job growth.  It will also ensure that the price of internet advertising paid by small businesses will be set by the market, and not by a monopolist.

When one company controls the market, it ultimately controls consumer choice.  If competition really were just "one click away" as Google suggests, why have they invested so heavily to be the default choice on web browsers and mobile phones?  Clearly they are not taking any chances.

I thank the Subcommittee for its time and interest, and I look forward to assisting in any way that I can.

- 4 -

251



# Exhibit A

252





253





Elite '11   Colleen M.
♦ 37      I'm done-I only jog far enough to burn off the cheesecake I had for...
138       Washington, DC

⭐⭐⭐⭐⭐  1/27/2011

Thank you restaurant week for making me able  to go to this restaurant on my shoestring budget!  YUM!  I had the dry aged sirloin, my friend had the filet.  Go with the filet!  Great quality meat, you could cut it with a spoon.  They have garlic mashed potatoes there, and yes they leave the redskins on when they mash them, the only way mashed potatoes should be served!  We had clam chowder and ceasar to start with, both were pretty darn good!  It's been a while since I have had quality clam chowder.  Then we ended with key lime pie, which I didn't think I liked until I had theirs, and some chocolate espresso cake or something.  I rarely want chocolate for dessert, but oh man!  It's very compressed and heavy, not like an airy cake.  WOW-soo good!

I do not think we could have had a nicer server or a better experience.  The only problem I had was I got there about 5 minutes early for my reservation and they said they could not seat me yet but would let me know when my table was ready.  About 20 minutes after my reservation they said htey were ready.  At this point I was at the bar and she said I could finish my drink.  5 minutes later another lady from the hostess stand came up and asked if I would mind being seated as it was now almost 30 minutes from my reservation time.  She was VERY rude and used a nasty tone.  But I was glad to be seated and just took my drink with me.  Bartender, clientele, and waitor, all were more than perfect.  It was a great experience, and I do want to go back soon.  I hear the coconut cream pie and some lobster app are to die for... I'll keep you posted :)

The prices for drinks weren't that bad either, like 12 something for my hendricks on the rocks ..

Was this review ...?  Useful ▾   Funny ▾   Cool ▾

📑 Bookmark   ✉ Send to a Friend   🔗 Link to This Review            💬 Add owner comment   🚩 Flag this review

254



# Exhibit B

255



256



# Exhibit C

257



258



259



260



261



# Exhibit D

262



263



264



265



# Exhibit E

266





267



*Links to Yelp have
been removed*

268



**Exhibit F**

269



270



271



272



# Exhibit G

Case 5:24-cv-06101-SVK   Document 24-4   Filed 10/28/24   Page 43 of 43

273



VerDate Nov 24 2008   11:11 Dec 21, 2011   Jkt 071471   PO 00000   Frm 00277   Fmt 6633   Sfmt 6633   S:\GPO\HEARINGS\71471.TXT   SJUD1   PsN: CMORC