Sathya S. Gosselin (SBN 269171)
Swathi Bojedla (admitted *pro hac vice*)
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: sgosselin@hausfeld.com
Email: sbojedla@hausfeld.com

*Attorneys for Plaintiff Yelp Inc.*

(*additional counsel listed on signature page*)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| **YELP INC.,**<br><br>                       Plaintiff,<br><br>            v.<br><br>**GOOGLE LLC,**<br><br>                      Defendant. | Case No. 5:24-cv-06101-SVK<br><br>**PLAINTIFF YELP'S OPPOSITION TO GOOGLE'S MOTION TO DISMISS**<br><br>Date:  December 17, 2024<br>Time: 10 a.m.<br>Place: Courtroom 6, 4th Floor<br>Judge: Magistrate Judge Susan van Keulen |

**TABLE OF CONTENTS**

I.  INTRODUCTION AND STATEMENT OF THE ISSUES..............................................1

II.  BACKGROUND..................................................................................................2

    A.  Search Architecture and Advertising..................................................................3

    B.  Google's Anticompetitive Conduct....................................................................4

    C.  Harm to Competition..........................................................................................6

III.  LEGAL STANDARD..........................................................................................7

IV.  ARGUMENT ....................................................................................................8

    A.  Google's Motion to Dismiss Concedes that Counts I-III and VII Plausibly Allege Antitrust Claims. ..............................................................................8

    B.  Yelp's Claims Are Timely..................................................................................9

        1.  The Statute of Limitations Did Not Begin to Run in 2007.........................9

        2.  Google's Antitrust Violations Continue Even Today. ............................11

        3.  Yelp's claims for injunctive relief are also timely. ...................................16

    C.  Google's Attempt to Dismiss Characterizations of the Exclusionary Conduct, as Opposed to Legal Claims, Fails. .........................................17

    D.  Yelp's Remaining Counts Are Adequately Pled. ..............................................20

        1.  Yelp adequately alleges a tying claim. ................................................20

        2.  Yelp adequately pleads monopoly leveraging.........................................24

        3.  Yelp's UCL Claim Survives Because Yelp's Federal Claims Survive.....25

V.  CONCLUSION ................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ..................................................................... 21, 22

5

6

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
   948 F.2d 536 (9th Cir. 1991) ............................................................................. 24

7

*AMF, Inc. v. Gen. Motors Corp. (In re Multidistrict Vehicle Air Pollution)*,
   591 F.2d 68 (9th Cir. 1979) ................................................................... 13, 14, 15

8

9

*In re Animation Workers Antitrust Litig.*,
   87 F. Supp. 3d 1195 (N.D. Cal. 2015) ............................................................... 10

10

11

*ASARCO, LLC v. Union Pac. R.R. Co.*,
   765 F.3d 999 (9th Cir. 2014) ............................................................................... 8

12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ........................................................................................... 18

13

14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 7

15

*Bowles v. Reade*,
   198 F.3d 752 (9th Cir. 1999) ............................................................................. 16

16

17

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ............................................................................. 19

18

19

*Brooke Grp. Ltd. v. Brown Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ........................................................................................... 11

20

21

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ................................................................. 20, 22, 23

22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2014 WL 1091589 (N.D. Cal. Mar. 13, 2014) .................................................. 16

23

24

*Clifton v. Houghton Mifflin Harcourt Publ'g Co.*,
   152 F. Supp. 3d 1221 (N.D. Cal. 2015) ............................................................... 7

25

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*,
   111 F.3d 1427 (9th Cir. 1996) ........................................................................... 14

26

27

28

- ii -

*Doe v. Napa Valley Unified Sch. Dist.*,
2018 WL 4859978 (N.D. Cal. Apr. 24, 2018)................................................17, 25

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .......................................................................16

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ..........................................................................21

*In re Google Digital Advert. Antitrust Litig.*,
721 F. Supp. 3d 230 (S.D.N.Y. 2024) ...........................................................16

*Hankins v. Wheeler*,
2022 WL 2208848 (E.D. La. June 21, 2022) .................................................18

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) .......................................................................................14

*Heartland Payment Sys., Inc. v. MICROS Sys., Inc.*,
2008 WL 4510260 (D.N.J. Sept. 29, 2008) ...................................................23

*Hennegan v. Pacifico Creative Serv., Inc.*,
787 F.2d 1299 (9th Cir. 1986) ................................................................14, 15

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020).....................................................20, 25

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*,
340 F. Supp. 3d 934 (N.D. Cal. 2018)............................................................18

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ............................................................10, 11, 24

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
518 F.2d 913 (9th Cir. 1975) .........................................................................16

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ...........................................................................................22

*John Doe 1 v. Abbott Lab'ys*,
571 F.3d 930 (9th Cir. 2009)) ........................................................................25

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016) ...........................................................................21

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) .......................................................................................10

*Klein v. Facebook, Inc.*,
  580 F. Supp. 3d 743 (N.D. Cal. 2022)..................................................................14

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008)........................................................................20

*MedioStream, Inc. v. Microsoft Corp.*,
  869 F. Supp. 2d 1095 (N.D. Cal. 2012)..........................................................15, 16

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004)........................................................................18, 19

*In re Netopia, Inc., Sec. Litig.*,
  2005 WL 3445631 (N.D. Cal. Dec. 15, 2005) ....................................................18

*Oliver v. SD-3C LLC*,
  751 F.3d 1081 (9th Cir. 2014) ....................................................................*passim*

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
  63 F. Supp. 2d 1218 (E.D. Cal. 1999) ................................................................14

*Riva v. Pepsico, Inc.*,
  82 F. Supp. 3d 1045 (N.D. Cal. 2015)..................................................................7

*Rumble, Inc. v. Google LLC*,
  2022 WL 3018062 (N.D. Cal. July 29, 2022) ...........................................9, 17, 18

*Safeway Inc. v. Abbott Lab'ys*,
  2010 WL 147988 (N.D. Cal. Jan. 12, 2010).............................................18, 19, 25

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) ....................................................................*passim*

*SaurikIT, LLC v. Apple Inc.*,
  2022 WL 1768845 (N.D. Cal. May 26, 2022)......................................................16

*SaurikIT, LLC v. Apple, Inc.*,
  2023 WL 8946200 (9th Cir. Dec. 28, 2023).........................................................15

*SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*,
  88 F.3d 780 (9th Cir. 1996) ................................................................................10

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
  2024 WL 4532937 (N.D. Cal. Oct. 15, 2024) ......................................................18

*Times-Picayune Pub. Co. v. United States*,
  345 U.S. 594 (1953) ............................................................................................21

- iv -

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
  592 F.3d 954 (9th Cir. 2010) ........................................................................ 7

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971) ................................................................................... 10

*Zidek v. Analgesic Healthcare, Inc.*,
  2014 WL 2566527 (N.D. Ill. June 6, 2014) ........................................... 8, 18

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW (4th
  ed. 2017) ................................................................................................... 21

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (2d ed. 2004) .................................. 22

Daniel A. Crane, *Tying Law for the Digital Age,* 99 Notre Dame L. Rev. 821 (2024) ................ 24

Fed. R. Civ. P. 15 ............................................................................................ 16

Michal S. Gal & Daniel L. Rubinfeld, *The Hidden Costs of Free Goods: Implications
  for Antitrust Enforcement*, 80 Antitrust L.J. 521 (2016) ........................... 23

1    **I.    INTRODUCTION AND STATEMENT OF THE ISSUES**

2              Google's motion to dismiss is notable for what it concedes. Google does not challenge Yelp's

3    plausible allegations of Google's exclusionary, anticompetitive conduct; Yelp's plausible allegations

4    of three distinct product (and geographic) markets; or Yelp's plausible allegations of Google's

5    monopoly and market power in those markets. Google *admits*, moreover, that Yelp has adequately

6    alleged three different violations of Section 2 of the Sherman Act (Counts I-III) and a violation of

7    California's Unfair Competition Law ("UCL") (Count VII). Along the way, Google also accepts as

8    plausible Yelp's numerous allegations that Google promotes its own inferior search results over those

9    of its local search competitors, drives traffic and revenues away from its local search competitors

10   through its conduct, and has raised its rivals' costs in order to gain market share. Based on these

11   concessions, much of this Court's work is already done: Yelp's federal and state antitrust claims can

12   proceed, without even reaching Yelp's alternative characterizations of Google's exclusionary conduct.

13             Failing to undermine Yelp's claims and having lost the recent *U.S. v. Google* trial (Compl.,

14   ECF No. 1, ¶¶ 6, 10), Google tries out a novel theory—that a defendant's first *step* toward an eventual

15   Section 2 violation, the beginnings of a "general architecture concept," creates a strict four-year

16   deadline for filing despite the absence of injury or a cognizable antitrust violation at such early stages.

17   After that, according to Google, a defendant is free to violate the antitrust laws at will—and there can

18   be no continuing violations because the only overt act courts recognize is the conceptual shift or

19   "design" on day one. Under Google's theory, because its first attempts at self-preferencing began in

20   2007, when Google first launched its fledgling local search service, any injuries to Yelp after 2011 are

21   not actionable, regardless of its other exclusionary conduct, when Yelp's injuries occurred, or when

22   Google acquired enough market power for an actionable antitrust violation.

23             That flies in the face of well-settled antitrust jurisprudence (including Google's own cited

24   cases) holding that the clock starts when an antitrust violation occurs and injures a rival and *restarts*

25   with each new overt act that injures the plaintiff further. Google's unsupported proposal would create

26   a perverse scenario for any antitrust plaintiff—either bring suit immediately (at the first hint of

27   exclusionary conduct) against a defendant who may one day have market power, and face certain

28

- 1 -

1   dismissal because no antitrust violation has yet occurred, or hold off until the defendant gains market

2   power through its exclusionary conduct, as required by the Sherman Act, and lose on timeliness

3   grounds. For good reason, there is no such rule.

4       Google's other miscellaneous arguments cannot succeed either. First, Google impermissibly

5   seeks to sever and dismiss one of Yelp's alternative characterizations of exclusionary conduct (a

6   refusal to deal), a procedural argument at odds with Rule 12(b)(6), and one which Google recently

7   advanced and lost in this District. Second, Google seeks dismissal of Yelp's tying and monopoly

8   leveraging theories, both of which are plausibly alleged and legally sound. And, finally, Yelp's state-

9   law antitrust claims endure for the same reasons that Yelp's federal antitrust claims do. For all these

10  reasons, Google's motion should be denied in its entirety.

11  **II.    BACKGROUND**

12      Google operates a general search engine ("GSE") that provides consumers on the internet with

13  responses to their search queries. Compl., ECF No. 1, ¶ 6. As Judge Mehta (D.D.C.) recently found

14  after a months-long bench trial, Google unlawfully commands an 89.2% market share of the general

15  search market, making it the de facto gateway to the internet. *Id.* Today, roughly 9 billion searches are

16  performed daily on Google's GSE. *Id.* As such, Google has tremendous, singular influence on what

17  Americans see when they search the internet. *Id.* Rather than serving as an unbiased conduit to the

18  internet, Google has instead focused its efforts on using its monopoly in general search to suppress

19  competition in related markets. *Id.* ¶¶ 11-13.

20      Yelp is a specialized vertical provider ("SVP") that provides local search services. *Id.* ¶¶ 3, 19.

21  SVPs like Yelp provide specialized search results based on proprietary data and narrow and deep

22  subject-matter expertise. *Id.* ¶ 8. While Yelp focuses on local business, other SVPs have their own

23  areas of focus: Expedia (travel), Glassdoor (jobs and employers), and Zillow (apartment rentals and

24  real estate). *Id.* SVPs focusing on local search, like Yelp, enable consumers to enter queries for

25  businesses, services, or locations within a specific geographic area, and receive detailed information,

26  including user-generated reviews, photos, and videos. *Id.* ¶ 69. To fund its operations, Yelp also sells

27  local search advertising, allowing local business to reach potential customers in targeted geographic

28

- 2 -

1    areas. *Id.* ¶ 3. This litigation focuses on Google's anticompetitive conduct in the local search and local

2    search advertising product markets.

3        **A.    Search Architecture and Advertising**

4        To understand the effectiveness of Google's conduct, consider how general search engines

5    work. GSEs allow consumers to find responsive information by entering keyword queries. *Id.* ¶ 46.

6    When a consumer enters a query, the GSE will provide "organic" search results (*i.e.*, those the GSE's

7    algorithms determine to be the highest-quality results for the given query) from the internet on the

8    search engine results page, or SERP. *Id.* ¶ 47. When search results are returned, a consumer is faced

9    with a SERP populated by those organic results and various other elements, such as knowledge panels,

10   maps, images, videos, and advertisements. *Id.* There are two key aspects that drive whether a consumer

11   will see or click on a search result—location on the SERP and how the result appears. *Id.* ¶¶ 32-33.

12       Placement on a SERP is extremely important to whether a consumer will even see a search

13   result. *Id.* ¶ 33. Consumers "overwhelmingly focus on the top of the results page, the 'visible area' that

14   users immediately see when they open a webpage without having to scroll down or across." *Id.* The

15   first-ranked result is by far the most likely to receive clicks, accounting for 31% of consumer clicks,

16   while results six to ten make up 3.73% of clicks *combined. Id.* Consumers are also more attracted to

17   search results that contain additional elements, such as images, maps, or product information. *Id.* ¶ 41.

18   "[A]fter looking at graphic-driven features on a SERP, users drastically reduce their attention to

19   organic search results," even where those search results are superior. *Id.*

20       Taken together, the Complaint alleges that search results that (1) appear at the top of the SERP,

21   and (2) include additional elements beyond just a link and description are far more likely to receive

22   attention and clicks from consumers. And clicks are important because they are linked with advertising

23   dollars—the more clicks a company's website receives, the more advertising revenues it receives,

24   either through a cost-per-click or other model or through gaining traffic that entices advertisers to

25   purchase advertising directly from the company itself rather than the GSE. *Id.* ¶¶ 8, 30-31. This case

26   is about what happens when the gatekeeper—Google, the GSE on which 90% of all general search

27   queries originate—uses these search elements (and other conduct) to preference its own inferior results

28

- 3 -

1    over those of its competitors, in order to drive clicks, traffic, and advertising dollars to itself and

2    handicap its rivals, thereby harming competition and consumers.

3    **B.    Google's Anticompetitive Conduct**

4    Yelp was founded in 2004 with the mission of connecting consumers with great local

5    businesses through local search. Through significant investment, creative branding, and a focus on

6    community building, Yelp innovated a stagnant market and became a leader in the local search market,

7    besting competitors who had entered the market before it. *Id.* ¶ 116 and Fig. 5. Yelp invested in

8    building a base of detailed and enthusiastic customer reviews of local businesses, providing a high-

9    quality local search product to consumers. *Id.* ¶ 116.

10    Google recognized in the mid- to late aughts that it faced a threat from Yelp and similar SVPs,

11    whose differentiated, high-quality products provided alternatives to consumers who could take their

12    traffic and clicks (and the attendant advertising dollars) away from Google. *Id.* ¶ 37. As one measure

13    to combat this possibility, Google developed its first vertical platforms in-house, such as travel and

14    shopping, that it displayed via tabs at the top of the general SERP. *Id.* ¶ 38. But "traffic was limited,"

15    and people were not interested in Google's vertical products; as Google complained privately, "few

16    users [were] motivated to click on our tabs…." *Id.* So Google created and deployed its "OneBox,"

17    moving its own vertical search results onto the main SERP with prominent positioning above organic

18    search results. *Id.* Google's OneBox combines both elements that draw the consumer's attention away

19    from organic search and toward Google's inferior vertical products—placing them at the top of the

20    SERP, preventing consumers from scrolling further, and utilizing graphics, maps, and other elements

21    not available to Google's competitors.

22    In 2007, Google launched "universal search." *Id.* ¶ 39. Through universal search, when a

23    consumer inputs a keyword into Google's GSE, and that search relates to one of Google's own verticals

24    *or* the top organic result is a competitor's vertical search service, Google deploys a OneBox that

25    prominently features Google's own competing vertical search results. *Id.* ¶ 40. That same year, Google

26    *first* "launched a review feature … and began competing with Yelp" in local search. *Id.* ¶ 118. By

27    2009, Google still lacked a "viable local search product," so Google attempted—unsuccessfully—to

28

- 4 -

acquire Yelp. *Id.* ¶¶ 119-20. At the time, Google acknowledged internally that it had not succeeded in gaining market share. *Id.* ¶ 119 (acknowledging "[l]imited success with our [r]eviews" and that "[u]sers begin to start at review sites for key categories/regions" rather than on Google). "[R]ebuffed on … a takeover offer," Google created "Google Places," the next iteration of its local search product, but there too Google "did not have the critical mass of reviewers it needed" and was "unable to compete." *Id.* ¶ 120. By mid-2010, Google was still "build[ing] out its own competing product," and Google was still "nascent" in local search. *Id.* ¶ 123. That same year, "Google started selling advertising on Google Places," its first foray into local search advertising. *Id.* ¶ 122.

Far from the end of the story, the Complaint alleges that this was just the beginning of Google's long campaign to grow its presence—from nothing—in the markets for local search services and local search advertising. By roughly 2010, Google was desperate and began misappropriating content from rival local search providers like Yelp while engaging in self-preferencing conduct to boost its own visibility to the detriment of its competitors. *Id.* ¶¶ 123-25. In 2011, the Federal Trade Commission opened an investigation into Google's practices, resulting in a 2012 staff report condemning them. *Id.* ¶ 124. The staff report spelled out specific practices that Google had engaged in, including scraping Yelp and other rivals' content to improve its own products. *Id.* The report also revealed various other anticompetitive conduct, including using the presence of competing vertical sites (like Yelp) in its organic search results "to automatically boost the ranking of its own vertical properties above that of its competitors." *Id.* ¶ 126. The FTC staff report also found that certain Google algorithm updates had resulted in demotion of its competitors. *Id.* The FTC staff report concluded: "Unlike Google's vertical competitors, who expend considerable resources on optimizing their websites in order to rank highly on Google's SERP, Google does not expend the time and resources to optimize its own vertical properties; it simply places them on the SERP." *Id.* The FTC made no findings concerning Google's market share or market power in the local search services or local search advertising markets. In fact, the FTC was skeptical that even Google's monopoly power in *general search services* could last. Mot., Schmidtlein Decl. ("Schmidtlein Decl."), Ex. A at 114; Compl. ¶ 6.

Emboldened, Google continued its anticompetitive conduct, taking market share in local search

- 5 -

1    and local search advertising as it went. Google also fortified its position in the GSE market, creating

2    exclusive distribution channels that solidified its control over traffic to Yelp and other SVPs. *Id.* ¶ 65.

3    Yelp alleges that Google also continued to tweak its algorithm at various points to decrease traffic to

4    its competitors, as another means of increasing market share for itself. *Id.* ¶ 128. One such change to

5    Google's algorithm in 2015 caused Yelp to have its first ever decline in year-over-year traffic. *Id.* That

6    2015 algorithm change and others over time caused significant drops in traffic to Yelp, harming it as

7    a competitor and allowing Google to take market share in the relevant markets. *Id.*

8        At the center of this narrative is Google's constantly changing SERP design and algorithm,

9    which "has a specific methodology to detect local search queries and inject Google's OneBox for local

10   search in response." *Id.* ¶ 76. Every day, "[w]hen Google's algorithm detects a local search intention,

11   based on the [unique] user query, Google delivers its OneBox, promotes its own search results, and

12   demotes that of its local search competitors, including Yelp." *Id.* ¶ 158. "With each new local search

13   query and response, Google renews its anticompetitive conduct, harming consumers, competition, and

14   local search competitors such as Yelp. As such, Yelp experiences a new and accumulating injury—

15   and damages—from Google's conduct every few seconds; each instance is a new and independent act

16   by Google." *Id.* ¶ 159.

17       C.    **Harm to Competition**

18       Google's anticompetitive conduct harms competition by preventing competitors from

19   achieving or maintaining scale in local search services. *Id.* ¶ 154. SVPs are highly dependent on Google

20   for traffic; from 2012-2019, for example, more than 70% of Yelp's U.S. web traffic came through

21   Google. *Id.* ¶ 153. SVPs like Yelp rely on traffic to improve their quality through network effects: as

22   more content is created, more consumers are attracted to the vertical and quality improves, and the

23   vertical can grow and monetize through increased advertising. *Id.* ¶ 145. By stemming the flow of

24   traffic to its rivals, Google builds market share for itself and constrains competition in the market for

25   local search services, as competitors who cannot achieve scale are disincentivized from investing in

26   content and becoming viable competitors to Google. *Id.* ¶ 145. Google's conduct also raises the cost

27   for rivals to operate, as many SVPs like Yelp depend on Google for traffic to their sites and are forced

28

- 6 -

to purchase advertising from Google to reach consumers. *Id.* ¶¶ 153-54. Propping up Google's inferior local search product—which features local search results that are on average shorter, more prone to error, less subject to quality control, and less likely to result in consumer engagement than those of rivals—also harms consumers through degraded quality. *Id.* ¶¶ 136-39.

When Google engages in anticompetitive conduct and self-preferences its own local search vertical over Yelp and other competitors, it increases its share of consumers and traffic and gives itself an advantage in bringing in advertising revenues, which follow traffic. *Id.* ¶ 150. Unconstrained by competition on the merits, Google is able to increase local search advertising pricing without the threat of advertisers switching away. *Id.* This has already happened in the related market of general search advertising; the United Kingdom's Competition and Markets Authority found that in the U.S. Google has progressively increased monetization, in terms of revenue per search and the ad load on its SERP, both of which harm advertisers through higher costs and dilution of the value of their advertising dollars. *Id.* ¶ 151. It also harms competition, consumers, and Yelp and other SVPs, who rely on advertising dollars to continue to invest in producing a high-quality product. *Id.* ¶ 149.

## III.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of wrongdoing." *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1051 (N.D. Cal. 2015) (quoting *Twombly*, 550 U.S. at 545). A statute-of-limitations defense, as Google attempts here, is an affirmative defense on which the defendant bears the burden of proof. *Clifton v. Houghton Mifflin Harcourt Publ'g Co.*, 152 F. Supp. 3d 1221, 1226 (N.D. Cal. 2015). A claim cannot be dismissed as time-barred unless "the running of the statute is apparent on the face of the complaint" and "it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (citations omitted). "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises

1    disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *ASARCO, LLC v. Union Pac. R.R.*

2    *Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).

3    **IV.    ARGUMENT**

4        **A.    Google's Motion to Dismiss Concedes that Counts I-III and VII Plausibly Allege**

5            **Antitrust Claims.**

6        As even Google recognizes, Yelp has plausibly alleged that Google has monopoly power in the

7    local search services market in the United States, which Google willfully and intentionally obtained

8    (or maintained) through its exclusionary, anticompetitive conduct detailed in the Complaint (Count I).

9    Yelp has also plausibly alleged, in the alternative, that Google has sufficient market power, obtained

10    (or maintained) through its exclusionary, anticompetitive conduct, to pose a dangerous probability of

11    monopolizing the local search services market in the United States (paired with specific intent) (Count

12    II). And Yelp has likewise plausibly alleged that Google has sufficient market power, obtained (or

13    maintained) through its exclusionary, anticompetitive conduct, to pose a dangerous probability of

14    monopolizing the local search advertising market in the United States (paired with specific intent)

15    (Count III). As to all three, Yelp also adequately alleges harm to competition, antitrust injury, and

16    damages. Google offers no challenge to Counts I-III beyond timeliness—and insists that Yelp's UCL

17    claim (Count VII) should rise or fall with the first three, Mot. at 22. Absent Google's winning on its

18    ill-conceived statute of limitations arguments, Yelp's Section 2 claims can proceed.

19        The Court can stop Google's preferred count-by-count analysis there and need not address

20    Google's criticisms of Count IV (tying), Counts V and VI (monopoly leveraging), or Yelp's refusal to

21    deal allegations (one of many alternative characterizations of the exclusionary conduct for Counts I-

22    III) because the practical effect of those arguments is nil: none could defeat Yelp's Section 2 claims,

23    even taken together. "The federal rules allow for dismissal for 'failure to state a claim' but do not

24    provide a basis for striking individual legal theories." *Zidek v. Analgesic Healthcare, Inc.*, 2014 WL

25    2566527, at *2 (N.D. Ill. June 6, 2014).

26        Google's attempts to undermine Yelp's styling of its Section 2 counts under alternative theories

27    and counts are, respectfully, a waste of this Court's resources and the parties' time. *See infra* IV.C.

28

- 8 -

Ironically, in a similar recent case, Google (and its same counsel) did just the opposite, seeking to dismiss a plaintiff's claims because it *did not* disaggregate its Section 2 cause of action into sub-theories across different counts. *Rumble, Inc. v. Google LLC*, 2022 WL 3018062, at *3 (N.D. Cal. July 29, 2022) ("Defendant argues that Plaintiff's amended complaint should be broken into distinct theories of liability based on (1) self-preferencing, (2) tying of the YouTube app to other Google apps, and (3) unlawfully dominating the search market with agreements involving distribution of Defendant's search product."). Google cannot have it both ways. As in *Rumble*, "[w]ithout real dispute, Plaintiff has adequately alleged a Section 2 claim." *Id.* ("Defendant does not dispute that Plaintiff has adequately pled a Section 2 claim based on the first theory of liability, self-preferencing"; rejecting "the premise that a court can disaggregate a single Section 2 cause of action into subtheories, then scrutinize and potentially dismiss some subtheories without dismissing the entire cause of action"). "And the sort of parsing urged by [Google] is at least arguably in tension with the Supreme Court's direction that Sherman Act plaintiffs 'should be given the full benefit of their proof without compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Id.* (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

At this stage, the Court need only decide whether Yelp has plausibly alleged its Section 2 claims. If the Court so concludes, as Yelp submits it should, based on the Complaint and Google's concessions outlined above, then it can dispense with Google's motion after evaluating timeliness.

### B.    Yelp's Claims Are Timely.

Yelp's timely antitrust claims arise from (1) Google's exclusionary conduct finally succeeding in achieving market power in local search and local search advertising, which took more than a decade, and (2) numerous overt Google actions that continue to the present day. Google's proposal that the Complaint is "premised [exclusively] on Google's 2007 launch of universal search," Mot. at 10, distorts Yelp's allegations and cannot be reconciled with the face of the Complaint.

#### 1.    The Statute of Limitations Did Not Begin to Run in 2007.

Google misunderstands how the statute of limitations works in a federal antitrust case. As the Supreme Court explained nearly 50 years ago, "[t]he basic rule is that damages are recoverable under

1    the federal antitrust acts only if suit therefor is 'commenced within four years after the *cause of action*

2    accrued ....'" *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) (quoting 15 U.S.C.

3    § 15b) (emphasis added). "Generally, a cause of action accrues and the statute begins to run when a

4    defendant commits an act that injures a plaintiff's business." *Id*. But that injuring act, "of course," must

5    be one "that violates the governing statute." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 198 (1997)

6    (Scalia, J.) (concurring in part). Every treatise echoes this framework: "The limitations period begins

7    to run when the cause of action accrues—ordinarily, when the plaintiff suffers injury *resulting from*

8    *the antitrust violation*." ABA Antitrust Law Section, 1 ANTITRUST LAW DEVELOPMENTS (9th ed. 2022)

9    at 856 (emphasis added); *see* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS

10   OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (2024) 320b ("[O]ne must first pinpoint the time

11   at which the cause of action arose ....") ("Areeda & Hovenkamp (2024)"). And Google's preferred

12   authorities reiterate the same "ordinary Clayton Act rule." *Klehr*, 521 U.S. at 188 (quoting *Zenith*

13   *Radio*, 401 U.S. at 338); *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208-09 (N.D.

14   Cal. 2015) (same).

15        In making its head-scratching argument, Google overlooks the role and timing of the antitrust

16   violation, which dooms its arguments. Take, for example, Google's central contention that the "statute

17   of limitations began to run in 2007" from the face of the Complaint. Mot. at 10. Google ignores whether

18   Yelp had actionable Section 2 claims at that time, as 15 U.S.C. § 15b and *Zenith Radio* demand. As

19   noted above, Yelp's monopolization and attempted monopolization claims require monopoly power

20   or a dangerous probability of monopoly power in the local search markets alleged. *See, e.g.*, *Image*

21   *Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1214 (9th Cir. 1997) (Sherman Act prohibits

22   "the acquisition or maintenance of a monopoly by exclusionary conduct"); *SmileCare Dental Grp. v.*

23   *Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (enumerating elements of

24   monopolization and attempted-monopolization claims). On the face of the Complaint, neither

25   possibility could have been true in 2007, when Google introduced universal search and its first-ever

26   local search product, struggling for years thereafter with "viab[ility]." Compl. ¶¶118-22. Google

27   confuses exclusionary conduct, which is not actionable in the absence of market power, with Section

28

- 10 -

2 antitrust liability, which requires both. *See Image Tech. Servs.*, 125 F.3d at 1212 (evaluating whether defendant "has both attained monopoly power and exercised exclusionary conduct"); Areeda & Hovenkamp (2024) 806e; *see also Brooke Grp. Ltd. v. Brown Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws").

Viewed in this light, Google's contention that only 2007 (or some other early date) matters falls apart. Yelp's Complaint plausibly alleges, *e.g.*, that Google only "began competing with Yelp" in 2007 (when it first "launched a review feature"), with "limited success" in its first two years. Compl. ¶ 118. In 2009, Google still lacked a "viable local search product." *Id.* ¶¶ 118-120. Google did not even begin to sell local search advertising until 2010. *Id.* ¶ 122. And Google's overall "position in local search" was still "nascent" as of 2010. *Id.* ¶ 123. All of which begs the question that Google neglects to answer: How could it be, from the face of the Complaint, that *by 2007* Google had supposedly attained a monopoly (or a dangerous probability of such), when it was just starting out in local search—and struggling mightily by its own admission? Google cannot succeed here.

Google's fallback suggestions that 2009, 2011, or 2015 might be the operative date fare no better. Mot. at 10-11. Yelp's early warnings to Congress cannot confirm the availability of distinct Section 2 liability at the time, years before Google attained its now-dominant position in local search and local search advertising. Schmidtlein Decl., Ex. B, at 250 (warning of "hamper[ing] entrepreneurial activity" if Google is permitted to "exploit and *extend* its dominance" in general search) (emphasis added). And Google misses the point in disparaging allegations of its theft of Yelp's content in 2007-2009 and changes to its algorithm in 2015: Yelp plausibly alleges Google took these steps, among many others, to grow its market share in local search and local search advertising *starting from nothing*.

## 2.    Google's Antitrust Violations Continue Even Today.

Google also misapprehends the continuing violation doctrine and its application here. On this much the parties agree: "To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets

- 11 -

two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'" *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).

Absent from Google's motion, however, are the bedrock Ninth Circuit authorities that describe the continuing violation analysis in the competitor context—and compel denial here. As the Ninth Circuit has explained, "[t]his standard [distilled in *Pace Industries*] is meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—*from those where all of the harm occurred at the time of the initial violation.*" *Id.* (emphasis added). Where a defendant makes an "irrevocable, immutable, permanent, and final" decision that violates the antitrust laws and is the source of all damages, the statute of limitations begins to run from that date. *Id.* at 1203 (citing *AMF, Inc. v. Gen. Motors Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68, 72 (9th Cir. 1979)). But where the defendant takes subsequent unlawful action—even pursuant to a pre-existing policy, agreement, or decision—it "restart[s]" the statute of limitations. *Id.* Key to this analysis is whether "the defendant had the ability *not* to take the challenged action" at later junctures. *Id.*; *see Oliver v. SD-3C LLC*, 751 F.3d 1081, 1087 (9th Cir. 2014) (emphasizing that earlier action "did not permanently and finally control" subsequent acts by the defendants and that each "could have ceased charging the price-fixed price at any time"). Under this standard, even "fine-tun[ing]" an antitrust violation refreshes the statute of limitations. *Samsung*, 747 F.3d at 1204.

One antitrust treatise summarizes this rule in the monopolization–competitor context: "When the monopolist creates its monopoly by a ***single discrete act*** injuring rivals, the statute runs against the injured rivals from the time the act is committed." Areeda & Hovenkamp (2024) 320c4 (emphasis added). But "[w]hen the monopolist creates its monopoly by a series of repeated or reasserted acts designed to maintain its monopoly, the statute of limitation is restarted provided that the subsequent acts fall within the definition of 'independent' predicate acts" embraced by the circuit courts. *Id.*

Faithful to this framework, Yelp plausibly alleges various new and independent acts through the present day. This is not a scenario, on the face of the Complaint, in which all of the harm occurred

at a specific moment in time, *Samsung*, 747 F.3d at 1202; a single "irrevocable, immutable, permanent and final" decision violated the antitrust laws once in the distant past, *AMF*, 591 F.2d at 72; or the conduct alleged prevented the possibility of reversing course thereafter, *Oliver*, 751 F.3d at 1087. The Complaint narrates Google's progression from "unbiased and impartial matchmaker" to unlawful monopolist in general search services, local search services, and local search advertising through numerous anticompetitive actions, technological refinements, and instances of "fine tuning" that continue even today. As Yelp plausibly alleges, "there have been *numerous changes* to the SERP since 2007" and "Google's conduct has worsened in recent years." Compl. ¶¶ 42, 156 (emphasis added). "Google has sought to create and *steadily expand* its own foothold in the local search market so that it can sell more of its own advertising …." *Id.* ¶ 8 (emphasis added). As it grew, "Google sought to *increase triggering* of OneBox results—highlighting Google's own properties—not only to provide users with the right answers to their inquiries, but also to drive traffic to Google's verticals." *Id.* ¶ 125 (emphasis added). Google even "tweak[ed] its algorithm and steer[ed] customers away from Yelp." *Id.* ¶ 9; *id.* ¶ 128 (alleging various "algorithm changes"). And all of this turns, of course, on Google's constantly changing algorithm, which "has a specific methodology to detect local search queries and inject Google's OneBox for local search in response." *Id.* ¶ 76. Indeed, "Google's anticompetitive conduct … recurs every day," although it could change course at any time. *Id.* ¶ 156. "When Google's algorithm detects a local search intention, based on the [new and unique] user query, Google delivers its OneBox, promotes its own search results, and demotes that of its local search competitors, including Yelp." *Id.* ¶ 158. "[E]ach instance is a new and independent act by Google." *Id.* ¶ 159.

　　　　Google portrays all of this as merely the implementation of a product design in 2007 without *any* "new act by Google" since, Mot. at 11—proposing in effect that (on the face of the Complaint) Google's search technology, algorithm, and implementation methods and strategies remained stagnant for nearly two decades. Not so. The Complaint details changes, progression, and variety from Google, not a single moment fixed in time. For example, a recent Google SERP reveals a new design and algorithm shift, featuring specialized local results that incorporate Google reviews and ratings under "Google Guaranteed" at the very top of the SERP. Mot. at 4; Compl. ¶ 42, Fig. 1. An entire industry,

- 13 -

1    moreover, studies search optimization and Google's algorithm changes. *E.g.*, *id.* ¶ 33 and n.4-5.

2    Google homes in on a single sentence fragment in the Complaint to suggest that "the general

3    architecture *concept*" is the violation, somehow complete as of 2007. Mot. at 3, 8, 11. But a "general

4    concept" or "design" is not the measure of a continuing antitrust violation. Timeliness under the

5    Clayton Act turns on overt "acts"—including those in service of larger policies, designs, or general

6    concepts, however longstanding. *See*, *e.g., Samsung, 141* F.3d at 1202 ("[E]ach time a plaintiff is

7    injured by an act of the defendants a cause of action accrues to him to recover the damages caused by

8    that act"), 1203 (summarizing *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299 (9th Cir.

9    1986), where "[e]ven though the anticompetitive agreement to divide the market between producers

10   dated back to 1972, the anti-competitive acts of the parties to that agreement, taken pursuant to its

11   terms, were sufficient to support an antitrust action 18 years later"); *Columbia Steel Casting Co. v.*

12   *Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir. 1996) (enforcing 18-year-old anticompetitive

13   contract within limitations period was a new overt act); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,

14   63 F. Supp. 2d 1218, 1224 (E.D. Cal. 1999) (timely claims based on policy first established 15 years

15   earlier); *see also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968)

16   (plaintiff permitted to sue in 1955 for a "lease only policy" that began in 1912 because that conduct

17   "constituted a continuing violation of the Sherman Act … which inflicted continuing and accumulating

18   harm on" the plaintiff). Here, Yelp plausibly alleges that Google has engaged in countless overt acts

19   under this rubric, or "general concept," of exclusion to the present day. "Continued implementation"

20   of this sort—to use Google's own words, Mot. at 11—restarts the statute of limitations. *See, e.g.*, *Klein*

21   *v. Facebook, Inc.*, 580 F. Supp. 3d 743, 797 (N.D. Cal. 2022) (finding "no authority for [the] argument

22   that an act is not 'new and independent' simply because the defendant has previously committed the

23   same type of act as part of a unified anticompetitive strategy").

24         Google strains to compare Yelp's Complaint to *AMF* despite obvious differences and the Ninth

25   Circuit's repeated admonition in modern technology cases that "*AMF* is the exception, not the rule."

26   *Samsung*, 747 F.3d at 1203; *Oliver*, 751 F.3d at 1087. In *AMF* (the rare "permanent at initiation"

27   instance), "the unique nature of the automobile business [in 1964] meant that the initial refusal to deal

28

- 14 -

was an 'irrevocable, immutable, permanent and final' decision and any damages that occurred during the limitations period 'necessarily resulted from' and 'were but unabated inertial consequences of some pre-limitations action.'" *See Samsung*, 747 F.3d at 1203; *Oliver*, 751 F.3d at 1087; *AMF*, 591 F.2d at 72 (noting that car-manufacturer decisions not to integrate AMF's "Smog Burner" and instead develop their own were final as of the date of those refusals because, *e.g.*, "[t]he original equipment supply market to automobile manufacturers differs substantially from other supplier relationships. Any part must be integrated into the full car design. Planning is essential, and planning requires lead time."). Here, as in *Samsung* and *Oliver*, and under any fair reading of the Complaint, Google's 2007 change "did not permanently and finally control" its decision-making moving forward; Google "ha[s] the ability not to take the challenged action" and can cease its anticompetitive conduct at any time. *See Samsung*, 747 F.3d at 1203-04; *Oliver*, 751 F.3d at 1087.

*Hennegan*, 787 F.2d at 1300-01, which Google also omits from consideration, is an instructive analog that governs Google's digital conduct here. In *Hennegan*, the Ninth Circuit assessed an 18-year-old arrangement in which tour guides had agreed to steer customers away from the plaintiff's shop and toward rival souvenir shops for payment. *Id*. The Ninth Circuit held that a cause of action accrued every time that a tour guide shepherded away a tourist (or received payment) because those were "overt act[s]" in furtherance of the antitrust violation. *Id.* Unlike in *AMF*, the agreement in *Hennegan* (reached 18 years earlier) did not "immediately and permanently destroy" plaintiff's business, cause all of the injury, or constitute an "irrevocable, immutable, permanent and final" decision at inception. *Id.* So too here: Every day, Google steers consumers away from Yelp and causes new injury. And Google could stop tomorrow.

Instead of reckoning with these controlling Ninth Circuit authorities, Google turns to outlier cases that are not analogous. *SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023), for example, is an unpublished two-paragraph split decision that cites *Samsung* approvingly and turned on a few threadbare allegations about developer contracts and a 15-year-old warranty agreement that all parties agreed had never changed. *Id.* at *2 (Desai, J., dissenting) ("The majority's holding imposes a pleading burden beyond what is required to survive a statute of limitations defense."). *MedioStream,*

*Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095 (N.D. Cal. 2012), predates the Ninth Circuit's guidance in *Oliver* and *Samsung*—relying instead on an earlier version of the district court's *Samsung* opinion that the Ninth Circuit ultimately reversed, *id.* at 1107—and addressed a complaint with "no additional anticompetitive conduct" beyond anticompetitive agreements imposed a decade earlier. *MedioStream* recognizes, moreover, the larger principle that subsequent overt actions pursuant to "mutable policies first put into place outside the limitations period" restart the clock. *Id.* at 1105. Finally, *In re Google Digital Advert. Antitrust Litig.*, 721 F. Supp. 3d 230 (S.D.N.Y. 2024), an out-of-circuit decision pending appeal, merely barred challenge to advertising restrictions "on the number of line items permitted in header bidding" implemented in their entirety seven years earlier. *Id.* at 273.

Notably, in all three instances and unlike with Google's proposal (Proposed Order at 1), the court granted plaintiffs leave to amend before or after the operative decisions. *See SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845, at *2 (N.D. Cal. May 26, 2022); *Mediostream,* 869 F. Supp. 2d at 1117; *Google Digital Advert.*, 721 F. Supp. 3d at 240-41. If the Court were to be persuaded by these authorities, Yelp respectfully requests leave to amend its Complaint to include additional allegations of Google's conduct and tolling through the present. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend be "freely give leave when justice so requires."); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) ("This policy is 'to be applied with extreme liberality.'"); *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999) (absent "specific findings of prejudice, bad faith, or futility" leave should be granted).

### 3. Yelp's claims for injunctive relief are also timely.

Laches likewise cannot bar Yelp's claims for injunctive relief. Laches requires a showing of (1) unreasonable delay in filing suit and (2) prejudice to the defendant. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 1091589, at *13 (N.D. Cal. Mar. 13, 2014). When considering a laches defense, antitrust courts "look to the same legal rules that animate the four-year statute of limitations" for damages under the Clayton Act. *Oliver*, 751 F.3d at 1086; *Samsung*, 747 F.3d at 1205. Here, Google's only arguments about delay or prejudice are derivative of its larger assertion that Yelp should have filed suit in 2007, although no such "competitor[] antitrust violation" yet existed. *See Int'l Tel. &*

- 16 -

1  *Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 927, 929 (9th Cir. 1975). For the same reasons

2  that Yelp's damages claims are timely, so too are Yelp's injunctive claims. *Oliver*, 751 F.3d at 1087

3  ("Because Plaintiffs allege that they were injured within the four-year limitations period, Plaintiffs

4  have alleged sufficient facts to show that laches does not bar their federal antitrust claim").

5  **C.    Google's Attempt to Dismiss Characterizations of the Exclusionary Conduct, as
6          Opposed to Legal Claims, Fails.**

7          In passing, Google nibbles at the edges of Yelp's monopolization and attempted

8  monopolization claims (Counts I-III), contending those claims must be dismissed "[t]o the extent" they

9  "rest upon alleged refusal-to-deal theories." Mot. at 20. But Rule 12(b)(6) is not a vehicle for trimming

10 alternative legal theories or claims in part. Google misinterprets Counts I-III and is incorrect about the

11 strength of Yelp's alternative refusal-to-deal characterization of Google's exclusionary conduct.

12         In pleading the elements of Yelp's monopolization and attempted monopolization claims,

13 Counts I-III each summarize Google's wide-ranging anticompetitive conduct, incorporate by reference

14 the entirety of the allegations, and note that Google's conduct "can be characterized [alternately] as a

15 tying arrangement, a refusal to deal, monopoly leveraging, and monopolistic product design/redesign."

16 Compl. ¶¶ 172, 175, 182, 186, 194, 198. Refusal to deal is just one of many classifications of the

17 exclusionary conduct undergirding Yelp's monopolization and attempted monopolization claims.

18         Google does not challenge each of those exclusionary conduct characterizations, *see* Mot. at

19 21-22 and *supra* IV.A, and so Google's attempt to strike (in effect) Yelp's refusal-to-deal theory is

20 improper and has no basis under Rule 12(b)(6). Indeed, as noted above, Google and its counsel tried

21 out this argument recently, in this District, and failed. *Rumble*, 2022 WL 3018062, at *3 (denying

22 Google's motion to dismiss that sought to "disaggregate a single Section 2 cause of action into

23 subtheories, then scrutinize and potentially dismiss some subtheories without dismissing the entire

24 cause of action … given that Plaintiff undisputedly has adequately pled a Section 2 claim based on

25 self-preferencing"); *see also id.* ("Defendant does not cite, and the Court has been unable to find, any

26 Supreme Court or Ninth Circuit authority ratifying this approach."); *Doe v. Napa Valley Unified Sch.

27 Dist.*, 2018 WL 4859978, at *2 (N.D. Cal. Apr. 24, 2018) (rejecting defendants' attempt "to reframe

28

- 17 -

Plaintiff's negligence claim as three separate claims, and then move to dismiss two of Plaintiff's three theories of negligence"). After all, "[b]y its own terms, there does not appear to be any way to grant partial dismissal of a claim under [Rule] 12(b)(6)." *In re Netopia, Inc., Sec. Litig.*, 2005 WL 3445631, at *3 (N.D. Cal. Dec. 15, 2005); *see In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 2024 WL 4532937, at *10 (N.D. Cal. Oct. 15, 2024) ("Motions to dismiss should not be used for piecemeal purposes."); *Zidek*, 2014 WL 2566527, at *2.

Distilled down, these cases affirm that "when a plaintiff asserts multiple theories of recovery as supporting a single claim, 'the pleading is sufficient if the factual allegations support liability … under any legal theory.'" *Hankins v. Wheeler*, 2022 WL 2208848, at *6 (E.D. La. June 21, 2022) (quoting *Murphy v. City of Tulsa*, 2016 WL 11619779, at *2 (N.D. Okla. Feb. 29, 2016)). And this conclusion follows even more strongly for a Sherman Act claim given "the Supreme Court's direction that Sherman Act plaintiffs 'should be given the full benefit of their proof without compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Rumble*, 2022 WL 3018062, at *3 (quoting *Continental Ore*, 370 U.S. at 699). The Court can end there.

Regardless, Yelp adequately alleges a refusal to deal. Although there is no generalized duty to deal with a competitor, "liability under § 2 can arise when a defendant voluntarily alters a course of dealing and 'anticompetitive malice' motivates the defendant's conduct." *Safeway Inc. v. Abbott Lab'ys*, 2010 WL 147988, at *6 (N.D. Cal. Jan. 12, 2010); *accord Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 952 (N.D. Cal. 2018); *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985); *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132–33 (9th Cir. 2004) (discussing factors from *Verizon* and *Aspen Skiing* that are probative of an actionable refusal to deal).

Yelp's Complaint alleges that Google voluntarily altered a prior course of dealing with Yelp and other SVPs, in which SVPs could be (deservedly) featured in the SERP (frequently at the top because SVPs provide highly relevant organic results in response to commercial queries). *See, e.g.*, Compl. ¶¶ 32, 35, 36, 37, 117. Indeed, the Complaint's allegations show that the success of SVPs tracked the success of Google's general search services and organic search results, making the

- 18 -

relationship profitable for both Google and SVPs. *See id.* ¶ 54 ("Google's own empirical research demonstrates … [that] Amazon Prime loyalty members tend to search more—not less—on Google"). And there are ample allegations of anticompetitive malice because Google sacrificed short-term profitability from these relationships, developing inferior verticals of its own (which floundered for years) and scraping its competitors' hard-won data to support them, until Google "developed several algorithm updates that resulted in demotion of its competitors, while excluding itself from the same metrics that resulted in those demotions." *See id.* ¶¶ 126, 128, 129, 131. As cases like *MetroNet* and *Safeway* warn against, this anticompetitive conduct turned profitable in the long term as Google grew its market share (and attendant advertising revenues). *Id.* ¶¶ 83, 84, 129.

In the face of these plausible allegations, Google demands improperly that this Court draw inferences against Yelp. For instance, Google argues that the Complaint "does not allege that Google refused to deal with Yelp" because Yelp can still appear *somewhere* on Google's SERP. Mot. at 20. But the Ninth Circuit's refusal-to-deal jurisprudence is not so stark. *See MetroNet Servs.*, 383 F.3d at 1132 ("An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal."). And at the pleading stage, Yelp has plausibly alleged that Google's practice of placing competitor links at or near the bottom of the SERP (or even on a second page) is unreasonable and functionally the same as outright exclusion, given the research showing how few consumers find those results. Compl. ¶¶ 33, 42 & Fig. 1.

Google also argues the Complaint does not establish that Google's "only conceivable rationale … was to 'sacrifice short-term benefits in order to obtain high[] profits in the long run.'" *See* Mot. at 21 (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016), a summary judgment decision). In doing so, Google confuses the more onerous summary judgment standard, which requires evidence to support a genuine dispute of material fact, with the pleading standard, as articulated, for example, by the Ninth Circuit in *Starr v. Baca*: "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." 652 F.3d 1202, 1216 (9th Cir. 2011). *See also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)

1    ("Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for

2    a defendant's conduct."). Here, Yelp has advanced a plausible explanation for Google's conduct—it

3    altered its previous, mutually beneficial relationship with Yelp to gain market share, siphon off

4    advertisers, and suppress competition. Google's other cited cases acknowledge that these allegations

5    are sufficient to state a claim. *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1151

6    (N.D. Cal. 2020) (requiring only that plaintiff plead factual allegations that plausibly suggest the

7    defendant "sacrificed a profitable course of dealing in the short term in order to benefit long term from

8    the exclusion of competition"); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir.

9    2008) (plaintiff must plead that defendant took actions "contrary to its short-term business interests").

10   At the pleading stage, that is enough.

11       **D.    Yelp's Remaining Counts Are Adequately Pled.**

12           **1.    Yelp adequately alleges a tying claim.**

13       Yelp adequately alleges a tying claim too, among its other characterizations of Google's

14   exclusionary conduct. To plead a *per se* tying claim, "a plaintiff must [allege]: (1) that the defendant

15   tied together the sale of two distinct products or services; (2) that the defendant possesses enough

16   economic power in the tying product market to coerce its customers into purchasing the tied product;

17   and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product

18   market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).

19       As the Complaint details, Google exploits its monopoly in general search to force its local

20   search product onto consumers by automatically populating (and prioritizing) the general SERP with

21   its local search results, whether consumers want it or not. Compl. ¶¶ 140-43. Google does not challenge

22   the market power or volume-of-commerce elements of Yelp's tying claim. Instead, Google asserts

23   Yelp has not plausibly alleged "two distinct products"—even though Google concedes "Yelp has

24   plausibly alleged separate relevant markets for general search services and local search services"—

25   because Google purportedly competes in both markets with one "unified product," Mot. at 15-16, a

26   fact contention the Court should ignore. Even if that were true, the existence of distinct products does

27   not depend on whether *the defendant* offers the products separately. Rather, the law—which Google

28                                          - 20 -

omits—is that separate products exist when there is "sufficient consumer demand so that it is efficient for a firm to provide the products separately." *Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 995 (9th Cir. 2023) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 462 (1992)). Separate consumer demand can be inferred from "'consumer requests to offer the products separately, disentangling of the products by competitors … and the defendant's historical practice.'" *Id.* (quoting Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW (4th ed. 2017) ¶ 1745c).

Yelp alleges separate demand for general search and local search; Google just ignores it. For example, Google's 2014 study "Understanding Consumers' Local Search Behavior" recognized significant demand for local search, advising advertisers how to target this discrete consumer demand. Compl. ¶¶ 77, 105. Consumers also use local search SVPs like Yelp precisely because they seek that service separately. *Id.* ¶¶ 19-22, 77. Long after Google developed and offered general search, it separately developed and offered local verticals as distinct products—Google Local, Google Maps, and Google Places—to compete for this consumer demand, building review content that it considered "critical to winning local search." *Id.* ¶¶ 115-18, 120-24. In contrast, Google's two cited cases addressed complaints with no allegations of separate consumer demand. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 63 (1953) ("[N]othing in the record suggests that advertisers viewed the city's newspaper readers, morning or evening, as other than fungible customer potential."); *Kaufman v. Time Warner*, 836 F.3d 137, 144 (2d Cir. 2016) ("the Complaint lacks any allegation that there have ever been separate sales of set-top boxes and cable services").

Google also argues there can be no "coercion" of consumers to use its local search, even though consumers must take Google's local search with its general search, because consumers are still free to go to other providers for additional local search results. Mot. at 17. Again, Google is wrong on the law. First, Google improperly combines two alternative means of coercion: a positive tie, where buyers must "take the second product if they want the first one," and a negative tie, where "the customer promises not to take the tied product from the defendant's competitor." *Aerotec*, 836 F.3d at 1178. Here, Google imposes a positive tie: in practice and per Google's Terms of Service, the Complaint plausibly alleges that consumers must take Google's local search product when they want Google's

- 21 -

general search and cannot opt out. Compl. ¶¶ 142-43. Yelp need not also plead a prohibition from going to competitors. *See Aerotec*, 836 F.3d at 1178.

Second, coercion is complete when a consumer is forced "to take the second product if they want the first one." *Id*. It does not matter that a consumer may subsequently go elsewhere for additional products. By capturing consumers in the first instance, Google relegates its rivals in local search to supplemental searches—which may not occur, considering Google's self-preferencing has produced an "increasing volume of searches, including local searches, where users *do not leave Google's SERP at all*, called zero-click searches." Compl. ¶ 44 (emphasis added). Google thus "coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates [itself] from the competitive stresses of the open market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13 (1984). And coercion still exists where a small portion of consumers take the tied product from a competitor in the first instance. *Cascade Health*, 515 F.3d at 915 ("[t]he fact that only four [out of twenty-eight], or about 14% [of consumers]" purchased from a competitor was indication of coercion); Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 749b at 328 (2d ed. 2004) (less than 10% proportion of separate sales indicates an illegal tie).

Finally, Google asserts that "Yelp does not allege that Google sells its product" because "consumers use search engines 'for free.'" Mot. at 16-17. That is incorrect—even if Yelp uses the shorthand of a nominally "free" service once in addressing the SSNDQ test. Compl. ¶¶ 30-45, 52. As Yelp alleges, "[u]nlike in a competitive market, where consumers can choose what they wish to '*purchase*,' Google exercises its monopoly power to force users to '*buy*' Google's local search services and in doing so effectively deprives them of organic search results that are more relevant and trustworthy." *Id*. ¶ 143 (emphasis added). "When consumers search the internet, they provide Google with *information* on their focused interest," which Google monetizes by "allow[ing] advertisers to purchase advertising tethered to various search terms to direct consumers to advertisers' websites," for which Google "would receive a payment per [consumer] click." *Id.* ¶ 30 (emphasis added). Far from providing a truly "free service," Google generated a staggering $175 billion in revenue in 2023 from monetizing consumers' information this way; in its own words, "Google's core business is monetizing

- 22 -

commercial queries." *Id.* ¶¶ 34-35. In contrast to Google's cited cases, consumer search is not the mere "acceptance of a free service." Mot. at 16 (quoting *Athos Overseas, Ltd. v. YouTube, Inc*., 2022 WL 910272, at *3 (S.D. Fla. Mar 29, 2022). Instead, consumers convey as consideration their user data, in the form of their search queries and clicks, that Google monetizes. Compl. ¶¶ 34-35. Google admits consumer traffic is currency, observing competition "'can be intense,' especially for user clicks on commercial search results"; "SVPs can 'siphon traffic (*and thus revenue*) away from [Google],'" Mot. at 5 (quoting Compl. ¶ 8) (emphasis added), creating a "risk to our monetizable traffic," Compl. ¶ 35. This is nothing new; the antitrust literature has long recognized markets in which services are nominally "free" but actually are provided in exchange for attention or information, and that literature cautions against a "narrow focus" that, in the case of Google's search services, ignores the nature of the search advertising platform in which such information is monetized. *E.g.*, Michal S. Gal & Daniel L. Rubinfeld, *The Hidden Costs of Free Goods: Implications for Antitrust Enforcement*, 80 Antitrust L.J. 521 (2016) at 523, 542-45.

Importantly, courts do not limit unlawful tying to traditional retail contexts where consumers make direct cash payments to a provider. Rather, "[t]o understand the antitrust issues in [a tying] case, it is necessary to appreciate the structure of the market." *Cascade Health*, 515 F.3d at 891. The Ninth Circuit thus upheld a triable tying claim in the "complex" "market for hospital services and medical care" where monetization occurs among three participants: patients largely do not pay hospitals directly for medical services and instead "buy health insurance from insurers (often through their employers)," who separately transact with hospitals for "reimbursement rate[s]." *Id.* at 892, 915-16. In *United States v. Microsoft Corp.,* the D.C. Circuit likewise held that Microsoft should not "be absolved of tying liability" for giving away its Internet Explorer browser for free with its operating system because this conduct helped give "Microsoft power to stave off even superior new rivals." 253 F.3d 34, 56, 89 (D.C. Cir. 2001). *See also Heartland Payment Sys., Inc. v. MICROS Sys., Inc*., 2008 WL 4510260, at *8-10 (D.N.J. Sept. 29, 2008) ("Even though merchants are forced to *use* rather than *purchase* Merchant Link's services" because they receive it "for free," defendant's conduct still "clearly implicates the 'antitrust concern' underlying tying arrangements" in that it "coerces the

- 23 -

abdication of buyers' independent judgment as to the tied product's merits and insulates it from the competitive stresses of the open market") (internal quotations omitted). Similarly, Google cannot escape tying liability for forcing consumers to take Google's local vertical with its general search because this conduct "starves competitors of the traffic and revenues that would allow them to achieve scale and pose a competitive constraint" on Google, while propping up Google's own inferior product. Compl. ¶ 2; *supra* II(C). Were unlawful tying limited to direct consumer cash payments, technology monopolists like Google would be free to tie up lucrative markets simply because of the non-traditional monetization structure of online services. *See* Daniel A. Crane, *Tying Law for the Digital Age,* 99 Notre Dame L. Rev. 821 (2024) at 824, 860 (tying law was built for problems from the industrial age, which are "no longer characteristic of most tying claims" in the digital age involving a different set of problems including "the economic terms on which companies can obtain a return").

### 2.    Yelp adequately pleads monopoly leveraging.

Yelp also adequately pleads monopoly leveraging, as even Google seems to admit. Mot. at 18 (seeking dismissal of Counts V and VI only to the extent "duplicative" of Counts I-III). Unlawful monopoly leveraging occurs when a monopolist in one market "exploits that dominant position to enhance a monopoly in another market." *Image Tech. Servs.*, 125 F.3d at 1216. To be sure, where "a monopolist has a lawful monopoly in one market and uses its power [merely] to gain a competitive advantage in the second market," there is no violation. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546-48 (9th Cir. 1991). Rather, "there must be predatory conduct" (as Yelp alleges) to attain "the *creation, or attempted creation, of a monopoly* through monopoly leveraging" for a Section 2 violation. *Id.* at 548-49 (citations omitted).

Consistent with this framework, Yelp alleges that Google leveraged its *unlawful* monopoly in general search to obtain or maintain its *unlawful* monopoly in local search (and local search advertising) through anticompetitive, exclusionary behavior including "self-preferencing its own inferior local search vertical over its competitors, driving traffic and revenue away from its competitors, precluding competitors from achieving scale, and increasing rivals' costs to gain market share for itself." Compl. ¶ 223. Google recognizes Yelp's allegations of "exclusionary, anticompetitive

- 24 -

conduct," but makes the entirely unsupported claim that Yelp must advance "independent allegations" of exclusionary conduct for leveraging, separate and apart from its other monopolization and attempted-monopolization theories. Mot. at 19. But that is not the law. Quite the opposite, in Google's cited case, the court held "the leveraging theory rises or falls with the other theories" because there must "be anticompetitive conduct in order for there to be a viable leveraging theory." *hiQ Labs*, 485 F. Supp. 3d at 1155.

Google's condemnation of "monopoly leveraging as a standalone Section 2 claim" throughout, Mot. at 19, is a red herring. *John Doe 1 v. Abbott Lab'ys* asked only whether allegations of monopoly leveraging stated a Section 2 claim "*absent* an antitrust refusal to deal (or some other exclusionary practice) in the monopoly market or below-cost pricing in the second market." 571 F.3d 930, 931 (9th Cir. 2009) (emphasis added). Unlike in *John Doe 1*, Yelp alleges exclusionary conduct in spades and does not challenge the "mere possession of monopoly power [or] the practice of charging monopoly prices" by a natural monopolist. *Id*. at 934; *see Safeway*, 2010 WL 147988, at *3 ("the *Doe* court suggested that 'a free-standing monopoly leveraging claim' may be viable … if accompanied by an allegation of a refusal to deal.") (discussing *John Doe 1*, 571 F.3d at 935). In any event, not a single case advanced by Google requires separate allegations of anticompetitive conduct for a monopoly leveraging claim that do not overlap with any other monopolization or attempted monopolization theories. Google again seeks piecemeal dismissal of alternative legal *theories*. *Supra* 17-18.

### 3. Yelp's UCL Claim Survives Because Yelp's Federal Claims Survive.

Google's challenge to Yelp's UCL claim repeats its challenges to Yelp's federal antitrust claims, *see* Mot. at 22, and fails for the same reasons. Under the logic of Google's attack, "Yelp's claim of unlawful acts under the UCL should accordingly be [upheld] for the same reasons as their Sherman Act claims." *Id*. Google's accusation that Yelp's unfair conduct allegations are "facially insufficient" is not, in truth, an argument about any pleading deficiencies; it is an argument about factual "overlap" with other claims, all of which should proceed. Mot. at 22.

### V. CONCLUSION

For the foregoing reasons, Google's motion to dismiss should be denied.

- 25 -

1

Dated: November 12, 2024

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAUSFELD LLP

By: /s/ Sathya S. Gosselin
Sathya S. Gosselin (SBN 269171)
Swathi Bojedla (admitted *pro hac vice*)
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
sgosselin@hausfeld.com
sbojedla@hausfeld.com

Renner K. Walker (SBN 295889)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
rwalker@hausfeld.com

Joanne Bui (SBN 340378)
**HAUSFELD LLP**
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
jbui@hausfeld.com

*Attorneys for Plaintiff Yelp Inc.*

- 26 -