1
2
3
4                        UNITED STATES DISTRICT COURT
5                      NORTHERN DISTRICT OF CALIFORNIA
6

7    YELP INC.,                              Case No. 24-cv-06101-SVK
8                    Plaintiff,
9           v.                               **ORDER GRANTING IN PART AND
                                             DENYING IN PART MOTION TO
10   GOOGLE LLC,                             DISMISS**
11                   Defendant.              Re: Dkt. Nos. 24, 25

12          Plaintiff Yelp Inc. ("Yelp") brings antitrust claims arising under Section 2 of the Sherman

13   Act against Defendant Google LLC ("Google").  Dkt. 1 at 1 ("Complaint" or "Compl.").  Before

14   the Court is Google's Motion to Dismiss (the "Motion") Yelp's claims.  Dkt. 24;  *see also* Dkts.

15   30 ("Opposition"), 36 ("Reply").  Based on the Parties' arguments, the Court previously ordered

16   supplemental briefing from the Parties to "address[s] the point in time, based on Yelp's

17   allegations, at which [Google] allegedly began exercising monopoly power."  Dkt. 41 at 2.

18   Supplemental briefing concluded on March 14, 2025.  *See* Dkts. 42 ("Supp. Br."), 43 ("Supp.

19   Opp."),[1] 45 ("Supp. Reply").  Google also filed a Request for Consideration of Documents

20   Incorporated by Reference and a Request for Judicial Notice.  Dkt. 25;  *see also* Dkts. 31, 37.  The

21   Court finds the Motion is suitable for determination without oral argument.  Civ. L.R. 7-1(b).

22   Now, having reviewed the Complaint and the Parties' briefs, the Court **GRANTS** Google's

23   request for consideration of documents and **GRANTS IN PART AND DENIES IN PART**

24   Google's Motion, with leave to amend as indicated below.

25   ////

26

27   ---
     [1] The Court has also considered Yelp's Statement of Recent Decision pursuant to Civ. L.R. 7-
28   3(d)(2).  *See* Dkt. 44 (attaching *Gamboa v. Apple, Inc.*, No. 24-cv-1270, Dkt. 27 (N.D. Cal. Feb.
     28, 2025)).

United States District Court
Northern District of California

## I.   REQUEST FOR INCORPORATION BY REFERNECE AND JUDICIAL NOTICE

As a preliminary matter, Google requests this Court consider four documents beyond the Complaint in determining the Motion.  Dkt. 25 at 1.  These are:  (1) a Federal Trade Commission ("FTC") memorandum dated August 8, 2012, bearing the subject "Google Inc. File No. 111-0163" (the "FTC Staff Memo");  the testimony and written responses of Jeremy Stoppelman for a September 21, 2011 congressional hearing before the Senate Judiciary Committee (the "2011 Hearing Transcript");  the FTC's Statement Regarding Google's Search Practices, dated January 3, 2013 (the "2013 FTC Statement");  and Google's terms of service dated May 22, 2024 (Google's "ToS").  Dkt. 25 at 1;  Dkts. 24-3 to 24-6.

As to the FTC Staff Memo and Google's ToS, Google argues that the Court should "treat[ these] documents as though they are part of the complaint itself" under the incorporation-by-reference doctrine.  Dkt. 25 at 2.  As to the 2011 Hearing Transcript and 2013 FTC Statement, Google argues that pursuant to Fed. R. Evid. 201(b), a "court can take notice of the *existence* of congressional testimony, even if it may not rely on the testimony for the truth of the facts recited therein."  *Id.* at 3 (emphasis by Google) (relying on *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 834 (N.D. Cal. 2011) (taking judicial notice of, *inter alia*, the transcript in a district court case "for the purposes of noting the Court's decision, but not for the truth of the facts recited therein.")).

Yelp does not oppose Google's request "in its narrowest form," conceding that the FTC Staff Memo and Google's ToS "are fairly incorporated in the Complaint by reference," and that this Court may take notice of the existence of the 2011 Hearing Transcript and the 2013 FTC Statement.  Dkt. 31 at 1.  However, "Yelp disagrees with Google's *characterizations* of the import of these materials" and its attempts, according to Yelp, to "use any of these materials to resolve competing theories" in Google's favor.  *Id.* at 1-3 (emphasis by Yelp).

As the Ninth Circuit has affirmed, "judicial notice and incorporation-by-reference do have roles to play at the pleading stage."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  In ruling on a motion to dismiss, a court may consider "the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial

notice." *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061. (9th Cir. 2008). Because Yelp concedes that the FTC Staff Memo and Google's ToS are fairly incorporated in its Complaint, the Court will consider these materials under the incorporation-by-reference doctrine. The Court further agrees that it can take judicial notice of the existence of the 2011 Hearing Transcript and the 2013 FTC Statement. *See Anschutz*, 785 F. Supp. 2d at 834 (N.D. Cal. 2011); *see also Khoja*, 899 F.3d 988, 1000-01 (confirming that "an agency report … is generally susceptible to judicial notice" and that "the district court could have correctly noted the fact that … the EMA knew of the 25 percent interim results" at a certain time but finding it was an abuse of discretion for a court to "conclude on a motion to dismiss what the 2014 EMA Report revealed about [the defendant's] alleged scheme."). Accordingly, Google's request for consideration of documents is **GRANTED**.

The Court cannot and does not rely on either the 2011 Hearing Transcript or the 2013 FTC Statement for the truth of the contents therein. *See Anschutz*, 785 F. Supp. 2d at 834; *Khoja*, 899 F.3d at 1001. The Court is also mindful of the Ninth Circuit's guidance as to documents incorporated by reference:

> Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims. … [However], what inferences a court may draw from an incorporated document should also be approached with caution. We have stated that, unlike judicial notice, a court "may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6). While this is generally true, it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint. This admonition is, of course, consistent with the prohibition against resolving factual disputes at the pleading stage.

*Khoja*, 899 F.3d at 1002-03 (9th Cir. 2018) (citations omitted) (collecting precedent). Thus, while the Court considers the FTC Staff Memo and Google's ToS incorporated and may consider them for the truth of the matters therein, it will not use them to resolve disputed facts. *Id.*

////

////

## II.    BACKGROUND[2]

Americans use internet search services every day to retrieve information, responsive to search queries, about the world around them.  Compl., ¶ 1.  This case is about two players in search-related markets.  General search services "allow consumers to find responsive information on any topic on the internet by entering keyword searches in a general search engine."  *Id.*, ¶ 46.  General search services are also sometimes referred to as "horizontal" search services.  *See id.*, ¶¶ 23, 129.  Local search services, which enable consumers to search "for specific types of businesses (*e.g.*, restaurants or gyms), types of professional services (*e.g.*, accountants, electricians, or auto repair), or locations for activities (*e.g.*, parks or baches) within a relevant geographic area (*e.g.*, a city, a neighborhood, or a zip code)" and receive information and/or user reviews as results.  *Id.*, ¶ 69.  Local search services are similar to but slightly distinct from "vertical" search services:  vertical searches allow users to query "on a particular subject matter" and receive "proprietary, structured data that is not available elsewhere."  *Id.*, ¶ 7.  Local search services are one type of vertical search.  For example, in the case of Yelp, the "subject matter" is local businesses;  other examples include Expedia for travel searches, Glassdoor for job searches and Zillow for rental or real estate searches.  *Id.*  Providers of local search services are thus also referred to in the Complaint as "specialized vertical providers" ("SVPs"), including for example Yelp itself.  *See, e.g., id.*, ¶¶ 7, 23, 38, 40, 128-29.

Plaintiff Yelp is a prominent local search services provider and SVP.  *Id.*, ¶¶ 3, 69-70.  "Yelp was founded in 2004 with a mission to connect consumers with great local businesses through local search."  *Id.*, ¶ 3.  "Yelp provides a vertical search option for local businesses," allowing users to access detailed information and reviews about local businesses.  *Id.*, ¶¶ 3, 7.

Defendant Google has been a general search services provider since its founding in 1998.  *Id.*, ¶¶ 23, 25-26.  Today, Google "is the first place that most users turn to when they have an inquiry, effectively serving as the 'gateway' to the internet.  Each day, roughly 9 billion searches

---

[2] The Court relies on the allegations in The Complaint.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (courts generally "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party.").

are performed using Google's general search engine." *Id.*, ¶ 6.

Consumers use search engines for "free" in the sense that they do not pay money to make queries. *Id.*, ¶ 52. Rather, "[w]hen consumers search the internet, they provide Google with information on their focused interest in various topics." *Id.*, ¶ 30. Such information is valuable to advertisers and Google monetizes such information through "search advertising." *Id.*, ¶¶ 30-34. Search advertising is an advertising model in which Google will place advertisements, including sponsored links or product listing ads, on its search engine results page ("SERP") with placement varying based on the money bid by different advertisers. *Id.*, ¶¶ 30-33. Google generates most of its revenue from search advertising, generating $175 billion in revenue from search advertising in 2023. *Id.*, ¶ 34. Similarly, Yelp sustains its business by selling "local search advertising, enabling businesses to advertise directly to potential customers seeking specific businesses or services within particular neighborhoods." *Id.*, ¶ 3. Accordingly, in addition to relevant local search and general search *service* markets, Yelp alleges a third relevant market: the local search *advertising* market.[3] *Id.*, ¶¶ 11-13, Market Allegations §§ I (General Search Services), II (Local Search Services) and III (Local Search Advertising).

Yelp has no complaints with regard to Google's early activity in the internet search space. *See id.*, ¶¶ 6, 9, 24-29. Yelp alleges that, at first, it "peacefully coexisted with Google, working together and licensing Yelp's user-generated content for Google's use." *Id.*, ¶ 9. This began to change in the mid-2000s, when Google allegedly became "threatened by the rise of SVPs" such as Yelp. *See id.*, ¶ 35. From there, several events unfolded.

First, in the mid-2000s, Google began developing vertical search engines in-house. *Id.*, ¶ 38. Such Google search verticals include Google Images, Google Maps, Google Books, Google Videos, Google News and so forth. *See id.*, ¶ 39. Yelp alleges that Google Maps is effectively "Google's local search," as 77% of respondents to SearchEngineLand.com (a search marketing publication) reported using Google Maps "to find 'near me' business information well ahead of other sites." *Id.*, ¶ 85.

---

[3] Yelp does not allege that any corresponding general search advertising market is relevant. *See* Compl., at "Market Allegations."

United States District Court
Northern District of California

1    Then, in "2007, Google launched 'universal search.'" *Id.*, ¶ 39.  According to Yelp,

2    Google's universal search "blended" Google's in-house verticals with its general search results.

3    *Id.*  "Google's SERP now included OneBoxes," *i.e.*, boxes containing Google's vertical search

4    results, that were typically placed "at the top of the SERP and above any organic search results."

5    *Id.*, ¶¶ 38-39.  Yelp alleges that "universal search operates substantially similarly today[:]  when a

6    user inputs a keyword search into Google's general search browser, and Google detects that either

7    the search relates to one of [its] own vertical search services or that the top organic result is a

8    competitor's vertical search service, Google deploys and prominently features a OneBox with

9    Google's own related vertical search results … at the top, in a OneBox, above even the best result

10    for the user."  *Id.*, ¶ 40.  An example of how "sponsored results," the "OneBox," and "organic

11    results" interacted in 2024 is reproduced below from Figure 1 of the Complaint.

12    ////

13    ////

14    ////

15    ////

16    ////

17    ////

18    ////

19    ////

20    ////

21    ////

22    ////

23    ////

24    ////

25    ////

26    ////

27    ////

28

United States District Court
Northern District of California

Figure 1

Compl., p. 13, Fig. 1 (OneBox highlighted).  Yelp alleges that "there have been numerous changes to the SERP since 2007" but that "the general architecture concept is the same."  *Id.*, ¶ 42.

In 2009, "faced with continued pressure to create a viable local search product" and with "limited success" with Google Maps at the time, Google launched a new in-house vertical known as "Google Places."  *Id.*, ¶¶ 118-20.  However, Yelp also alleges that because Google "did not have the critical mass of reviewers it needed for Google Places to be successful," and after a failed licensing deal with and takeover offer to Yelp, Google began scraping Yelp's content.  *Id.*, ¶¶ 120-123.  In 2010, Google started selling advertising on Google Places.  *Id.*, ¶ 122.

In 2011, the FTC opened an investigation into, *inter alia*, whether Google (1) "'scraped,' or appropriated the content of vertical rivals, in order to improve its own vertical products," and

(2) "had unlawfully preferenced its own content over that of rivals, while simultaneously demoting rival websites." *Id.*, ¶ 124 (incorporating FTC Staff Memo at ii-iii)).  The FTC Staff Memo concluded that, "[a]lthough it is a close call, [Staff] do not recommend that the [FTC] proceed on" the self-preferencing cause of action because "Google's efficiency justifications are strong[, and] Google can legitimately claim that at least part of the conduct at issue improves its products and benefits users."  FTC Staff Memo at ii.  However, the FTC Staff Memo also concluded "that Google's [scraping] conduct should be condemned as a conditional refusal to deal under Section 2" and that "Google has presented no efficiency justification for its conduct."  FTC Staff Memo at ii-iii.  The FTC Staff Memo was dated August 8, 2012.

The Court takes notice of the fact that, on September 21, 2011, Yelp's co-founder and then-CEO Jeremy Stoppelman provided testimony and a prepared statement to the Senate Judiciary Committee.  Dkt. 24-4.  The Court also takes notice of the fact that the title of the hearing was "The Power of Google: Serving Consumers or Threatening Competition?" and that it was presented to the Subcommittee on Antitrust, Competition Policy and Consumer Rights.  *Id.*

The Court further takes notice of the fact that, on January 3, 2013, the FTC made a "Statement … Regarding Google's Search Practices."  Dkt. 24-5.  The Court will not take notice of the contents of the 2013 FTC Statement, except to notice the fact—not reasonably subject to dispute—that the FTC closed its investigation into Google and "ultimately did not bring suit against Google" at that time.  *Id.*;  Compl., ¶ 127.  Instead, Yelp alleges, Google made certain commitments to assuage the concerns of the FTC.  Compl., ¶ 128.

Finally, in 2015, Yelp alleges that "Google adjusted its algorithm with the effect of decreasing traffic to its local search competitors, causing Yelp to have its first ever decline in year-over-year traffic."  *Id.*, ¶ 128.

The Complaint is largely silent as to Google's actions between 2016 and 2024.  However, Yelp refers to the Honorable Amit P. Mehta (D.D.C.) several times to support its allegations and notes that "in *United States v. Google*, a case brought by the Department of Justice and various state attorneys general, Judge Mehta found Google liable for violating federal antitrust laws by unlawfully maintaining its monopoly in the markets for general search services and general search

text ads." *Id.*, ¶¶ 6, 10, 46, 90-91; *United States v. Google LLC*, 747 F. Supp. 3d 1, 187 (D.D.C. 2024). Accordingly, pursuant to Fed. R. Evid. 201(c)(1), the Court will also take judicial notice *sua sponte* of an additional fact: that on October 20, 2020, the Department of Justice filed a Complaint against Google for violation of Section 2 of the Sherman Act in the markets for general search services, among other markets (*U.S. v. Google*, 20-cv-3010-APM, Dkt. 1 at 2).

On August 28, 2024, Yelp filed suit against Google, alleging that it engaged in various anticompetitive practices in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) and California's Unfair Competition Law ("UCL"). *See generally*, Compl. In particular, Yelp alleged that Google has monopolized the local search services market (Count I), has attempted to monopolize the local search services market (Count II) and has attempted to monopolize the local search advertising market (Count III). Compl., Counts I-III. These claims include, at a high level, allegations of "a tying arrangement, a refusal to deal, monopoly leveraging and monopolistic product design/redesign," including by "self-preferencing." Compl., ¶¶ 175, 186, 198. Yelp also alleged, in separate counts, that Google had unlawfully tied its local search services to its general search services (Count IV), that Google had unlawfully leveraged its monopoly in general search services to "attempt to create or maintain a monopoly in" both Local Search Services and local search advertising (Counts V-VI) and that, by engaging in the conduct alleged to be in violation of the Sherman Act, Google had breached California's UCL (Count VII). Compl., Counts IV-VII.

On October 28, 2024, Google moved to dismiss the Complaint.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a district court to dismiss a complaint if it fails to state a claim upon which relief can be granted. In ruling on a motion to dismiss, a court may consider only "the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Metzler*, 540 F.3d at 1061. (9th Cir. 2008).[4] Courts generally "accept factual allegations in the complaint as true and construe the

---

[4] As indicated above, the Court may consider the four documents requested by Google, though not to resolve factual disputes and—in the case of judicially noticed documents—not for the truth of the contents thereof. *See, supra*, § I.

United States District Court
Northern District of California

1    pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031 (9th

2    Cir. 2008).  However, a court is not "required to accept as true allegations that are merely

3    conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec.*

4    *Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  Furthermore, Plaintiffs "generally need not plead

5    around affirmative defenses." *Ploof v. Arizona*, No. 22-15061, 2023 WL 2929314, at *1 (9th Cir.

6    Apr. 13, 2023).

7        If the court finds that dismissal is warranted, the "court should grant leave to amend even if

8    no request to amend the pleading was made, unless it determines that the pleading could not

9    possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.

10   2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

11   **IV.    DISCUSSION**

12       **A.    Google's Motion to Dismiss Yelp's Claims as Time-Barred**

13       Google argues first and foremost that the Complaint must be dismissed because Yelp's

14   claims are time-barred.  Mot. at 10-15.  Google argues that the statute of limitations began to run

15   in 2007, when Google introduced its "universal search" feature and that all of Yelp's claims are

16   thus untimely.  *Id.*  Yelp responds that, while it alleges Google took certain actions in 2007, 2009

17   and 2015, none of these actions could start the running of statute of limitations because

18   "exclusionary conduct … is not actionable in the absence of market power."  Opp. at 10-11.

19   Because of the centrality of this issue to the Parties' dispute, the Court ordered supplemental

20   briefing to address "the point in time, based on Yelp's allegations, at which [Google] allegedly

21   began exercising monopoly power."  Dkt. 41.  As explained below, because Yelp has sufficiently

22   alleged monopoly power and has *not* alleged that such power accrued prior to 2020 for most

23   claims, the Court **DENIES IN PART** Google's Motion on this ground.  The exception is Count

24   IV, which as reasoned below, is time-barred.

25           **1.    The Statute of Limitations and Laches Require Exclusionary Conduct**
                      **Coupled with Monopoly Power During the Limitations Period**

26

27       Actions under the Sherman Act are subject to a four-year statute of limitations.  15 U.S.C.

28   § 15b.  Similarly, "the four-year statute of limitations in 15 U.S.C. § 15b 'furnishes a guideline for

United States District Court
Northern District of California

computation of the laches period,'" and courts apply the same legal rules to claims for equitable

relief brough under California's UCL.  *See SaurikIT, LLC v. Apple Inc.*, No. 4:20-cv-08733-YGR,

2022 WL 1768845, at *4 (N.D. Cal. May 26, 2022).  However, as this Court explained in its prior

order, an antitrust "cause of action accrues and the statute [of limitations] begins to run when a

defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine

Rsch., Inc.*, 401 U.S. 321, 338 (1971) (citations omitted).  That act "refer[s], of course, to 'an act'

that violates the governing [antitrust] statute." *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 198

(1997) (Scalia, J., concurring in part).  Because the governing statute here concerns an exercise of

monopoly power, the qualifying "act," therefore," must involve Google's alleged monopoly;

exclusionary conduct on its own, in the absence of market power, is insufficient.  *See Image Tech.

Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) (evaluating in relevant

part whether defendant "has both attained monopoly power and exercised exclusionary conduct.").

In supplemental briefing, Google argues that Yelp must allege "new purportedly

exclusionary conduct within the limitations period." Supp. Br. at 4.  It is true that that "the

possession of monopoly power will not be found unlawful unless it is accompanied by an element

of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540

U.S. 398, 407 (2004) (emphasis in original).  But Google's argument that the exclusionary

conduct must be "new" is not persuasive, as the authorities Google relies upon involved cases

where the defendant had *already attained monopoly power* in prior years through the allegedly

exclusionary conduct.  Supp. Br. at 4 (characterizing *SaurikIT, LLC v. Apple, Inc.*, 2023 WL

8946200 at *1 (9th Cir. Dec. 28, 2023) and *Stanislaus Food Products Co. v. USS-POSCO

Industries, 2010 WL 3521979, at *13–17 (E.D. Cal. Sept. 3, 2010)*).  If the qualifying act for the

statute of limitations requires that monopoly power (or a dangerous probability thereof) be

present, then a previously performed act may mature into a qualifying one when the monopoly

power arises.  *Cf. Nw. Aluminum Co. v. Hydro Aluminum Deutschland GmbH*, 2003 WL

23571743, at *7 (D. Or. July 3, 2003) ("Antitrust claims accrue when a plaintiff is injured by a

defendant's violation of antitrust law.") (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401

U.S. 321, 338 (1971)); *see also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th

Cir. 2014) ("[B]ecause the harm to Samsung challenged in this suit was speculative at the time of the initial wrong, the law of limitations in federal antitrust actions allowed Samsung to file suit once the harm crystallized in 2006.").

To hold otherwise would be to hold that a careful actor could forever avoid antitrust liability by engaging in exclusionary conduct calculated to bring about a monopoly at a date outside the limitations period.  Plaintiffs would be forced to "either bring suit immediately, … and face certain dismissal[ for lack of monopoly power,] … or hold off until the defendant gains market power [sufficient for an attempted monopolization claim] … and lose on timeliness grounds."  Opp. at 1-2.  Accordingly, Yelp's claims are untimely only if Yelp alleges that Google engaged in exclusionary conduct while having either monopoly power or a dangerous probability of achieving monopoly power outside of the limitations period.

### 2. The Court Need Not Determine Which of Yelp's Exclusionary Conduct Allegations Underpin Its Monopolization Claims

The Court first turns to the "exclusionary conduct" alleged by Yelp.  The Parties disagree about what conduct from the Complaint is alleged to be violative of the Sherman Act.  Google argues that the alleged act is Google's 2007 introduction of universal search and redesign of its SERP, (Mot. at 10.), although Google acknowledges "passing references to two other allegedly anticompetitive acts:" the alleged 2007-2009 "scraping" of Yelp's content and the alleged 2015 algorithm change.  *Id.* at 10-11.  Yelp does not contest that these are the *beginnings* of the potentially exclusionary acts but responds instead, in relevant part, that Google did not yet have market or monopoly power when it committed these acts.  Opp. at 9-11.

The Court need not decide whether Google's 2007 introduction of universal search and SERP redesign, its alleged 2007-2009 scraping or its 2015 algorithm change are the exclusionary conduct alleged by Yelp.  All of these acts predate 2020[5] and thus, if Yelp has alleged that Google

---

[5] In arguing that leave to amend should be granted, Yelp also makes passing reference to a "tolling" theory that it could assert.  Opp. at 16.  In supplemental briefing, Yelp makes clear that such tolling would be operative "from 2020 onward" based on the governmental-action tolling doctrine and the *U.S. v. Google* litigation.  Supp. Opp. at 4-5.  But because all of these acts also predate October 20, 2016 (four years prior to the date on which the Department of Justice filed its complaint), such tolling—even if it applied—would make no difference as to the exclusionary conduct at issue for the monopolization and attempted monopolization claims.

1    had the requisite market or monopoly power during these times, any one of the acts would doom

2    Yelp's claims under the statute of limitations.

###    3.    Yelp Has Sufficiently Alleged Monopoly Power or a Dangerous Probability of Achieving Monopoly Power, Within the Limitations Period, for Counts I-III

5    The Court now turns to the crux of the matter:  When does Yelp allege that Google

6    achieved monopoly (or market) power?  After reviewing the Parties' supplemental briefing, the

7    Court agrees with Google that "*both sides agree* that Yelp does *not* plead the point in time at

8    which Google attained monopoly power" in local search services and local search advertising.

9    Supp. Reply at 2 (emphasis by Google);  *compare, e.g.*, Supp. Br. at 1-2 ("the point in time, based

10    on Yelp's allegations, at which Google allegedly began exercising monopoly power is simply not

11    pleaded in the Complaint") (cleaned up) *with* Supp. Opp. at 1, 6-8 (*e.g.*, "Yelp has not so alleged

12    [that Google attained monopoly power 'long ago.']  Quite the opposite, Yelp's allegations

13    embrace proof at trial that Google did not attain 65% market share in local search until recently, if

14    at all.") (emphasis omitted).

15    The Parties disagree, however, as to the import of this agreement.  Google argues that, if

16    Yelp cannot plead a specific date on which monopoly power accrued, then Yelp's claims must be

17    dismissed.  Supp. Br. at 1;  Supp. Reply at 2.  Yelp counters that because the statute of limitations

18    is an affirmative defense, it is Google's burden to show that the Complaint, on its face, is

19    untimely.  Supp. Opp. at 2-5.  As to the legal standard, Yelp has the better argument.  The statute

20    of limitations and laches are both affirmative defenses.  At the pleading stage, a "claim may be

21    dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of

22    limitations … [only] when the running of the statute is apparent on the face of the complaint."

23    *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010).  "A

24    complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of

25    facts that would establish the timeliness of the claim."  *Id.*

26    The Court also agrees with Google, however, that it is Yelp's burden to sufficiently plead

27    monopoly (or market) power in the first place.  Supp. Reply at 2 (citing, *e.g.*, *Aurora Astro Prods.*

28    *LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1147-49 (N.D. Cal. 2023) (dismissing

United States District Court
Northern District of California

antitrust claim as to a certain time period for failure to plead monopolization during that time period).  But this requirement cannot be conflated with the well-settled law that "[o]nly when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."  *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 604 (9th Cir. 2018).  Thus, the Complaint may only be dismissed on statute-of-limitations grounds if Yelp has pleaded "itself out of court" by alleging that Google had market power and engaged in exclusionary conduct prior to August 28, 2020.  However, the Court may dismiss the Complaint simply for failing to state a claim if it finds that Yelp has not sufficiently alleged monopoly power at all.

With these principles in mind, the Court now examines whether Yelp has sufficiently pleaded monopoly power and, if so, as of what date (if any).

### a.    Counts I-II:  Monopolization and Attempted Monopolization of Local Search Services

Yelp's first claim alleges that Google maintained a monopoly in local search services in violation of antitrust law.  Compl., ¶¶ 172-81.  Yelp's second claim alleges that Google has attempted to monopolize local search services in violation of antitrust law.  Compl., ¶¶ 182-93.

To set forth a monopolization claim, a plaintiff must allege, *inter alia*, that the defendant possessed monopoly power in the relevant market.  *Aurora*, 691 F. Supp. 3d at 1146 (N.D. Cal. 2023) (quoting *MetroNet Servs. Corp. v. U.S. W. Commc'ns*, 329 F.3d 986, 1002 (9th Cir. 2003), *cert. granted, judgment vacated sub nom. Qwest Corp. v. MetroNet Servs. Corp.*, 540 U.S. 1147 (2004)).  "Market power is the ability to raise price profitably by restricting output."  *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) (emphasis omitted).  "Monopoly power differs in degree from market power, requiring something greater."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (2023), *cert. denied,* 144 S. Ct. 681, 217 L. Ed. 2d 382 (2024), and *cert. denied,* 144 S. Ct. 682, 217 L. Ed. 2d 382 (2024) (quotations and citations omitted).  "Direct evidence of monopoly power includes a showing of restricted output and supracompetitive prices."  *Aurora*, 691 F. Supp. 3d at 1147 (citing *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1001 (9th Cir. 2008)).  Meanwhile, a plaintiff may establish monopoly power through circumstantial evidence

14

by: "(1) defin[ing] the relevant market, (2) show[ing] that defendant owns a dominant share of that market, and (3) show[ing] that there are significant barriers to entry and … that existing competitors lack the capacity to increase their output in the short run." *Id.* (quoting *MetroNet*, 329 F.3d at 1003). "Courts generally require a 65% market share to establish a prima facie case of market power." *Aurora*, 691 F. Supp. 3d at 1147 (quoting *Image Tech. Servs.*, 125 F.3d at 1206 (9th Cir. 1997)).

As for attempted monopolization, with regard to monopoly power, it requires only the lesser showing of "a dangerous probability of achieving monopoly power." *Image Tech. Servs.*, 125 F.3d at 1202. The threshold for such a "dangerous probability" is lower than for actual monopoly power: The Ninth Circuit has previously found that "a 44% market share demonstrates market power" for an attempted monopolization claim "if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." *Id.* at 1207 (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995)).

The relevant market for these claims is the local search services market. *See* Compl., ¶¶ 69-80. As for market share, Yelp pleads that, "[w]hile exact figures can vary … it's generally estimated that Google holds well over 90% of the market share in local search." Compl., ¶ 83. This is a present-tense allegation that—when viewed in the light most favorable to Yelp—must be taken to mean that Yelp alleges that, as of August 28, 2024, google held an approximately 90% market share. This 90% figure is sufficient for either monopolization or attempted monopolization.

This allegation is complicated, however, by the fact that it was generated by a query to Google's Gemini AI tool. Compl., ¶¶ 82-83. Google argues that a "citation to an artificial intelligence ["AI"] tool is not a plausible allegation" and that "'uncritical reliance on content created by a [generative AI tool]'" can result in misleading representations to courts. Supp. Br. at 2 (quoting the latter statement from ABA Comm. On Ethics & Pro. Resp., Formal Op. 512 (July 29, 2024)). This Court is cognizant of the fact that reliance on AI tools may lead to errors and

misrepresentations.[6]  Yet, while Google's concerns about "pleading-by-bot" are legitimate, neither the Federal Rules of Civil Procedure not the Civil Local Rules of this District prohibit such use of AI.  Indeed, Fed. R. Civ. P. 8 does not require that pleadings contain *any* citations to evidence whatsoever.  A party is free to make uncited claims as he or she chooses, subject to the good faith requirements of Rule 11:  "that to the best of the person's knowledge, information, and belief, formed after an inquiry *reasonable under the circumstances* … the factual contentions have evidentiary support or, if specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b) (emphasis added).  Google has not argued that Yelp's query to Google's AI tool is an unreasonable inquiry under the circumstances, nor moved for any sanction (such as moving to strike the allegation).  The Court declines to address the Rule 11 implications of Yelp's use of AI in its pleading, if any, at this time.

Moreover, in this case, although not conclusive, Yelp's allegation of 90% market share is also supported by a 2022 study finding that Google's share of local business reviews had grown by 73% compared to Yelp's 6%, (Compl. ¶ 84) and a November 25, 2019 publication suggesting that 77% of consumers used Google's local search (Google Maps) "to find 'near me' business information well ahead of other sites," (*id.*, ¶ 85).  Accordingly, Yelp has at least sufficiently pleaded monopoly power for Count I.

As to the statute of limitations, as Google admits, "Yelp does not plead the point in time at which Google attained monopoly power" in local search services.  Supp. Reply at 2.  While it is possible that Google may ultimately prove its statute of limitations defense, the Court thus cannot say that "it appears beyond doubt that the [Yelp] can prove no set of facts that would establish the

---

[6] Indeed, some courts in this District have adopted procedures for the use of artificial intelligence by counsel and parties, including, *e.g.*, requirements that "counsel must at all times personally confirm for themselves the accuracy of any content generated by these tools," (Standing Order for Civil Cases Before District Judge Araceli Martínez-Olguín, § 4), that "[c]ounsel is responsible for maintaining records of all prompts or inquiries submitted to any generative AI tools in the event those records become relevant at any point," (*id.*), that the use of artificial intelligence in briefs or pleadings be identified within the body of such brief or pleading, (Standing Order for Civil Cases Before Magistrate Judge Peter H. Kang at 8-10) and prohibiting the use of AI to submit "uncorroboratable assertions of law or fact" (*id.* at 10).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   timeliness of the claim" based on the face of its Complaint.  *Von Saher*, 592 F.3d at 969 (9th Cir.

2   2010).  "At this early stage, the Court cannot conclude that Plaintiffs' claims are time-barred."

3   *Gamboa v. Apple Inc.*, No. 24-CV-01270-EKL, 2025 WL 660190, at *4 (N.D. Cal. Feb. 28, 2025).

4   The timing of when Google crossed the 65% threshold of market power is simply not clear from

5   the face of the Complaint.  Similarly, the timing of when Google crossed a lower threshold,

6   sufficient for a dangerous probability of achieving monopoly power, is also not clear.  Google's

7   Motion to Dismiss Counts I-II as time-barred is **DENIED**.

8                    **b.    Count III:  Attempted Monopolization of Local Search**
                             **Advertising**
9

10          Yelp's third claim alleges that Google has attempted to monopolize the local search

11  advertising market in violation of antitrust law.  Compl., ¶¶ 182-93.  The only difference between

12  Count III and Count II (addressed above) is that Yelp alleges a different relevant market, and the

13  Court must thus examine Yelp's allegations as to that market.

14          Yelp alleges that local search advertising is the relevant market for Count III.  Compl., ¶¶

15  89-109.  Yelp also alleges that there are barriers to entry in this market, including "network effects

16  necessary for advertisers to find a new entrant attractive from a traffic perspective" and "the

17  amount of data to which Google and other local search platforms already have access concerning

18  user behaviors and preferences," which would be unavailable to new entrants.  *Id.*, ¶ 114.  As for

19  market share, Yelp pleads that, based upon its understanding, belief and estimates, "Google's

20  share of the market for local search advertising in the United States (by ad revenue) exceeds 50%

21  and continues to grow each year."  *Id.*, ¶ 111.  Again, construed in the light most favorable to

22  Yelp, this is a present-tense allegation.  It is at least plausibly sufficient as an allegation of a

23  dangerous probability of monopoly power.  *See Image Tech. Servs.*, 125 F.3d at 1207.

24          The Parties further agree, as with local search services, that Yelp does not plead at what

25  point Google's share of the local search advertising market crested the threshold of dangerous

26  probability.  *See* Supp. Br. at 1-2;  Supp. Opp. at 1, 6-8;  Supp. Reply at 2.  Accordingly, as with

27  Counts I-II, at this early stage, the Court cannot conclude that Plaintiffs' local search advertising

28  claim is time-barred.  *See Gamboa v. Apple Inc.*, No. 24-CV-01270-EKL, 2025 WL 660190, at *4

United States District Court
Northern District of California

(N.D. Cal. Feb. 28, 2025).  Google's Motion to Dismiss Counts III as time-barred is **DENIED** without prejudice.

### 4. Yelp's Allegations of Unlawful Tying of Local Search Services to General Search Services (Count IV) Are Time-Barred

#### a. Yelp Alleges Monopoly Power in General Search Services Outside of the Limitations Period

The situation is different with regard to Yelp's tying claim, which alleges that "Google has unlawfully tied its local search product to its general search product."  Compl., ¶¶ 206-17.  To state a claim for tying in violation of the Sherman Act, Yelp must allege:  (1) "that the defendant tied together the sale of two distinct products or services;"  (2) "that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product;"  and (3) "that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).  As Yelp itself points out, however, a tying claim "do[es] not turn on Google's monopoly power in local search or local-search advertising but rather on Google's (adjudicated) monopoly power in the tying market for general search services."[7]  Supp. Opp. at 8 (citing *Cascade Health*, 515 F.3d at 913).  Accordingly, the relevant inquiry here is whether and when Yelp alleged that Google acquired "enough economic power in the tying market," *i.e.*, general search services.

Yelp indisputably alleges that Google has "enough economic power"—indeed, monopoly power—in general search services *today*.  *E.g.*, Compl., ¶ 6, 59 (alleging "approximately 88 percent market share").  But Yelp's allegations do not stop there:  Yelp also alleges that "in July 2007, Google estimated its general search services market share at 68 percent," with an increase to 77% in 2013 and 79% in 2018.  Compl., ¶ 60 and Figures 2-3.

Accordingly, Yelp has alleged on the face of the Complaint that Google had sufficient

---

[7] Yelp's reference to the "adjudicat[ion]" of Google's alleged monopoly power is a reference to *United States v. Google LLC*, 747 F. Supp. 3d 1, 117-24 (D.D.C. 2024) ("[C]onclud[ing] that Google has monopoly power in the general search services market.").  Supp. Opp. at 4.  The Court need not decide at this time what preclusive effect, if any, the *United States v. Google* decision has in this case because, at the pleading stage, the Court must take Yelp's allegations of fact as true.

1    economic power to tie local search services to general search services as early as 2007 or 2013.

2    This is well outside the four-year statute of limitations period.

3            **b.      The Alleged Anticompetitive Conduct Does Not Form a**

4                    **Continuing Violation**

5            As for the alleged exclusionary conduct, as the Court noted previously, Yelp's general

6    allegations potentially encompass the 2007 launch of universal search and SERP redesign and the

7    2015 algorithm change. *See, supra*, § IV.A.2.  With regard to Count IV in particular, however,

8    Yelp's allegations are more specific: "Google does this by designing its SERP so that users are

9    directed towards its own, inferior local search vertical and away from competitors, without any

10   ability for consumers to choose otherwise."  Compl., ¶ 211.  The SERP design complained of by

11   Yelp was introduced in 2007 and thus first accrued into a tying claim (if otherwise viable) when

12   Google acquired monopoly power in 2007 or 2013.  If that were the end of the inquiry, Yelp's

13   tying claim would be time-barred.  However, the Court must first address Yelp's contention that

14   the anticompetitive acts it points to, including Google's 2007 SERP redesign, form a continuing

15   antitrust violation under Ninth Circuit law.  *See* Opp. at 16.[8]

16           The continuing violations doctrine is "an exception to th[e four-year] time limit" of the

17   statute of limitations. *Samsung*, 747 F.3d at 1202 (9th Cir. 2014).  To state a continuing violation

18   of the antitrust laws:

19                a plaintiff must allege that a defendant completed an overt act during
                 the limitations period that meets two criteria: 1) It must be a new and
20               independent act that is not merely a reaffirmation of a previous act;
                 and 2) it must inflict new and accumulating injury on the plaintiff.

21   *Id.*  While there must be a new act, small actions may suffice: "the typical antitrust continuing

22   violation occurs … when conspirators continue to meet to fine-tune their cartel agreement."  *Id.* at

23   1204 (approving of out-of-circuit cases).  "[A]cts taken to enforce a [pre-existing] contract" also

24   qualify as "overt acts that restarted the statute of limitations."  *Id.* (citing *Columbia Steel Casting*

25   *Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir. 1996) and *Pace Indus., Inc. v. Three*

26

27   ───────────────
     [8] Yelp makes similar arguments with regard to its monopolization and attempted monopolization
28   claims.  However, because the Court found that those claims were not time-barred on the face of
     the Complaint based on Yelp's allegations as to market power, it need not decide whether those
     claims state continuing violations.

United States District Court
Northern District of California

1   *Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).

2          Yelp argues Google has taken "actions," that its "conduct has worsened," that it has

3   "increase[d] triggering of OneBox results," has "tweaked its algorithms," and engaged in other

4   "fine-tuning," "refinements," and "progression." *See* Opp. at 13 (citing Compl., ¶¶ 8-9, 42, 76,

5   125, 128, 156). But these allegations are insufficient where they are "bereft of any dates or

6   details" about the changes. *See Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 797 (N.D. Cal.

7   2022) (dismissing plaintiffs' "copy, acquire, kill claims" as untimely). Most importantly, the

8   Complaint alleges that "[w]hile there have been numerous changes to the SERP design since 2007

9   … the general architecture concept is the same [today]." Compl., ¶ 42. The only sufficient

10  allegation of changed conduct is thus the 2015 change to Google's algorithm which, as the Court

11  mentioned previously, would not place Yelp within the limitations period.

12         Yelp also points out that "Google's 2007 change did not permanently and finally control

13  its decision-making moving forward," and argues that "[e]very day, Google steers consumers

14  away from Yelp and causes a new injury." Opp. at 15. In support of this argument, Yelp relies on

15  the Ninth Circuit case *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299. In *Hennegan*,

16  plaintiffs owned and operated a gift and souvenir shop in Guam and filed suit against defendant

17  tour operators, alleging that the tour operators "shepherded tourists to the shops of the souvenir

18  vendors—and away from their shop—in exchange for unlawful payments." *Id.* at 1300. The

19  Ninth Circuit held that the statute of limitations did not bar the plaintiffs' suit because "overt acts

20  include[d] the payment by the souvenir vendors to the tour operates *and the tour operators'*

21  *shepherding of tourists away from the Hennegans' shop and to the shops of the souvenir vendors*."

22  *Id.* (emphasis added). Google does not address *Hennegan* but points instead to an unpublished

23  decision where the Ninth Circuit held that there was no continuing violation by Apple for "every

24  time it sells a new iOS device with [the challenged] warranty agreement," where the warranty

25  agreement remained unchanged. *SaurikIT, LLC v. Apple, Inc.*, No. 22-16527, 2023 WL 8946200,

26  at *1 (9th Cir. Dec. 28, 2023).

27         Neither case quite resolves this dispute. *Hennegan* is Ninth Circuit precedent but arose

28  before the modern technological era and dealt with "steering" that involved physical acts by the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    defendants; *Hennegan* also dealt with *contracts* between the defendants.  *Hennegan*, 787 F.2d at

2    1300.  It thus more squarely fit within the rule counting "acts taken to enforce a [pre-existing]

3    contract" as overt acts.  *Samsung*, 747 F.3d at 1202.  *SaurikIT* is more recent but is an unpublished

4    decision that is persuasive but not binding.  2023 WL 8946200 at *1.

5        The technological differences between *Hennegan* and this case are irrelevant.  It is well-

6    settled that the Sherman Act, as a common-law statute, "adapts to modern understanding and

7    greater experience."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 n.5 (9th Cir. 2008)

8    ("The Supreme Court … noted that 'from the beginning the Court has treated the Sherman Act as

9    a common-law statute,' and that 'just as the common law adapts to modern understanding and

10   greater experience, so too does the Sherman Act's prohibition on "restraints of trade" evolve to

11   meet the dynamics of present economic conditions.'" (quoting *Leegin Creative Leather Prods.,*

12   *Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) (cleaned up)).  Accordingly, whether an antitrust

13   defendant steers customers physically or, as Yelp alleges Google does, digitally, makes no

14   difference.  However, *Hennegan* is meaningfully different because of its contract-enforcement

15   posture.  In *Hennegan*, the defendant tour guides were taking actions to enforce contracts with

16   defendant souvenir shops.  Here, Yelp has not plausibly alleged Google engages in such activity.

17   It does not allege, for example, that Google has an unlawful deal with another SVP to divert traffic

18   away from Yelp and to that SVP.  To allow Yelp to state a continuing violation on the present

19   facts—that every time a user uses Google to search, a new violation occurs—"would effectively

20   swallow the statute of limitations rule."  *Gamboa*, 2025 WL 660190, at *3, n.1.

21       In sum, on the face of the Complaint, it is apparent that its tying allegations are based on

22   an exercise of monopoly power that occurred in 2007 or 2015.  Because Yelp has pleaded "itself

23   out of court," (*Durnford*, 907 F.3d at 604), Google's Motion to Dismiss Count IV of the

24   Complaint is **GRANTED with leave to amend**.  Even though Yelp will be unable to escape its

25   general-search monopoly power allegations dating back to 2007 or 2013, the Court gives Yelp the

26   opportunity to plead additional exclusionary conduct, if any, sufficient to allege a continuing

27   violation within the limitations period.

28   ////

### 5. Yelp's Monopoly Leveraging Claims Are Dismissed on Other Grounds

For the reasons explained below, the Court will grant Google's Motion to Dismiss Yelp's monopoly leveraging claims (Counts V-VI) on other grounds. Accordingly, Google's Motion to Dismiss Counts V-VI as time-barred is **DENIED as moot**.

### 6. Yelp's UCL Claim Survives to the Same Extent Other Claims Survive

Finally, the Parties agree that Yelp's UCL claims should be dismissed (Google) or upheld (Yelp) "for the same reasons as their Sherman Act claims." Mot. at 22; Opp. at 25; Reply at 15. Accordingly, because the Court has found that at least some of Yelp's Sherman Act claims survive, Google's Motion to Dismiss the UCL claim as time-barred is **DENIED**.

### B. Google's Independent Arguments for Dismissal of Count IV (Tying)

Google further argues that Yelp's tying claim, Count IV the Complaint, should be independently dismissed for failing to state a valid claim. Mot. at 15-18. As previously explained, in addition to the allegation that "the defendant possesses enough power in the tying product market to coerce its customers into purchasing the tied product," a tying claim must allege "that the defendant tied together the sale of two distinct products or services" and "that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Aerotec*, 836 F.3d at 1178; *Cascade Health*, 515 F.3d at 913. Although the Court addressed the "market power" requirement above, because the Court granted Google's Motion to Dismiss on statute of limitations grounds with leave to amend, the Court addresses the other elements now.

Google raises three issues with Yelp's tying allegations: (1) that Yelp fails to allege two distinct products, (Mot. at 15-16); (2) that Yelp fails to allege that Google sells and that customers purchase either product, (*id.* at 16-17); and (3) that Yelp fails to allege that Google uses its market power to "coerce" its users into using its local search results, (*id.* at 17-18). The Court addresses each argument in turn.

### 1. Yelp Has Plausibly Alleged Two Distinct Products

Yelp alleges separate relevant markets in general search services and local search services. *See* Compl., ¶¶ 11-13, Market Allegations §§ I-II. Google argues this "is of no moment," because "Google competes for both [general and local search] queries with the same unified product—

search results—in [the] two allegedly different markets." Mot. at 16. Rather, according to Google, Yelp's true complaint not the tying of the different search results but "the design of the page that displays them." *Id.* at 15 (citing *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953)). Yelp responds that "the existence of distinct products does not depend on whether [Google] offers" them separately but on the objective consumer-demand test. Opp. at 20-21. Yelp asserts it has alleged separate consumer demand. *Id.* at 21.

The Court agrees with Yelp that, as the Ninth Circuit has recently explained, to constitute two distinct products, "there must be sufficient consumer demand so that it is efficient for a firm to provide' the products separately. *Epic Games*, 67 F.4th at 995. "Th[e] consumer-demand test, in turn, has two parts: (1) that it is possible to separate the products, and (2) that it is efficient to do so, as inferred from circumstantial evidence." This test is entirely consistent with *Times-Picayune* where, with the market at issue being the newspaper *advertising* market, the Supreme Court found that the morning and evening advertising markets where completely fungible—*i.e.*, there was no demand by the consumers (the advertisers, not the readers) to have separate products. *Times-Picayune*, 345 U.S. at 610, 613 ("But every newspaper is a dual trader in separate though interdependent markets; it sells the paper's news and advertising content to its readers; in effect that readership is in turn sold to the buyers of advertising space. This case concerns solely one of these markets … the advertising market. … [N]othing in the record suggests that advertisers viewed the city's newspaper readers, morning or evening, as other than fungible customer potential.").

As to the first prong, Yelp has plausibly alleged that it is possible to separate local search results from general search results. Yelp has alleged that there are dedicated local search providers, such as itself, who do just that by providing only local search results. Compl., ¶¶ 19-22, 77. Yelp has also alleged that some general search providers, including Google, have developed distinct local search products, *e.g.*, the stand-alone versions of Yahoo Local and Google Maps/Google Places, that users may visit. *Id*., ¶¶ 116, 118, 120. These allegations are sufficient at the pleading stage. *Epic Games*, 67 F.4th 946 at 996 (holding that "the App Store and [Apple's in-app payment processor, IAP] clearly can be separated because Apple *already does* so in certain

1    contexts, namely that IAP is not required for in-app purchases of physical goods.") (emphasis in

2    original).

3            As to the second prong, Yelp's allegations are sparser but still sufficient.  Yelp alleges that

4    "consumers specifically conduct searches 'with their location and proximity in mind,'" going so

5    far as to alter their search queries by appending qualifiers such as "near me" to achieve local

6    search results out of a general search engine.  Compl., ¶ 77.  It also alleges that a 2014 study by

7    Google showed that "4 in 5 consumers conduct local searches," and that "more than 50% of

8    [consumers'] smartphones searches 'have local search intent'" when the consumer is "on the go."

9    *Id.*  This is sufficient, construing the Complaint in the light most favorable to Yelp, to allege that it

10   would be efficient to provide local search results and general search results separately.

### 2.    Tying Claims May, in Some Cases, Reach "Free" Services

12           Google also argues that, because the Ninth Circuit has referred to the "sale" of one product

13   and the "purchase" of another in *Aerotec*, there is a categorical rule that "the acceptance of a free

14   service does not constitute an impermissible tie-in."  Mot. at 16-17 (quoting *Athos Overseas, Ltd.*

15   *v. YouTube, Inc.*, 2022 WL 910272, at *3 (S.D. Fla. Mar 29, 2022); also citing (*Kellam Energy,*

16   *Inc. v. Duncan*, 668 F. Supp. 861, 881 (D. Del. 1987) ("Merely accepting something provided for

17   free does not constitute an impermissible tie-in.")).  Yelp alleges that both local search results and

18   general search results are free to the consumer.  Compl., ¶ 52.  At the same time, Yelp alleges that

19   both it and Google monetize consumer searches by selling user data to advertisers or otherwise

20   allowing advertisers to make use of the consumer searches.  *Id.*, ¶¶ 3, 30-34.  In the context of the

21   allegations before it, this Court does not share Google's rigid view of the Sherman Act.

22           To support its position, Google cites several district court cases.  Mot. at 16.  These cases

23   are either not persuasive in the context of the search and search-advertising markets or otherwise

24   do not support Google's categorical rule.  First, in *Dream Big Media Inc. v. Alphabet Inc.*, the

25   Court took into account whether the services were free in examining the *coercion* prong of the

26   analysis.  No. 22-CV-02314-JSW, 2022 WL 16579322, at *4 (N.D. Cal. Nov. 1, 2022) ("Because

27   [plaintiffs] fail to allege they purchased any Google mapping services, Getify and Sprinter

28   Supplier fail to allege coercion.").  To be sure, whether services are free may affect the coercion

United States District Court
Northern District of California

analysis, however *Dream Big* does not suggest it ends the tying inquiry outright.  *See id.*

Second, in *Kellam Energy, Inc. v. Duncan*, while court did apply such a strict rule, it did so in the context of a sale of product (gasoline dispensing equipment).  668 F. Supp. 861, 881 (D. Del. 1987).  The Ninth Circuit has cautioned that, "[t]o understand the antitrust issues in [a tying] case, it is necessary to appreciate the structure of the market."  *Cascade Health*, 515 F.3d at 891. The complex search-service and advertising markets, whereby consumers give information to search engine providers who in turn sell such information to advertisers, as Yelp alleges (Compl., ¶¶ 3, 30-34), is significantly dissimilar from the market in *Kellam*.

Finally, Google's third case, *Athos Overseas, Ltd. v. Youtube, Inc.*, like *Dream Big Media*, is best read as a coercion case: the court in *Athos* explained that "Plaintiff d[id] not allege that it *had* to purchase [the service]."  No. 1:21-CV-21698, 2022 WL 910272, at *3 (S.D. Fla. Mar. 29, 2022) (emphasis added);  *see also Dream Big Media*, 2022 WL 16579322, at *4 (citing to *Athos* to support its finding of lack of coercion).  Therefore, *Athos*, like *Dream Big Media*, does not persuade this Court that Google's categorical rule should be applied.

Moreover, *Dream Big*, *Kellam* and *Athos* all share a unifying fact that is absent here:  The plaintiffs' themselves in each case were the allegedly tied customers.  It makes sense that a plaintiff may have a more difficult task in plausibly alleging coercion if the product is free and the plaintiff him- or herself freely accepts it.  By contrast, the Ninth Circuit has found triable issues of fact as to tying where monetization occurs among three participants, *e.g.*:

> [In a market with] hospitals, insurers, and patients. Hospitals, like those operated by PeaceHealth and McKenzie, provide services to patients and sell services to insurers. Insurers are usually commercial health insurance companies that seek to buy medical services from hospitals on the best terms possible. The insurers in turn sell insurance services to patients and employers. Patients buy health insurance from insurers (often through their employers) and sometimes buy services from hospitals.

*Cascade Health*, 515 F.3d 883 at 891–92, 913-16.

The Court is also conscious of the guidance that, "[j]ust as the common law adapts to modern understanding and greater experience, so too does the Sherman Act's prohibition on 'restraint[s] of trade' evolve to meet the dynamics of present economic conditions."  *Leegin*

*Creative*, 551 U.S. at 899; *Cascade Health*, 515 F.3d at 895 n.5 (quoting *id.*).  Although not binding on this Court, the D.C. Circuit's *en banc* decision in *U.S. v. Microsoft* is instructive.  In relevant part, when faced with a tying arrangement between two products that were bundled together where it was unclear whether one (the bundled web browser, Internet Explorer) was entirely free while the other (the operating systems) was purchased, the D.C. Circuit directed the district court to resolve the factual conflict on remand and to draw different inferences accordingly.  Notably, the D.C. Circuit did not instruct the district court to dismiss the tying claim out-of-hand if it found that Internet Explorer was provided for free.  *United States v. Microsoft Corp.*, 253 F.3d 34, 96-97 (D.C. Cir. 2001) (en banc).  Indeed, the Sherman Act makes no distinction between classic, paid markets and markets monetized in other ways, (15 U.S.C. § 2), and the Ninth Circuit has suggested that "there may be markets where companies offer a product to one side of the market for free but profit in other ways, such as by collecting consumer data or generating ad revenue." *Epic Games*, 67 F.4th at 978 (9th Cir. 2023) (holding that a district court "erred by imposing a categorical rule that an antitrust market can *never* relate to a product that is not licensed or sold.").

Accordingly, at this stage, the Court cannot say that Yelp's tying claims are categorically foreclosed simply because it alleges that Google monetizes consumer data rather than taking money from the users directly.  Compl., ¶¶ 3, 30-34.  While this may affect Yelp's claim that users are coerced into accepting local search results with general search results, (*see Dream Big Media*, 2022 WL 16579322, at *4), it does not alone end the tying inquiry.

### 3.    Yelp Has Not Plausibly Alleged Coercion

"[C]oercion is often the touchstone issue in assessing a claim of illegal tying." *Cascade Health*, 515 F.3d at (9th Cir. 2008); *see also Paladin Assocs. Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) ("Essential to the second element of a tying claim is proof that the seller coerced a buyer to purchase," or, in this case, the acceptance of, "the tied product.").  Coercion may generally be express or implied: "an express refusal to sell the tying product without the tied product obviously constitutes coercion," but "tying conditions need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions." *Dream Big*, 2022

26

WL 16579322, at *4 (citing *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426 (9th Cir. 1995) and *Aerotec*, 836 F.3d at 1179).  "[C]oercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in." *Cascade Health*, 515 F.3d at 914.

Google argues that Yelp has not sufficiently pleaded coercion: it says that users are free to go directly to Yelp, *e.g.*, by scrolling past the OneBox and clicking on the link to Yelp and that users do not have to use Google's local search results.  Mot. at 17-18.  Yelp responds that it is not alleging "a negative tie, where 'the customer promises not to take the tied product from a defendant's competitor,'" but only "a positive tie, where [users] must 'take the second product if they want the first one.'"  Opp. at 21-22 (arguing that "Yelp need not also plead a prohibition from going to competitors.") (quoting *Aerotec*, 836 F.3d at 1178).  Accordingly, the Court does not understand Yelp's tying allegations[9] as being directed to Google's prevention of traffic to Yelp but only alleging that Google coerces users to accept its own local search results with its general search results.  Yelp argues it has alleged coercion via two means:  "Google imposes a positive tie … [via] Google's Terms of Service," and Google's SERP design (including the OneBox) automatically serves local search results to users of general search.  Opp. at 21-22 (citing Compl., ¶¶ 44, 142-43.

Yelp's first allegation, based on Google's ToS, is essentially an allegation of express coercion.  Yelp alleges, for example, that "users cannot opt out of Google's self-preferenced local search content when they enter a search query in Google.  Users are bound by Google's Terms of Service when they use its services such as Google Search and Google Maps."  Compl., ¶ 142.  But as Google points out, Google's ToS (incorporated by reference into the Complaint) do not require users to actually use Google's local search results; they merely prevent users from modifying the SERP design on the user's end.  In other words, Google's ToS may require that users *see options for* local search results, but they do not require users to accept the local search results (*i.e.*, the tied

---

[9] This understanding of Yelp's tying allegations says nothing about what conduct Yelp's other monopolization allegations may be alleged to reach.

1    product).  Mot. at 18 (quoting Google's ToS at 13).[10]  Accordingly, Yelp has not alleged express

2    coercion via Google's ToS.

3          Yelp's second allegation is broader and relies on a notion of implied coercion.  As Yelp

4    argues, "Google's self-preferencing has produced an 'increasing volume of searches, including

5    local searches, where users do not leave Google's SERP at all, called zero-click searches.'"  Opp.

6    at 22 (quoting Compl., ¶ 44).  "Google thus 'coerces the abdication of buyers' independent

7    judgment as to the tied product's merits and insulates [itself] from the competitive stresses of the

8    open market.'"  *Id.* (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13 (1984).  To

9    allege implied coercion, however, Yelp must allege that "an appreciable number of buyers have

10   accepted burdensome terms," or analogously, that an appreciable number of users have accepted

11   Google's local search results.  *Cf. Cascade Health*, 515 F.3d at 914.  In paragraph 44 of the

12   Complaint, Yelp alleges that "Google has so successfully self-preferenced its own products that

13   30% of clicks go to a Google property."  Compl., ¶ 44.  Thus, Yelp appears to allege that 70% of

14   clicks go to non-Google properties.  *See id.*  In *Cascade Health*, the Ninth Circuit looked to the

15   "proportion of separate sales," *i.e.*, the percentage of sales that remained open to competitors and

16   were not dominated by the alleged monopolist, and found that where "only four [customers,] or

17   about 14% percent," made purchases from competitors, this "may indicate some degree of

18   coercion."  *Cascade Health*, 515 F.3d at 915.  In contrast, here Yelp has alleged that 70% of clicks

19   (sales) remain open to competitors (non-Google properties)—a result far more open than the

20   restrictive 14% in *Cascade Health*.  *See* Compl., ¶ 44.  Even viewed in the light most favorable to

21   Yelp, such an allegation is insufficient to plausibly allege implied coercion.

22         Accordingly, the Court **further GRANTS** Google's Motion to Dismiss Count IV of the

23   Complaint because Yelp fails to plausibly allege either express or implied coercion.  Because the

24   _____

25   [10] The Court notes that there is no contradiction here between Google's ToS and the facts alleged
     in the Complaint.  Google agrees that, per its ToS, users cannot opt-out of being served with local

26   search options.  But Yelp does not allege, based on the ToS, that users must accept and use these
     options.  *Compare* Google's ToS at 13 ("You may not copy, modify, distribute, sell, or lease any

27   part of our services or software.") *with* Compl., ¶ 142.  In essence, Yelp's allegation is akin to
     alleging that a store owner requires that a customer, when picking up an item he has purchased,

28   walk through the store and be exposed to other potential products; unless there is an allegation that
     additional products must also be *accepted*, there is no express coercion.

United States District Court
Northern District of California

Court has granted Yelp leave to amend its tying claim to attempt to address the statute of limitations issue, Yelp may attempt to amend this claim to fix other pleading deficiencies.

### C. Yelp's Monopoly Leveraging Claims Are Dismissed as Duplicative of Its Monopolization and Attempted Monopolization Claims

Yelp's fifth and sixth claim allege that Google has leveraged its monopoly power in general search services "in an attempt to create or maintain a monopoly in the local search" services and advertising markets.  Compl., ¶¶ 218-30 (Count V – Monopoly Leveraging for Local Search Services), 231-42 (Count VI – Monopoly Leveraging for Local Search Services).  The Parties here agree that, under *Alaska Airlines, Inc. v. United Airlines, Inc.*, where the Ninth Circuit rejected the Second Circuit's monopoly leveraging doctrine, monopoly leveraging is not a free-standing cause of action in the Ninth Circuit unless there is some allegation of "predatory" or "anticompetitive" conduct, *i.e.*, conduct used for "the *creation, or attempted creation, of a monopoly* through monopoly leveraging."  948 F.2d 536, 549 (9th Cir. 1991);  *compare* Mot. at 19 *with* 24-25.  Google says Yelp has not alleged such conduct, while Yelp asserts that it has. *Compare* Mot. at 19 *with* 24-25.

But in fact, the Parties also seem to agree on the fact that Yelp *does* allege anticompetitive conduct; it is just that the agreed upon conduct is no different from the anticompetitive conduct alleged to support Counts I-III (Yelp's monopolization and attempted monopolization claims). Reply at 14;  Opp. at 24-25 (pointing only to Compl., ¶ 223, which is identical to ¶¶ 175, 186, and 198).  So, the Parties agree on the facts and only disagree as to what should result.  Google argues that Yelp's claims must be dismissed, while Yelp argues they should proceed.  Reply at 14;  Opp. at 25.  Neither is quite right.

Yelp may proceed with its monopoly leveraging claims, because Google concedes that Yelp has alleged anticompetitive conduct as required under *Alaska Airlines*.  *See* Reply at 14.  At the same time, Yelp has also admitted that there is nothing in its monopoly leveraging claims that "do[es] not overlap with [its] other monopolization or attempted monopolization theories."  Opp. at 25.  "It is well established that a district court has broad discretion to control its own docket, and that includes the power to dismiss duplicative claims;" the "decision to dismiss a duplicative

claim[ is reviewed] for an abuse of discretion." *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1091 (9th Cir. 2012) (dismissing a claim in one case as duplicative of a claim by the same plaintiff in another case). The Ninth Circuit has also affirmed dismissal of duplicative claims within the same litigation. *See Maurey v. University of Southern California*, No. 98-cv-02900-NM (AIJ), Dkt. 40 at 13-14 (C.D. Cal. Jan. 8, 1999) (explaining that, where a count "alleging breach of the implied covenant of good faith and fair dealing is duplicative of [the count] alleging breach of contract" and "added nothing to [the] relief" sought, the duplicative count should be dismissed), *aff'd*, 12 Fed. App'x. 529 (9th Cir. 2001); *but see Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("To the extent the district court concluded that the cause of action was nonsensical because it was duplicative of or superfluous to Astiana's other claims, this is not grounds for dismissal.").

On this record, while Yelp's monopoly leveraging theory is not "nonsensical," it is nonetheless concededly duplicative of Yelp's monopolization and attempted monopolization claims under *Alaska Airlines*. It is based on the same allegedly anticompetitive conduct and adds nothing to the relief Yelp seeks. Accordingly, to streamline the Complaint, the Court will **GRANT** Google's motion to dismiss Counts V and VI **with leave to amend**. Yelp may may continue to assert the same monopoly leveraging theory as part of Counts I-III and/or it may amend Counts V-VI if it is able to allege anticompetitive conduct that is both sufficient under *Alaska Airlines* and not duplicative of other claims.

### D.    Refusal to Deal Claims

Although Yelp does not allege a separate count of refusal to deal, Google points to allegations of a refusal to deal in Yelp's monopolization and attempted monopolization claims and seeks dismissal of these claims "to the extent" they "rest upon alleged refusal-to-deal theories." Mot. at 20. Yelp first argues that Rule 12(b)(6) does not permit the Court to "trim[] alternative legal theories or claims in part." Opp. at 17.

As courts in this district have explained, there is no "Supreme Court or Ninth Circuit authority ratifying th[e] approach" of "dismiss[ing] some subtheories without dismissing the entire cause of action." *Rumble, Inc. v. Google LLC*, No. 21-CV-00229-HSG, 2022 WL 3018062, at *3

(N.D. Cal. July 29, 2022).  Indeed, such an approach "is at least arguably in tension with the Supreme Court's direction that Sherman Act plaintiffs 'should be given the full benefit of their proof without compartmentalizing the various factual components." *Id.* (denying motion to dismiss "tying" theory of liability).  On the other hand, despite an absence of "ratification" from the Supreme Court or Ninth Circuit, some courts in this district have dismissed theories of liability.  *See Staley v. Gilead Scis., Inc.*, No. 19-CV-02573-EMC, 2020 WL 5507555, at *12 (N.D. Cal. July 29, 2020) (explaining that "[o]ften, a plaintiff asserts a single cause of action that is predicated on more than one liability theory, and a court eliminates one theory through a motion to dismiss" and granting motion to dismiss a "payment-of-royalties-post-patent-expiration" theory of antitrust liability).  Based on the guidance of the Supreme Court, at least in Sherman Act cases, this Court adopts the *Rumble* approach.

Nonetheless, it is a "common-sense principle"[11] that "a party cannot evade the dismissal of *a claim* by packaging it together with other more meritorious claims under a single cause of action." *Zeleny v. Burge*, No. 22-cv-05103-ABA-GRX, 2022 WL 18284878, at *3 (C.D. Cal. Dec. 20, 2022) (emphasis added).  The words "a claim" are critical here; the first question is whether a refusal-to-deal allegation may state a standalone claim in the Ninth Circuit, like tying, or whether it cannot stand alone, like monopoly leveraging.

The Supreme Court held that refusal to deal could violate the Sherman Act in *Aspen Skiing Co.*, 472 U.S. 585 (1985), and the Ninth Circuit found similarly in *MetroNet Services v. Qwest*, 383 F.3d 1124 (9th Cir. 2004).  The Ninth Circuit has recently summarized refusal to deal claims as follows:

> a company engages in prohibited, anticompetitive conduct when (1) it unilaterally terminates … a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition, and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers.

---

[11] Otherwise, for example, Yelp could avoid dismissal (even without prejudice) of its tying claims, which are time-barred as alleged, simply by "packaging" them together with its attempted monopolization claims.

*Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (synthesizing Supreme Court and Ninth Circuit authority). Accordingly, unlike "monopoly leveraging," "refusal to deal" is anticompetitive conduct in and of itself, so long as other elements of a Sherman Act violation are met. As such, Yelp may not evade scrutiny of its refusal-to-deal claim simply because it is contained within Counts I-III instead of broken out separately.

Turning to the content of Yelp's allegations, the Court finds that Yelp has not sufficiently alleged the elements of a refusal to deal. First, Yelp alleges that Google changed "a voluntary and profitable course of dealing" because it alleges that Google used to feature Yelp and other SVPs at the top of its SERP, that this was profitable for both Yelp and Google and that organic search results (like Yelp) now appear at the bottom of the SERP and on the second page. *See* Opp. at 18-19 (citing Compl. ¶¶ 32, 35, 36, 37, 54, 117). Google argues that a refusal to deal must be "an actual refusal to deal," not merely a refusal "to deal under the terms and conditions preferred by a competitor's rivals." Mot. at 21 (quoting *Aerotec*, 836 F.3d at 1183 and *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009). The Ninth Circuit has made clear that "[a]n offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal." *MetroNet Servs.*, 383 F.3d at 1132. Google argues that *MetroNet* is an extreme example where the offered price would not even have been profitable for the plaintiff, (Reply at 15), but Yelp's allegations here are similarly extreme: Yelp alleges that, unlike the top results, "results six to ten, e.g., make up 3.73% of clicks combined." Compl., ¶ 33. When viewed in the light most favorable to Yelp, the Complaint alleges that Google does offer to deal with Yelp—but only on unreasonable terms whereby Yelp is (allegedly) relegated to the bottom or second page of results where users will not click on Yelp. Such an allegation plausibly states a claim for a refusal to deal at this stage.

Second, Yelp must allege that "the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Qualcomm*, 969 F.3d at 993–94. Yelp points to ¶¶ 54, 126, 128-29, and 131, while Google argues that "none of [them] so plead." Opp. at 19; Reply at 15. Read charitably, these paragraphs support an allegation that Google was motivated by obtaining higher profits in the long

United States District Court
Northern District of California

run.  However, the Court agrees with Google that Yelp does not plausibly allege that Google sacrificed short-term benefits, nor that it was "the only conceivable rationale" for its SERP redesign.  Finally, Google does not challenge the third element of Yelp's refusal to deal claims.

Accordingly, the Court **GRANTS** Google's Motion to Dismiss Counts I-III to the extent they rest on Yelp's refusal-to-deal claims, with **leave to amend**.

### E.    Yelp's UCL Claim

Finally, as already explained, the Parties agree that Yelp's UCL claims should be dismissed (Google) or upheld (Yelp) "for the same reasons as their Sherman Act claims."  Mot. at 22;  Opp. at 25;  Reply at 15.  Accordingly, because the Court has found that at least some of Yelp's Sherman Act claims survive, Google's Motion to Dismiss the UCL claim is **DENIED**.

## V.    CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** Google's Request for Consideration of Incorporated Documents and Request for Judicial Notice and **GRANTS IN PART** and **DENIES IN PART** Google's Motion to Dismiss.  Yelp's monopolization and attempted monopolization claims (Counts I-III) are **dismissed with leave to amend** but only **to the extent they rely on refusal to deal claims**.   Yelp's tying claim (Count IV) is **dismissed with leave to amend**, both as time barred as pleaded and as failing to state a claim.  Yelp's monopoly leveraging claims (Counts V-VI) are **dismissed** as duplicative of Counts I-III **with leave to amend as indicated in Section IV.C, above**.  The Motion to Dismiss Yelp's UCL claim (Count VII) is **denied**.

**SO ORDERED.**

Dated: April 22, 2025

SUSAN VAN KEULEN
United States Magistrate Judge

33