# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| YELP INC., | Case No. 5:24-cv-06101-SVK |
| Plaintiff, | **[PROPOSED] ORDER GRANTING PLAINTIFF YELP INC.'S MOTION FOR ISSUE PRECLUSION AND PARTIAL SUMMARY JUDGMENT** |
| v. | |
| GOOGLE LLC, | Date: June 9, 2026 |
| Defendant. | Time: 10 a.m. |
| | Place: Courtroom 6, 4th Floor |
| | Judge: Magistrate Judge Susan van Keulen |

Upon consideration of Plaintiff Yelp Inc.'s Motion for Issue Preclusion and Partial Summary Judgment ("Motion"), it is hereby **ORDERED** that the Motion is **GRANTED**.

The Court finds that all issues identified below and resolved by Judge Mehta in *United States v. Google*, Case Nos. 20-cv-3010 (APM), Case No. 20-cv-3715 (D.D.C.)—along with subsidiary factual findings and legal determinations, including but not limited to the excerpts below—have preclusive effect in this case:

**(1) General search services in the United States is a relevant market, and it is separate and distinct from specialized search services and social media.**

    a. "[G]eneral search services is a relevant product market and alternative sources for query information, like SVPs and social media sites, are not adequate substitutes." *United States v. Google LLC*, 747 F. Supp. 3d 1, 109–10 (D.D.C. 2024).

    b. Peculiar Characteristics and Uses

        i. "No user could confuse a GSE with an SVP [specialized vertical provider] or a social media site. Unlike those other products, GSEs are a gateway to the World Wide Web . . . Search on a GSE therefore is not constrained by subject matter, inventory, or query type." *Id.* at 110.

        ii. Unlike general search providers, SVPs are "walled gardens . . . . Because a user's search is confined to the SVP's structured data, users cannot use an SVP to navigate beyond the platform . . . . In addition, as the name implies, SVPs are typically 'specialized' to a particular subject matter (e.g., Amazon for shopping, Expedia for travel, Yelp for local businesses)." *Id.*

        iii. "The product delivered to consumers on a GSE differs significantly from what is produced by an SVP. When a user enters a query into Google or Bing, the result is a search engine results page, or SERP, which contains organic links that enable the user to navigate to other websites. For commercial queries, the Google SERP will include advertisements, which similarly link to other webpages. And, in some cases, the SERP will contain vertical offerings, which

- 1 -

are built on structured data typically sourced from a third-party on topics such as shopping, flights, and hotels." *Id*. at 110-11 (citations omitted).

    iv. "Social media sites differ from GSEs in many of the same ways as SVPs. . . . No SVP or social media platform can meet user needs in the same way. They therefore are not functionally interchangeable with GSEs." *Id*. at 111-12.

  c. Industry or Public Recognition

    i. "First, browser developers recognize that GSEs are a distinct product . . . . Second, Android OEMs and mobile carriers also consider GSEs to be a distinct product . . . Third, advertisers consider GSEs to be differentiated from SVPs and social media platforms. . . . Fourth, Google itself recognizes general search services as a distinct product and separate market. . . . Finally, evidence suggests that the public also views GSEs as a distinct product." *Id*. at 112-13.

  d. Unique Production Facilities

    i. "Would SVPs or social media platforms be able to shift resources to put out a product that resembles a GSE [in response to a substantial degradation in Google's search quality] and thereby capture a significant number of dissatisfied Google users? The answer obviously is no." *Id*. at 113.

  e. Rejecting Google's arguments

    i. First, "[N]o SVP can fulfill a user's varied needs in the same manner as a GSE." *Id*. at 114.

    ii. Second, "that GSEs may compete for . . . local queries against Yelp does not mean that firms that specialize in certain verticals belong in the same product market as GSEs. The fact that users 'cross-query' does not require all online query sources be lumped together in the same market." *Id*.

    iii. Third, "there is nothing improper about aggregating varied query types into a single relevant market." *Id*. at 115.

iv. Finally, "the record shows that GSEs and SVPs are complementary goods, . . . . [T]hat large numbers of consumers use both Google and Amazon tells the court little about whether Amazon is 'reasonably interchangeable' with Google. (The same is true for Dr. Israel's analysis of queries on Yelp and the Auto, Flights, and Shopping verticals.) . . . The court therefore rejects Google's proposed query-response market and instead agrees . . . that there is a relevant market for general search services." *Id*. at 115-16.

    f. Geographic market

       i. "All parties agree that the relevant geographic market is the United States." *Id*. at 107. *See also United States v. Google*, 803 F. Supp. 3d 18, 40 n.1 (D.D.C. 2025) (*Google Search (Remedies)*).

**(2) Google has monopoly power in the general search services market.**

    a. "[T]he court concludes that Google has monopoly power in the general search services market." *Id*. at 124.

    b. As to market shares and duration of monopoly power:

       i. "By 2009, 80% of all general search queries, whether entered on a desktop computer or mobile device, flowed through Google. . . . That percentage had increased from 80% to 89.2% by 2020 . . . . Google's share of search queries on mobile devices was even higher at 94.9% in 2020. . . . The percentage on desktop devices was 84%. . . . Google's second-place rival, Bing, receives roughly 6% of all search queries. . . . Bing's market share has never risen above 12%." *Id*. at 38.

       ii. "Measured by query volume, Google enjoys an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices. This overwhelms Bing's share of 5.5% on all queries and 1.3% on mobile, as well as Yahoo's and DDG's [DuckDuckGo's] shares, which are under 3% regardless of device type." *Id*. at 119.

  iii. "Google is still the dominant firm in the relevant product markets. No existing rival has wrested market share from Google. And no new competitor has entered the market." *Google Search (Remedies)*, 803 F. Supp. 3d at 36.

 c. **As to entry barriers**:

  i. "The court finds that these [entry] barriers exist and that, both individually and collectively, they are significant barriers that protect Google's market dominance in general search." *Google Search*, 747 F. Supp. at 119 (referring to entry barriers of: "(1) high capital costs, (2) Google's control of key distribution channels, (3) brand recognition, and (4) scale").

  ii. "Google has a lot of scale, and new entrants struggle to obtain it. . . . [A]cquiring users and getting them into the 'habit' of using a new product is 'tricky.' Securing users to generate scale, in order to then exploit the benefits of scale, is a significant barrier to entry." *Id*. at 121 (citations omitted).

  iii. "None of [Google's] contentions demonstrate low barriers to entry," including "(1) evidence of new entrants; (2) the emergence of nascent technology like artificial intelligence; and (3) [Google's] own emergence in a market that, prior to its entry, was dominated by other firms." *Id.* at 122. The court further rejects "the growth of search output . . . as inconsistent with [Google's] monopoly power." *Id*. at 122.

**(3) Search advertising is a relevant antitrust market and there is no omnibus market for digital advertising.**

 a. "The court finds that Plaintiffs have established [a] relevant market[]—search advertising," *id*. at 107, and there is no "omnibus market for digital advertising," *id.* at 124-133.

 b. "The search advertising market is the broadest proposed advertiser-side market. It includes all advertisements served in response to a query—whether entered on a GSE,

- 4 -

an SVP, or a social media platform. Excluded from this market are display ads, retargeted display ads, and non-search social media ads." *Id*. at 125.

c. "[T]he *Brown Shoe* factors counsel in favor of finding a relevant market for search advertising. Neither Google's counterarguments nor its legal authorities persuade the court otherwise." *Id*. at 132.

d. Peculiar Characteristics and Uses

    i. "Search ads are a direct expression of a user's specific motivation or interest at the time it is entered . . . . At bottom, search ads and non-search ads are *not* 'roughly equivalent': Search ads better approximate user intent than other ad types, and they do so with immediacy." *Id*. at 126-27.

e. Industry or Public Recognition

    i. "Advertisers recognize search ads as a distinct product market. . . . Advertisers uniformly testified that they view search ads as unique because they respond to expressed user intent in real time." *Id.* at 127; *see also id.* at 127-130 (rejecting Google's arguments to the contrary).

f. Unique Production Facilities

    i. "[S]earch ads production . . . is characterized by certain common components. A platform must '(1) match Search Ads to consumers' real-time queries, (2) pull those ads into the relevant auction, (3) determine which ads in the auction will be shown, (4) determine where on the [results page] the shown ads will be positioned, and (5) calculate the price for each ad shown, should it be clicked on.'  Display and social ads are produced differently." *Id*. at 130 (citations omitted).

g. Distinct Prices

    i. "Search ads and display ads use different pricing models. Search ads are sold using a cost-per-click metric, such that advertisers pay only if a user clicks on a search ad . . . . These different pricing approaches are consistent with the

- 5 -

channels' different purposes." *Id*. at 131; *see also id*. at 131-33 (rejecting Google's arguments to the contrary).

Yelp is permitted to file one further Motion for Summary Judgment, Partial Summary Judgment, or Summary Adjudication by August 26, 2027, *see* Dkt. 71, without seeking authorization from this Court.


**SO ORDERED**.


Dated: _____

                              _____
The Honorable Susan van Keulen
United States Magistrate Judge

[PROPOSED] ORDER FOR ISSUE PRECLUSION AND PARTIAL SUMMARY JUDGMENT
5:24-cv-06101-SVK