UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YELP INC.,<br><br>    Plaintiff,<br><br> v.<br><br>GOOGLE LLC,<br><br>    Defendant. | Case No.  24-cv-06101-SVK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ISSUE PRECLUSION AND PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 91 |

Before the Court is Plaintiff Yelp, Inc.'s ("Yelp") Motion for Issue Preclusion and Partial Summary Judgment.  Dkt. 91 (the "Motion").  In its Motion, Yelp asks this Court to give preclusive effect to three determinations, along with subsidiary factual findings and legal determinations, made by the Honorable Amit P. Mehta in *United States v. Google*, Nos. 20-cv-3010-APM (D.D.C.).  The matter came on for hearing on June 9, 2026.  Dkt. 103.  Having considered the Parties' submissions and oral arguments, the relevant law and the record in this matter, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.  The Court gives preclusive effect to Judge Mehta's findings and determinations to the extent set forth in Section IV and grants partial summary judgment in Yelp's favor accordingly.

## I.  RELEVANT BACKGROUND

### A.  Yelp's Antitrust Action Against Google

Yelp brings this antitrust action against Defendant Google LLC ("Google").  The context of the lawsuit is familiar to the Parties and has been set forth (as alleged by Yelp) in two of the Court's prior orders:  the Court's Order Granting in Part and Denying in Part Google's Motion to Dismiss, (Dkt. 47) ("First MTD Order"), and the Court's Order Denying Google's Partial Motion to Dismiss, (Dkt. 58) ("Second MTD Order").  The Court will not retread the majority of the

United States District Court
Northern District of California

allegations here but highlights those relevant to deciding the issue of preclusion.[1]

First, Yelp's operative complaint seeks relief under five causes of action based on different antitrust theories. Counts I and II allege that Google has monopolized or attempted to monopolize the local search services ("LSS") market including, *inter alia*, by leveraging its alleged monopoly in the general search services ("GSS") market. *See* Dkt. 50 ("FAC") ¶¶ 11, 13, 159, 193-94, 205. In support thereof, Yelp alleges a relevant antitrust market for GSS, (*id.* ¶¶ 46-58), and alleges that Google has monopoly power in that market, (*id.* ¶¶ 59-68).

Second, Yelp separately alleges that Google unlawfully ties its "local search product to its general search product." *Id.* ¶¶ 225-36 (Count IV). In bringing an explicit tying claim, Yelp contends that the "general search services market and the local search services market are separate and distinct markets, with separate and distinct products and services." *Id.* ¶ 228. Yelp also alleges a relevant antitrust market in LSS. *Id.* ¶¶ 69-80.

Third, Yelp brings one claim directed to Google's alleged attempted monopolization of a "Local Search Advertising Market." *Id.* ¶¶ 213-14 (Count III).[2] In support thereof, Yelp alleges that local search advertising market is a relevant antitrust market and specifically that it is "wholly contained within the broader search advertising market." *Id.* ¶ 90, 101-09. Yelp in turn alleges that search advertising is a relevant market that is distinct from digital advertising generally. *Id.* ¶¶ 91-100. In this way, Yelp alleges that local search advertising is a "sub-submarket" of the digital advertising market. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 n.8 (9th Cir. 2018) (noting that "The Caddies' proposed markets are actually sub-submarkets. Advertising to golf fans is a submarket of the general advertising market. Advertising during live golf tournaments … is a further submarket of the submarket of advertising to golf fans."). Google

---

[1] As Google correctly points out, the Court's First MTD Order and Second MTD Order were decided at the pleading stage and thus took Yelp's allegations as true. *See* Dkt. 95 at 10. As discussed in greater detail in Section III.C.1., below, on a motion for summary judgment via issue preclusion, the Court does *not* take Yelp's allegations as true. Nonetheless, Yelp's allegations frame the issue preclusion inquiry because, in deciding whether "the issue at stake" in this case is the same as the issue on which Yelp seeks preclusion, Yelp's allegations are a part of the equation. *See* Dkts. 91, 95, 98 (the Parties' arguments center around whether the allegations Yelp has raised in this case are the same as certain issues decided by Judge Mehta).

[2] Yelp's fifth and final cause of action is an unfair competition claim under state law.

United States District Court
Northern District of California

disputes this characterization, arguing instead that the local search advertising market would be a separate, parallel submarket of the broader digital advertising market – and that "search advertising" is thus not at issue in this case.  *See* Dkt. 95 at 20-21;  *see also* Dkt. 109 ("Hrg. Tr.") at 38:20-40:23.

### B.    *United States v. Google*

On October 20, 2020, the United States Department of Justice ("DOJ") and the attorneys general of several states brought suit against Google under Section 2 of the Sherman act for unlawfully maintaining monopolies in the markets for general search services, search advertising, and general search text advertising.  *See United States et al. v. Google LLC*, No. 20-cv-03010-APM, Dkt. 1 (hereinafter "*U.S. v. Google*").[3]  The case developed over several years of proceedings.  In relevant part, discovery closed in November, 2022 and Judge Mehta held a bench trial over nine weeks concluding on November 16, 2023, to determine Google's liability.  *See* Dkt. 91 at 9;  Dkt. 95 at 25;  Dkt. 102-1.  On August 5, 2024, Judge Mehta issued a 276-page opinion[4] containing detailed findings of fact and conclusions of law.  *U.S. v. Google*, 747 F. Supp. 3d 1 (D.D.C. 2024) (hereinafter "*Google Liability*").  In relevant part, Judge Mehta found that:

1) "General Search Services is a Relevant Product Market." *Google Liability*, 747 F. Supp. 3d at 109-13;

2) "Google Has Monopoly Power in the General Search Services Market." *Google Liability*, 747 F. Supp. 3d at 117-24;  and

3) "Search Advertising is a Relevant Product Market, But Google Does Not Have Monopoly Power in It." *Google Liability*, 747 F. Supp. 3d at 125-36.

Thereafter, the remedies phase of *U.S. v. Google* began, with Judge Mehta entering "a scheduling order that set aside approximately six months for discovery," followed by a two-week

[3] An additional case brought by other states, *Colorado et al. v. Google*, No. 20-cv-3715-APM (D.D.C.), was consolidated with *United States v. Google* on January 7, 2021.  *See Colorado v. Google*, No. 20-cv-3715-APM, Dkt. 66.

[4] This page count is based on the opinion PDF available on ECF.  *U.S. v. Google*, Dkt. 1033.  The decision as ultimately published in the Federal Supplement spans 160 pages, and the Court refers to the pagination of the published decision in its pinpoint citations.

United States District Court
Northern District of California

evidentiary hearing from April 22 to May 9, 2025. *See U.S v. Google*, 803 F. Supp. 18, 41-42 (D.D.C. 2025) (hereinafter "*Google Remedies*"). While the record in *U.S. v. Google* was re-opened during the remedies phase, as Google's counsel explained during the hearing in this matter and as Yelp does not contest, the "discovery … that took place in the interim really focused on the remedies that were proposed" by the DOJ, relating to issues such as "data sharing [requirements] or the [proposed] divestiture of the Chrome browser." Hrg. Tr. at 46:2-47:8. There was no discovery directed to "update[ing]" Judge Mehta's liability findings. *Id.* at 47:8-16. However, there was evidence taken and discussion of "issues relating to[:] [S]hould certain remedies extend to things that would relate[] to generat[ive] AI companies," and there was "an assessment of" what the market looked like in terms of whether "generative AI companies [are] qualified competitors." *Id.* at 47:17-48:25; *see also id.* at 49:2-11. Google's counsel in this case, Mr. Schmidtlein, was trial counsel in *U.S. v. Google* and is familiar with this history. *See id.* at 20:8-10, 27:24-25.

Judge Mehta issued a detailed remedies decision on September 2, 2025. *Google Remedies*, 803 F. Supp. 18. Therein, Judge Mehta reaffirmed certain findings of the liability phase in resolving the parties' "dispute over the sufficiency of the liability-phase findings to [certain] proposed remedies." *Id.* at 36, 76-81 ("Much has changed since the end of the liability trial, though some things have not. Google is still the dominant firm in the relevant product markets. No existing rival has wrested market share from Google. And no new competitor has entered the market."). Judgment was entered December 5, 2025, and Yelp seeks issue preclusion through this date. Hrg. Tr. at 18:9-19:18; *U.S. v. Google*, Dkt. 1462 (final judgment).

## II.    LEGAL STANDARD

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).[5] Issue preclusion, relevant here, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the

---

[5] This doctrine, when asserted to support a claim in a new case by a party that was not a party to the prior case, is also referred to as "offensive non-mutual collateral estoppel." *See, e.g., Visa U.S.A. Inc. v. First Data Corp.*, 369 F. Supp. 2d 1121, 1123 (N.D. Cal. 2005)

issue recurs in the context of a different claim." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). Issue preclusion requires:

> that "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits."

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 935 (9th Cir. 2025), *cert. dismissed sub nom. Google LLC v. Epic Games, Inc.*, 146 S. Ct. 1051, 224 L. Ed. 2d 182 (2026) (hereinafter "*In re Google Play Store*"). Those four elements are the minimum requirements; however, even where they are satisfied, "courts [have] broad discretion to determine when [issue preclusion] should be applied." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979); *see also In re Google Digital Advert. Antitrust Litig.*, No. 21-md-3010-PKC, 2025 WL 3012840, at *3 (S.D.N.Y. Oct. 27, 2025) hereinafter "*In re Google Digital Advert.*").

Partial summary judgment is an appropriate vehicle for consideration of issue preclusion. *See, e.g., id.*; *Visa*, 369 F. Supp. 2d at 1122; *In re Google Play Store*, 147 F.4th at 934 n.5. "Summary judgment on 'part of ... [a] claim' is expressly permissible under Rule 56(a)," including as to issues of market definition and monopoly power. *In re Google Digital Advert.*, 2025 WL 3012840, at *4 (citing Fed. R. Civ. P. 56(a)) (collecting cases). As with other issues on which a moving party bears the burden of proof, the party moving for "issue preclusion bears the burden of establishing all necessary elements." *Montana v. Talen Montana, LLC*, 574 F. Supp. 3d 795, 810 (D. Mont. 2021). "Issue preclusion may [often] be decided on a summary judgment motion because it often turns on the application of legal principles to undisputed facts." *In re Google Digital Advert.*, 2025 WL 3012840, at *4.

## III.    DISCUSSION

Yelp moves for issue preclusion on three issues decided by Judge Mehta in *U.S. v. Google*, "along with subsidiary factual findings and legal determinations." Dkt. 91-1 at 2; Dkt. 91 at 7-8. Specifically, Yelp seeks to preclude Google from contesting the following:

(1) "General search services in the United States is a relevant market, and it is separate and distinct from specialized search services and social media." Dkt. 91-1 at 2;

5

(2) "Google has monopoly power in the general search services market." *Id.* at 4.

(3) "Search advertising is a relevant antitrust market and there is no omnibus market for digital advertising." *Id.* at 5.

In opposition, Google argues that Yelp has failed to meet its burden to show it is entitled to issue preclusion on these three determinations. First, for the GSS market definition and GSS monopoly power issues (issues (1) and (2)), Google argues that the issues as presented in this litigation are not the same as those decided in *U.S. v. Google*, in large part because of Yelp's tying theory. *See* Dkt. 95 at 11-16. Second, Google argues that the "search advertising" market definition issue also fails on the first prong of issue preclusion and that, additionally, Judge Mehta's search advertising determination was not necessary to the final judgment. *Id.* at 16-21. Google thus acknowledges that the second and third elements—"(2) the issue[s were] actually litigated and decided in the prior proceedings [and] (3) there was a full and fair opportunity to litigate the issue[s]"—are met for the GSS market, GSS monopoly power and search advertising market issues.[6] Additionally, Google argues that equitable considerations including the Seventh Amendment and the pending appeal in *U.S. v. Google* warrant denial of issue preclusion here. Dkt. 95 at 26-28.

The Court addresses Google's issue-specific arguments first, before turning to its broadly-applicable equitable arguments.

### A.   Issue Preclusion is Appropriate as to Judge Mehta's General Search Services Market Definition Findings

In *Google Liability*, Judge Mehta found "that general search services is a relevant product market and alternative sources for query information, like SVPs and social media sites, are not adequate substitutes." *Google Liability*, 747 F. Supp. 3d at 109-13. In this case, Yelp alleges that "General search services in the United States is a relevant antitrust market" and that "[o]ther search tools, platforms, and sources of information are not reasonable substitutes for general search services." Dkt. 50 ¶¶ 46-58. The first requirement of issue preclusion is that these issues at

---

[6] The third element, however, is implicated in Google's challenge to preclusion "for the full time period at issue" in this case, as discussed further in Section III.D., below. *See* Dkt. 95 at 23-26.

United States District Court
Northern District of California

stake in the two proceedings be "identical in substance." *Oyeniran v. Holder*, 672 F.3d 800, 807 (9th Cir. 2012). The Court agrees with Yelp that they are, for the following reasons.

### 1.    A General Search Services Market Is at Issue in this Case

The first step in the issue preclusion analysis is to "identify the issues in the two actions." *See, e.g.*, *Wilson v. Belleque*, 554 F.3d 816, 830 (9th Cir. 2009). Yelp's claims place a GSS market at issue via its monopoly leveraging and tying claims (Counts I-II and IV). *See* Dkt. 50 ¶¶ 11, 13, 159, 193-94, 205, 225-36. The Parties agree that, in support of these claims, Yelp asserts a relevant GSS market, a relevant LSS market, and that these markets are separate. *See id.* ¶¶ 46-58, 69-80; *compare* Dkt. 91 at 10 *with* Dkt. 95 at 8. There is no genuine dispute as to what Yelp has alleged in *this case*: separate markets with anticompetitive tying and/or leveraging.

### 2.    The Same Market Was at Issue in *U.S. v. Google*

The Parties do, however, dispute what was at issue in *U.S. v. Google* as compared to Yelp's allegations here. Yelp argues that the same GSS market was at issue at *U.S. v. Google*, and the Court agrees. Judge Mehta's definition of the GSS market, as evidenced by his analysis of the relevant[7] *Brown Shoe* factors, is clear. For example, the following excerpts in particular echo the GSS market as alleged by Yelp in this case:

> *1. Peculiar Characteristics and Uses*:
>
> No user could confuse a GSE with an SVP or a social media site. Unlike those other products, GSEs are a gateway to the World Wide Web. … Search on a GSE therefore is not constrained by subject matter, inventory, or query type. …
>
> By contrast, SVPs are "walled gardens," meaning their query responses are derived from structured data available only on that particular platform. … In addition, as the name implies, SVPs are typically "specialized" to a particular subject matter (e.g., Amazon for shopping, Expedia for travel, Yelp for local businesses). …
>
> The product delivered to consumers on a GSE differs significantly from what is produced by an SVP. When a user enters a query into Google or Bing, the result is a search engine results page, or SERP, which contains organic links that enable the user to navigate to other websites. …

---

[7] "[B]ecause general search is a free product, [Judge Mehta did] not consider factors related to pricing." *Google Liability*, 747 F. Supp. 3d at 110.

United States District Court
Northern District of California

*2. Industry or Public Recognition:*

… Browsers contain a default search access point, and only GSEs occupy that position. To install an SVP or a social media site as the default would restrict that key access point to a particular vertical or subset of verticals, creating a poor user experience. To that end, browsers allow users to switch the search default only to a GSE and not to an SVP or a social media platform. …

*3. Unique Production Facilities*

… Imagine if Google's search quality substantially degraded, whether purposely or through neglect. Would SVPs or social media platforms be able to shift resources to put out a product that resembles a GSE and thereby capture a significant number of dissatisfied Google users? The answer obviously is no. Absent extraordinary cost and expense, neither Amazon nor Meta could become a source for noncommercial or navigational queries. … And even if an SVP or social media firm were willing to make the required intense resource commitments, adapting its platform to perform general search functions would take a long time to materialize.

*Google Liability*, 747 F. Supp. 3d at 110-113 (internal citations omitted).  In sum, Judge Mehta's findings and analysis focused on the exact same GSS market at issue in this case:  A GSS market as compared to and distinct from LSS, *i.e.*, search services provided by local or specialized vertical providers ("SVPs") like Yelp. *See id*.  Having so determined, the Court agrees with Yelp that, absent issue preclusion, (1) there would be substantial overlap in the evidence and argument presented in this case vis-à-vis *U.S. v. Google*, (2) the same rule of law applies, (3) there would be overlapping issues in pretrial preparation and discovery and (4) the claims are closely related. *See* Dkt. 91 at 16-20 (analyzing the four restatement factors set forth in Restatement (Second) of Judgments § 27 cmt. c (Am. Law Inst. 1982)).[8]

Google's argument to the contrary is unavailing.  Google argues that, although Yelp and Judge Mehta both refer to something called the "general search services" market, there are in fact two separate and distinct markets at issue in these cases, and thus the issues are not identical.  In support, Google makes two points.  First, Google argues that Judge Mehta's opinion in various respects treats GSS as *containing* LSS and that such a GSS market definition is inconsistent with

---

[8] Google does not argue that the four restatement factors should be decided differently given Yelp's reading of the *Google Liability* decision.  *See* Dkt. 95 at 12-13.  Rather, Google urges that Yelp misreads Judge Mehta's order and that the GSS market at issue in *U.S. v. Google* was different in certain key ways.  *See id.*  The Court rejects Google's argument as explained below.

United States District Court
Northern District of California

that advanced by Yelp, as evidenced by Yelp's tying claims.  Second, Google argues that even if the markets are nominally the same, the underlying facts and "surrounding context" are not the same because of the different scope of this case versus *U.S. v. Google*.

### 3.  Google's Argument that Judge Mehta Analyzed a Different "General Search Services" Market is Unavailing

On the first point, the Court is not persuaded.  There is no part of Judge Mehta's opinion where GSS is discussed as including LSS as a *market*.  *See Google Liability*, 747 F. Supp. 3d at 110-113.  Judge Mehta does refer to general search engines (GSEs), *i.e.*, the participants in the GSS market, as answering "any query," but the fact that Google provides general search results and local search results in a single unified offering does not necessarily undermine the definition of GSS as a separate *market* from LSS, or of GSEs as being different from SVPs.  *See id.* at 111-12 ("When a user enters a query into Google or Bing, the result is a search engine results page, or SERP, which contains organic links that enable the user to navigate to other websites. … On the other hand, SVPs respond to queries with a results page that reflects the data possessed or controlled by the SVP.").  Indeed, Judge Mehta explicitly rejected the argument that there was a single unified "query product market." *See id.* at 113-16.  Moreover, the concept of a GSE answering both general and specialized *queries* is not inconsistent with Yelp's tying allegations of separate *products*, because whether a given offering (*e.g.*, Google's SERP) is two separate products tied together or a genuine single product is judged by the objective consumer demand test.  *See* Dkt. 47 at 23.  In other words, Yelp's position, though nuanced, is consistent:  Yelp argues that GSS and LSS are separate *markets* and that general search results and local search results are separate *products* (under the consumer demand test), and it argues that Google in fact coercively ties these products together via its SERP (which users cannot modify).  *See* Dkt. 50 ¶¶ 43, 155-57.  Yelp's position is not inconsistent with the GSS market definition in *U.S. v. Google*, and the discrete issue of the GSS market definition (leaving aside the "separate products" issue) is the same across the cases.

////

////

**4.    Google's Argument that Different Factual Contexts Between *U.S. v. Google* and this Case Mean the Markets Were Different is Unavailing**

Second, Google argues the factual context of this case is so different from *U.S. v. Google* that the issues cannot be the same. *See* Dkt. 95 at 6, 9, 11-13. In advancing this argument, Google argues that the "identity of the issues" element is a strict one: "[I]t is not sufficient that an issue is 'factually similar' to the one in an earlier case"; "the issues must be identical and involve the same facts and surrounding context." Dkt. 95 at 9 (quoting *Visa U.S.A. Inc. v. First Data Corp.*, 369 F. Supp. 2d 1121, 1123 (N.D. Cal. 2005) (citing *Western Oil & Gas Ass'n v. United States EPA*, 633 F.2d 803, 809 (9th Cir.1980) (emphasis added)). The Court does not doubt that there are differences to the "surrounding context" of *U.S. v. Google* vis-à-vis this case, but Google's argument overreaches.

The "strict" standard urged by Google does not hold up under *Montana v. United States* or Ninth Circuit case law. In *Montana*, the Supreme Court explained that this element of issue preclusion looks to "whether the issues presented by this litigation are *in substance the same* as those resolved" in the prior case. 440 U.S. 147, 155 (1979) (emphasis added); *see also Oyeniran*, 672 F.3d at 807 (the issues need only be "identical in substance"). Google reads both *Visa* and its underlying case, *Western Oil & Gas*, too rigidly: the Ninth Circuit in *Western Oil & Gase* merely explained that "if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the [resulting] legal issues…" *W. Oil & Gas Ass'n v. U.S. E.P.A.*, 633 F.2d 803, 809 (9th Cir. 1980). That standard is in keeping with *Montana* and the Court readily embraces it: A difference in *relevant* facts will bar issue preclusion, but a difference merely in surrounding context may not.

At oral argument, however, Google emphasized the Ninth Circuit's decision in *Google Play Store*, 147 F.4th 917 (9th Cir. 2025), to further bolster the "same context" requirement. Hrg. Tr. at 14:17-15:7, 26:14-25, 31:14-32:13; *see also* Dkt. 95 at 9. *Google Play Store* is distinguishable. There, the Ninth Circuit rejected Google's attempt to assert issue preclusion against Epic Games, Inc. ("Epic") based on Apple, Inc.'s ("Apple") 2021 victory in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*,

67 F.4th 946 (9th Cir. 2023).  *Google Play Store*, 147 F.4th at 933-36.

The Ninth Circuit did so because of two key differences between the "play store" case and the "Apple" case.  First, the Ninth Circuit determined that "the commercial realities" of how the Apple app store and the Google play store operated were different.  Apple's store was a "walled garden," while Google operated via an "open distribution approach."  *Id.* at 935 (explaining that "[i]t is well established that the relevant market 'can be determined only after a factual inquiry into the "commercial realities" faced by consumers.'  This case-by-case inquiry underlies the principle that relevant markets are not freestanding entities defined in a vacuum." (internal citations omitted)).  Second, the Ninth Circuit explained that the "theories of harm in the two cases [were] also different."  *Id.* at 935-36.  For example, "[b]ecause Apple vertically integrates its hardware, iOS operating system, and app store, a consumer locked in through any one part of the stack is, in effect, locked into the entire system," leading Epic to assert harm based on a wide range of iOS features.  *Id.*  Meanwhile, Epic's asserted harm against Google related to Google's alleged requirement that OEMs install the Play Store on the home screen of every android device and "deals [made] to keep other app stores off OEMs' home screens."  *Id.* at 936.  "These are not fringe issues.  **These are the issues that formed the core of market definition in each suit**[,]" and thus the fact "that Apple and Google were previously found to compete in the market for 'digital mobile gaming transactions' in the *Apple* litigation" was different from "the markets in [the *Google Play Store*] case—for Android app distribution and Android in-app billing."  *Id.* (emphasis added).

The fact that different "commercial realities" and "theories of harm" may bear on issue preclusion is well-taken.  Nonetheless, the Court finds *Google Play Store* distinguishable from the case at bar for two reasons.  First, the Ninth Circuit's analysis as to the different "commercial realities" faced by consumers arose out of the fact that the defendants and products at issue— Google and its "Play Store" versus Apple and its "App Store"—were different and operated differently.  *Id.* at 935.  These competitive realities were so different that they ultimately led to the Ninth Circuit's conclusion that the asserted markets in *Google Play Store* and *Apple* were also different, with Epic asserting a "digital mobile gaming transactions" market against Apple versus

11

an "*Android* app distribution" and "*Android* in-app billing" markets against Google.  *Id.* at 936.  By contrast, here and in *U.S. v. Google*, the defendant (Google) is one and the same, the relevant product (Google Search) is identical and thus the commercial realities faced by consumers are the same. These factual similarities support, rather than undermine, issue preclusion.  *Cf. Google Play Store*, 147 F.4th at 933-36.

Second, although it is true that Yelp's theories of harm are different in some ways from the plaintiffs' theories in *U.S. v. Google*, they are not the same kinds of differences as appeared in *Google Play Store*.  There, the Ninth Circuit explained that the differences in theories of harm bore directly on the market definition and meant that "the harm-specific market definition applicable here was not 'actually litigated' or 'decided' in Apple."  *Google Play Store*, 147 F.4th at 937.  That is not the case here where, despite differences in the DOJ versus Yelp theories of harm, the GSS market definition sought by Yelp is the same as the market defined, analyzed and decided by Judge Mehta.  *Compare, e.g.*, Dkt. 50 ¶¶ 46-58 *with Google Liability*, 747 F. Supp. 3d at 110-113.  On the whole, the Court does not find that these differences warrant denial of issue preclusion as to the definition of a GSS market.

* * *

In sum, Yelp has met its burden to show that the GSS market definition issue at stake in this litigation is the same in substance as the GSS market definition at issue in *U.S. v. Google*. Accordingly, as Google concedes the remaining elements of issue preclusion for this question, issue preclusion is appropriate as to the existence of a GSS market, pending the equitable considerations analyzed by the Court in Section III.D., below.

**B.     Issue Preclusion is Appropriate as to Judge Mehta's Monopoly Power Finding**

Having found that GSS was a relevant antitrust market, Judge Mehta proceeded to examine whether Google held monopoly power in that market;  he concluded that it did.  *Google Liability*, 747 F. Supp. 3d at 117-24.  The Parties' arguments on this issue largely follow the arguments related to the underlying GSS market definition.  *See* Dkt. 91 at 16-21;  Dkt. 95 at 11-15.  The Court's analysis is, accordingly, similar to that in Section III.A., which is incorporated by reference herein.  *See, supra*, § III.A.  There are only two distinct arguments raised by Google (*see*

United States District Court
Northern District of California

Dkt. 95 at 15-16), and the Court addresses each in turn.

First, Google argues that "Yelp's [tying] theory undermines a central premise behind Judge Mehta's holding that Google possessed monopoly power namely that, '[m]easured by query volume, Google enjoys an 89.2% share of the market for general search services…'" Dkt. 95 at 15-16 (quoting *Google Liability*, 747 F. Supp. 3d at 119). In other words, Google argues that Yelp cannot simultaneously contend that general search results and local search results are separate products (as it must do for its tying claim), while relying on *all* queries—without separating general from specialized queries—to show Google's market share, and thus monopoly power, in GSS. *See id.*; Hrg. Tr. at 29:7-30:25. The Court does not agree.

Google's argument is  flawed because the type of *result* provided by a GSE or SVP is not the same thing as the type of *query* input by a user. Yelp's tying theory is that Google ties its local search *results*[9] to its general search *results* via certain, unmodifiable offerings (*e.g.*, by embedding Google maps or reviews or shopping results in the OneBox). *See* Dkt. 58 at 5-7; Dkt. 50 ¶¶ 43, 155-57. To succeed on this theory, Yelp must prove that Google has monopoly power in the tying product's market (*i.e.*, GSS as the market providing general search results). But there is no reason to require Yelp to disaggregate general queries from specialized/local queries at this juncture of the analysis because queries merely show the overall volume of *use* of the GSE by consumers as compared to other GSEs. Indeed, Judge Mehta also noted this distinction. *See Google Liability*, 747 F. Supp. 3d at 114, 119 ("The fact that GSEs may compete for travel queries against Booking.com, shopping queries against Amazon, and local queries against Yelp does not mean that firms that specialize in certain verticals belong in the same product market as GSEs.").

To illustrate, both Parties at oral argument provided helpful examples of general queries versus specialized vertical searches (like local intent or shopping-targeted queries). Hrg. Tr. at 13:16-14:15 (Yelp), 27:1-28:22, 29:5-25 (Google). Nothing prevents a user from inputting a general factual inquiry, *e.g.*, "How tall is the Eiffel Tower?" into an SVP like Yelp. It is just that an SVP is not likely to provide a useful result. Similarly, nothing stops a user from inputting a

_____

[9] To the extent these are separate products, which Google disputes and which the Court has not decided  and does not decide today.

query with local (or other specialized) intent, such as "best sushi in San Jose," into a GSE like Google, though Yelp alleges consumers will receive inferior results. *See id*; Dkt. 50 ¶¶ 43, 155-57. Thus, while the distinctions in query type may be relevant to subsequent parts of the tying analysis, they are not relevant to an evaluation of Google's monopoly power in GSS at the first step of the tying analysis and are not inconsistent with allegations of separate products, (*see* Dkt. 50, ¶¶ 41, 138).

Second, Google argues that "Yelp's separate products theory" requires reassessment of the "product quality degradation" rationale also relied upon by Judge Mehta to find monopoly power. Dkt. 95 at 16. Yelp counters that, again, Judge Mehta's quality degradation findings related to GSS *in toto*, *i.e.*, inclusive of general search queries with local intent. Based on Judge Mehta's findings, the Court agrees that Yelp has the better reading. *See Google Liability* at 113-14, 118.

\* \* \*

Accordingly, for the same reasons as with regard to the GSS market definition, Yelp has met its burden to show that the GSS monopoly power issue at stake in this litigation is the same in substance a the GSS monopoly power issue decided in *U.S. v. Google*. Accordingly, as Google concedes the remaining elements of issue preclusion for this issue, issue preclusion is appropriate as to Google's monopoly power in GSS, pending the equitable considerations analyzed by the Court in Section III.D., below.

**C.    Issue Preclusion is Not Appropriate as to a "Search Advertising" Market**

In *Google Liability*, Judge Mehta also found that "Search Advertising Is a Relevant Market, But Google Does Not Have Monopoly Power in It." *Google Liability*, 747 F. Supp. 3d at 125-36. Yelp asks this Court to give preclusive effect to the first half of that finding—that "search advertising" is a relevant antitrust market—to give Yelp a "steppingstone" along the path to defining a "local search advertising" market. Dkt. 91 at 17-18. As with the GSS issues, the first step in the issue preclusion analysis is to "identify the issues in the two actions." *See, e.g.*, *Wilson v. Belleque*, 554 F.3d 816, 830 (9th Cir. 2009).

////

14

**1.    Yelp Has Not Met its Burden to Show that an Identical "Search Advertising" Market is at Issue in this Case**

Here, unlike with regard to the GSS market, the Parties agree that there was a "search advertising" market at issue in *U.S. v. Google* and that, as defined by Judge Mehta, this market was a submarket distinct from a broader digital advertising market. *Google Liability*, 747 F. Supp. 3d at 125-33. However, Google argues that Yelp has not met its burden to show that the same "search advertising" market is at issue in this case. Dkt. 95 at 19-21. For the following reasons, the Court agrees that Yelp has not met its burden.

Google argues that "search advertising" and "local search advertising" are not identical markets and thus not identical issues. *See* Dkt. 95 at 19. That statement is correct, if unremarkable. *See, e.g.*, *Google Play Store*, 147 F.4th at 936 ("That the markets in this case—for Android app distribution and Android in-app billing—overlap with or may constitute submarkets of the 'digital mobile gaming transactions' market does not make them identical markets."). That does not end the analysis, however, because Yelp alleges that the "local search advertising" market, which undeniably is at issue, is a submarket of "search advertising." Dkt. 50 ¶¶ 90, 101-09. Yelp thus argues that "search advertising," too, is at issue in this case.

Google disagrees, arguing that "search advertising" and "local search advertising" are *parallel* markets each carved out from the broader "digital advertising" market, contrary to Yelp's allegations. *See* Dkt. 95 at 19-20 (citing *Visa*, 369 F. Supp. 2d at 1124-25 ("Parallel, however, is not 'identical' for purposes of nonmutual offensive collateral estoppel.")). Google's response to the Court's question during the hearing helpfully explained this point:

> THE COURT: Right. But my question -- but wouldn't you need to establish a search advertising market to then -- isn't that where you start to then say, "And now I'm talking about a local search advertising market"?
>
> [Google]: … I wouldn't think of it that way. I think what you would -- and it would be a component. You would look at, are there things beyond search engines? … [L]ocal businesses, which I think is what they're going to say are the main people buying local search [advertisements], right? Local businesses, they're huge advertisers on social media, huge advertisers on other forms of non-search [advertising]. And the question of how substitutable those are, that's absolutely a unique question. That was not litigated in *U.S. v. Google*.

United States District Court
Northern District of California

Hrg. Tr. at 40:1-21.  The Court agrees with Google.  Because Google's position is contrary to Yelp's allegations, there is a genuine dispute of fact as to the nature of the "local search advertising" market:  Is "local search advertising" a submarket of search advertising and a sub-submarket of digital advertising, or is it an independent submarket of digital advertising that is parallel to search advertising?  Here, the Court cannot compare whether the issues are identical "because the relevant market[] in this case ha[s] yet to be defined," and "the Court is unable to determine from the record before it whether the relevant market[] alleged in this case could be carved out from the" market that was defined *U.S. v. Google*.  *Cf. Visa*, 369 F. Supp. 2d at 1124-25.  Google is entitled to present evidence as to this disputed fact.  In other words, the burden at summary judgment falls on Yelp to show that issue preclusion is appropriate;  while issue preclusion may often "be decided on a summary judgment motion because it often turns on the application of legal principles to undisputed facts," (*see In re Google Digital Advert.*, 2025 WL 3012840, at *4), in this case a genuine dispute of fact bars issue preclusion.[10]

> ### 2.    The Court Need Not Decide Whether the "Search Advertising" Market Was Necessarily Determined by Judge Mehta.

Because the Court denies Yelp's request for issue preclusion as to the "search advertising" market on alternative grounds, the Court does not rule on Google's alternate argument that the "search advertising" issue was not necessarily decided in *U.S. v. Google* under the fourth element of issue preclusion.

* * *

Accordingly, because Yelp has not met its burden to show that the "search advertising" market is at issue in this case as it was in *U.S. v. Google*, issue preclusion on this ground is inappropriate.

---

[10] Such a genuine dispute arises here because the issue relates to facts not yet adjudicated in this case and on which Yelp has presented no evidence.  By contrast, in Sections III.A-B., Google disputed only the findings and conclusions in *U.S. v. Google*.  "Although the facts [in the prior action] were disputed at trial, there is no genuine dispute before this Court **as to the content of the finding and conclusions in the [prior action]**." *In re Google Digital Advert. Antitrust Litig.,* 2025 WL 3012840, at *4 (emphasis added).  Thus, disputes about what was at issue in *U.S. v. Google*, *i.e.*, how to read Judge Mehta's opinion, are legal issues that the Court properly resolves at summary judgment.

16

### D. Equitable Considerations Weigh in Favor of Issue Preclusion as to the General Search Services Market and Monopoly Power

"The doctrine of issue preclusion is equitable in nature and, in a case where the parties to the first action are not identical (nonmutual) and one party seeks to use it affirmatively (offensively) to preclude the opposing party from litigating issues, the Court must also consider whether in fairness it ought to grant preclusion." *In re Google Digital Advert. Antitrust Litig.*, 2025 WL 3012840, at *16. "[N]o one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity." *Blonder-Tongue Lab'ys, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 333-34 (1971).

The Court finds *In re Google Digital Advert.* instructive and finds that equity weighs in favor of preclusion for many of the same reasons as explained by Judge Castel. 2025 WL 3012840, at *16-17. *U.S. v. Google* was brought by the DOJ and attorneys' general of several states and "had massively high stakes for Google"; Google had the "incentive to aggressively defend" the action; for the most part,[11] the findings and conclusions in *U.S. v. Google* are not "stale" or "out of date," with judgment having been entered just over 6 months ago at the end of 2025 – well after the initiation of this action by Yelp; and Google has pointed to "no prior adjudications in favor of Google on the issues presented that are inconsistent with the findings and conclusions in" *U.S. v. Google*. *Id.* In sum, application of issue preclusion is likely to "foster efficiency, not jury confusion" in this case. *Id.* Google makes three arguments to the contrary; only one, the time-limited value of *U.S. v. Google*, is persuasive and only in part.

#### 1. It Would be Unfair to Google to Give Preclusive Effect to the Findings of *U.S. v. Google* Beyond the Date of the *Google Liability* Decision in August 2024.

Google argues that issue preclusion is inequitable because any efficiency gain is "minimal" and jury confusion likely because Yelp cannot obtain preclusive effect for a ruling going out to the date of trial in 2028. Dkt. 95 at 23-26. The Court is not persuaded. Even if Yelp is not entitled to

---

[11] *But see, infra*, § III.D.1. (the *U.S. v. Google* findings are aging quickly in the context of the advent of generative AI).

issue preclusion for the entire period relevant to this action, a preclusive GSS market definition and monopoly power ruling beginning from 2009 and running through 2024 or 2025 would have great efficiencies for the Parties' discovery and pretrial preparation in this case.  The likelihood of jury confusion, by contrast, is low:  By imposing a simple date-based cutoff, the Court can explain to a jury that, for anything before the effective date, Google is an adjudicated monopolist in GSS; for anything after that date, the Parties will present evidence.  *Contra* Dkt. 95 at 26.  Accordingly, the fact that Yelp may benefit from issue preclusion for only a subset of the time relevant to this case is not a reason to deny preclusion wholesale.

However, Google's argument over the relevant time period for preclusion implicates a different fairness concern tied to the third required element of issue preclusion:  Google must have had a full and fair opportunity to litigate the issues on which preclusion is sought.  As Google argues in its opposition and as Judge Mehta acknowledged in *Google Remedies*:

> [A]rtificial intelligence technologies, particularly generative AI ("GenAI"), may yet prove to be game changers. Today, tens of millions of people use GenAI chatbots, like ChatGPT, Perplexity, and Claude, to gather information that they previously sought through internet search. These GenAI chatbots are not yet close to replacing GSEs, but the industry expects that developers will continue to add features to GenAI products to perform more like GSEs.

*Google Remedies*, 803 F. Supp. 3d at 36.  The Court cannot discount the possibility that the advent of generative AI may have shifted the relevant market dynamics, eaten away at Google's monopoly power, or both.  *See* Dkt. 95 at 24-25.  Yelp argues that, because the record in *U.S. v. Google* was re-opened for the remedies phase, Google had the opportunity to litigate this and any other issues through December 2025 – when judgment was entered.  Hrg. Tr. at 19:15-20:10. Google argues that because the close of fact discovery was in 2022 and the first generative AI product launched after the close of fact discovery, there was no discovery around whether or how generative AI would impact the GSS market.  Dkt. 95 at 24-25;  Hrg. Tr. at 50:3-13.[12]

The Court is persuaded that Google is correct in part, and the most equitable cut-off date

---

[12] However, Google conceded at the hearing that the evidentiary record was not closed until fall of 2023 at the close of trial:  The discovery record plus the trial record was "one phase."  Hrg. Tr. at 50:14-51:2.

United States District Court
Northern District of California

for issue preclusion is August 5, 2024, the date of the *Google Liability* decision.  The Court is mindful of Google's argument that the record was closed between the end of trial on November 16, 2023  and Judge's Mehta's liability decision on August 5, 2024, but as Google's opposition makes clear, generative AI competitors did not release public, search-capable models until October 2024 (ChatGPT) or May 2025 (Anthropic's "Claude") at the earliest.  Dkt. 95 at 25-26. Moreover, although such models appear to have been available prior to the *Google Remedies* decision, as Google explained during the hearing, discovery in the remedies phase was focused on the remedies that were proposed by the DOJ, relating to issues such as "data sharing [requirements] or the [proposed] divestiture of the Chrome browser."  Hrg. Tr. at 46:2-47:8. There was no discovery directed to "update[ing]" Judge Mehta's liability findings.  *Id.* at 47:8-16. To the extent that issues of generative AI were discussed, they were limited to what the market looked like in terms of whether "generative AI companies [are] qualified competitors" for the purposes of benefiting from the proposed remedies.  *Id.* at 47:17-48:25;  *see also id.* at 49:2-11. Accordingly, the Court finds that Google did not have a full and fair opportunity to litigate the impact of generative AI on the GSS market definition and on Google's monopoly power after August 5, 2024, and issue preclusion extending beyond that date would be inequitable and unfair to Google.

### 2.    The Seventh Amendment Does Not Bar Issue Preclusion in this Case

Google points out that *U.S. v. Google* was a bench trial, while in this case Google seeks a jury trial.  The Parties agree that, under *Parklane*, the Seventh Amendment "does not bar courts from giving preclusive effect to bench trial findings in a later jury trial" but "'the absence of a jury trial is a *non-dispositive* factor when balancing the equities of issue preclusion.'"  *Compare* Dkt. 95 at 27 (Google) (citing *Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1031 (C.D. Cal. 2009) (emphasis in original)) *with* Dkt. 98 at 20 (Yelp) (citing *Parklane*, 439 U.S. at 337).

Looking to the particular circumstances of this case, however, the Court is not persuaded that the lack of a jury in *U.S. v. Google* militates against issue preclusion here.  In particular, given that Yelp seeks only partial summary judgment based on issue preclusion, giving preclusive effect to the findings proffered by Yelp would not effectively dictate any punitive damages (or the

amount of other damages) in this case because . *Contra Grisham*, 670 F. Supp. 2d at 1036 (C.D. Cal. 2009) (identifying the "heightened due process considerations surrounding punitive damages awards"); *Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009, 1034 (N.D. Cal. 2012) (explaining that the fact that the plaintiffs were "seeking damages (including punitive damages)" was "most significant[.]").  Moreover, Yelp does not seek punitive damages—the amount of which must be determined by a jury—but rather statutory treble damages, which are set by the statute and "seek[] primarily to enable an injured competitor to gain compensation for that injury." *See* Dkt. 50 ¶¶ 198-99, 210-11, 222-23, 235 and p. 72; *contrast Grisham*, 670 F. Supp. 2d at 1036 (C.D. Cal. 2009) (in the RICO context, noting that "[c]ourts uniformly hold that a jury must determine the amount of punitive damages awarded.") *with Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("Notwithstanding its important incidental policing function, … Section 4 [of the Clayton Act] is in essence a remedial provision.").

In sum, the Court does not find that the mere fact that Google has a right to a jury trial in this case, which does not implicate a sum uncertain of punitive damages, defeats issue preclusion. *Contra* Dkt. 95 at 27.  To hold otherwise would be to improperly convert *Parklane*'s non-dispositive factor into an iron-clad rule.

**3.    Google's Pending Appeal Does Not Bar Issue Preclusion in this Case**

Finally, Google argues that the Court should deny issue preclusion "because Google has appealed the final judgment in *U.S. v. Google*." Dkt. 95 at 26-27.  This argument is not well-taken.  In this Circuit, "a final judgment retains its collateral estoppel effect, if any, while pending appeal." *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 882 (9th Cir. 2007).  If Google ultimately prevails on its appeal, it has multiple options to solve the "potential problem" of preclusion based on a vacated judgment, including "a direct action to vacate the second judgment." *Id.* at 882-83. For this reason, the Ninth Circuit has expressly "held that the benefits of giving a judgment preclusive effect pending appeal outweigh any risks of a later reversal of that judgment." *Id.* at 883 (citing *Tripati v. Henman,* 857 F.2d 1366, 1367 (9th Cir. 1988)).  Google's arguments that the Court should depart from this well-established rule are unpersuasive, rely on out-of-Circuit authority and do not grapple with *Tripati*.

20

* * *

Overall, the Court concludes that Yelp has met its burden to show that it is entitled to issue preclusion on the GSS market definition and GSS monopoly power findings based on *U.S. v. Google*, but not on the issue of the "search advertising" market.  Accordingly, the Motion for issue preclusion and partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  Recognizing (1) the partially divergent theories of harm in this case vis-à-vis *U.S. v. Google*, (2) the nuanced line between the separate products versus market definition analyses and (3) the equitable concerns in any preclusive findings based on *Google Remedies* as opposed to *Google Liability*, however, the scope of preclusion is narrow.  It extends no farther than the specific findings identified in Section IV, below, and the Court does not grant Yelp's request across the board for preclusion on "subsidiary factual findings and legal determinations, including but not limited to" the excerpts contained in Yelp's proposed order.  *Contra* Dkt. 91-1 at 2-7.

## IV.    SCOPE OF ISSUE PRECLUSION

The following legal determinations, including only the supporting findings of fact cited below, shall have preclusive effect in this case running through **August 5, 2024**.

### A.    General Search Services Market Definition

"[G]eneral search services is a relevant product market and alternative sources for query information, like SVPs and social media sites, are not adequate substitutes."  *Google Liability*, 747 F. Supp. 3d at 109-10.  "[T]he relevant geographic market is the United States."  *Id.* at 107.

#### 1.    Peculiar Characteristics and Uses

i.    "No user could confuse a GSE with an SVP or a social media site. Unlike those other products, GSEs are a gateway to the World Wide Web. … Search on a GSE therefore is not constrained by subject matter, inventory, or query type."  *Id.* at 110 (including FOF ¶¶ 27, 33).

ii.    "Also, navigational queries—that is, queries entered for the purpose of getting to another site on the web (e.g., "amazon," "home depot," "baltimore sun")—are exclusive to GSEs.  *Id.* (including FOF ¶ 39).

iii.    "By contrast, SVPs are 'walled gardens,' meaning their query responses are derived

21

from structured data available only on that particular platform. … Because a user's search is confined to the SVP's structured data, users cannot use an SVP to navigate beyond the platform." *Id.* (including FOF ¶ 144).

iv. "In addition, as the name implies, SVPs are typically 'specialized' to a particular subject matter (*e.g.*, Amazon for shopping, Expedia for travel, Yelp for local businesses). … Thus, a user who wishes to acquire different categories of information could not do so from a single SVP and instead would have to take trips to multiple sites." *Id.* (including FOF ¶ 141, 146).

v. "Social media sites differ from GSEs in many of the same ways as SVPs. They too are 'walled gardens,' primarily driven by user-generated content such as self-uploaded videos on TikTok or photos on Instagram. Searches on social media only yield results from profiles on the platform and do not display web links to external sites (although social media users can navigate to external web content, such as through a link posted by a user or through an advertisement)." *Id.* at 111 (including FOF ¶ 162).

### 2.    Industry or Public Recognition

i. "[B]rowser developers recognize that GSEs are a distinct product. Browsers contain a default search access point, and only GSEs occupy that position. To install an SVP or a social media site as the default would restrict that key access point to a particular vertical or subset of verticals, creating a poor user experience. To that end, browsers allow users to switch the search default only to a GSE and not to an SVP or a social media platform. The available alternative defaults in Chrome, Edge, Firefox, and Safari all are GSEs. Mozilla recognizes that certain SVPs are frequented by its users, and so it has created a unique feature in the desktop version of Firefox that allows users to perform individual searches with SVPs like Amazon or Wikipedia, using the Firefox toolbar. But even Firefox does not allow a user to change the default search engine to an SVP." *Id.* at 112 (including FOF ¶¶ 61, 146-47, 149).

### 3.    Unique Production Facilities

i. "Imagine if Google's search quality substantially degraded, whether purposely or

22

through neglect.  Would SVPs or social media platforms be able to shift resources to put out a product that resembles a GSE and thereby capture a significant number of dissatisfied Google users? The answer obviously is no.  Absent extraordinary cost and expense, neither [SVPs like] Amazon nor [social media companies] like Meta could become a source for noncommercial or navigational queries." *Id.* at 113.

ii.  "And even if an SVP or social media firm were willing to make the required intense resource commitments, adapting its platform to perform general search functions would take a long time to materialize." *Id.*

### 4.    Other *Brown Shoe* Factors

i.  "[N]ot every *Brown Shoe* factor is applicable because general search is a free product[.] [T]he court does not consider factors related to pricing." *Id.* at 110.

### 5.    Other Relevant Findings

i.  "No one disputes that an SVP can serve the same purpose as a GSE for an individual query on a particular subject matter.  A user can, for example, use either Google or OpenTable to find a nearby Japanese restaurant, or turn to Google or Amazon to shop for a blender.  But no SVP can fulfill a user's varied needs in the same manner as a GSE.  Few SVPs can provide answers to noncommercial queries or take a user to a desired location on the web through a navigational query.  And no SVP can answer long-tail queries like a GSE.  Thus, an SVP may be reasonably interchangeable with a GSE for a discrete purpose but for not the 'same purposes.'" *Id.* at 114.

ii.  "The fact that GSEs may compete for travel queries against Booking.com, shopping queries against Amazon, and local queries against Yelp," standing alone, "does not mean that firms that specialize in certain verticals belong in the same product market as GSEs. The fact that users 'cross-query' does not require all online query sources be lumped together in the same market." *Id.*

////

////

////

23

United States District Court
Northern District of California

**B.    Google's Monopoly Power in General Search Services**

"[T]he court concludes that Google has monopoly power in the general search services market." *Id.* at 124.

### 1.    Direct Evidence

i.    "Direct evidence" of Google's monopoly power in general search services "is limited." *Id.* at 118.  However, "Google admi[ts] that it does not 'consider whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product.' … The fact that Google makes product changes without concern that its users might go elsewhere is something only a firm with monopoly power could do." *Id.* (including FOF ¶ 134).

### 2.    Indirect Evidence – Market Share

i.    "By 2009, 80% of all general search queries, whether entered on a desktop computer or mobile device, flowed through Google. … That percentage had increased from 80% to 89.2% by 2020 … Google's share of search queries on mobile devices was even higher at 94.9% in 2020. … The percentage on desktop devices was 84%. … Google's second-place rival, Bing, receives roughly 6% of all search queries.  Bing (5.5%), Yahoo (2.2%), DDG (2.1%), and other rivals (0.9%) together see less than 11% of all queries.  Bing's market share has never risen above 12%." *Id.* at 38 (FOF ¶¶ 21-26) *see also id.* at 119 (relying on FOF ¶¶ 23-24, 25).

### 3.    Indirect Evidence – Entry Barriers

ii.    There are "several [entry] barriers to the general search services market: (1) high capital costs, (2) Google's control of key distribution channels, (3) brand recognition, and (4) scale.  The court finds that these barriers exist and that, both individually and collectively, they are significant barriers that protect Google's market dominance in general search." *Id.* at 119.

   o    "[A] startup could not raise enough money ... to build a very good, large-scale search engine because to build a competitive project is very expensive, amounting to a multi-billion dollar investment. … And those capital

24

expenditures are required *before* the additional, multi-billion-dollar investment needed to build and maintain an ad platform or other means of monetization" *Id.* at 120 (internal quotation marks omitted) (including FOF ¶¶ 50-52, 54-55).

o Prior to any implemented remedies, "Google control[ed] the most efficient and effective channels of distribution for GSEs." *Id.* (including FOF ¶ 59).

o "Record evidence firmly establishes that Google's brand is widely recognized and valued.  After all, 'Google' is used as a verb.  Even on Bing, "google.com" is the number one search." *Id.* at 121 (including FOF ¶¶ 130-32).

o "[S]cale is an important factor in search quality. … Google has a lot of scale, and new entrants struggle to obtain it. … Securing users to generate scale, in order to then exploit the benefits of scale, is a significant barrier to entry." *Id.* at 121 (including FOF ¶¶ 87, 89).

## V.    CONCLUSION

For the foregoing reasons, Yelp's Motion is **GRANTED IN PART** and **DENIED IN PART**.  Partial summary judgment is **GRANTED** to Yelp on the following portions of Counts I, II and IV:  General search services in the United States was a relevant antitrust market through August 5, 2024, and Google held monopoly power in that market from 2009 through that date.  In all other respects, Yelp's Motion is **DENIED**.

Pursuant to the Parties' stipulation as entered at Dkt. 88 regarding Yelp's request for this early, partial motion for summary judgment and the Stipulated Order Setting Further Case Schedule at Dkt. 110, Yelp is permitted to file one further motion for summary judgment no later than November 17, 2027.

**SO ORDERED.**

Dated: June 30, 2026

SUSAN VAN KEULEN
United States Magistrate Judge

United States District Court
Northern District of California

25